# EXHIBIT "A"

# DEPOSITION OF J. CAMPBELL

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

UNITED STATES OF AMERICA,       )
                                )
          Plaintiff,            )
                                )
     vs.                        )
                                )
ROBERT A. LONG,                 )
                                )
          Petitioner.           )
_____ )

Case No. 3:02CR-0031-JVS;
Case No. 3:04CV-00286-JWS

---

DEPOSITION OF JOEL CAMPBELL

---

May 10, 2007
9:26 a.m.

Taken at:
United States District Courthouse
222 West 7th Avenue, Courtroom 4
Anchorage, Alaska

Reported by:  Leslie J. Knisley
              Shorthand Reporter

A-8

JOEL CAMPBELL

e62f2d49-8c53-4184-8a1c-a8677927e838

1                          PROCEEDINGS

2                      JOEL CAMPBELL,

3         having been sworn, testified as follows:

4                          EXAMINATION

5         Q    (BY MR. DARMER)  Good morning,

6    Mr. Campbell.  Thank you for coming in today.

7    My name is Roman Darmer, and I'm the appointed

8    counsel for Robert Long in connection with

9    certain post-trial matters he has pending in

10   this court.

11                    Could we begin by asking you

12   during what period you served as a court

13   security officer in this district?

14        A    I know I quit two years ago, but I

15   don't remember when I started.  I'm serious.  I

16   don't remember the actual date, but I put in

17   about 20 years and a couple of months.

18        Q    Okay.  And you did retire two years

19   ago?

20        A    Yes.

21        Q    So, you think you were around during

22   the 2002 time period?

23        A    Yes.

24        Q    Okay.  Do you have any recollection of

25   the trial of Robert Long?

                                              **A-9**

JOEL CAMPBELL

1    A    To be real honest with you, no, I

2  don't.

3    Q    Okay.  All right.  Just very briefly,

4  while you were a court security officer, what

5  were your duties and responsibilities?

6    A    Well, the duties were, as you know,

7  you walk in, we man the post downstairs, Post 2,

8  sit in the courtrooms for keeping order and to

9  handle anything that the judge wants taken care

10  of.  Patrol the building; there were areas that

11  we had to patrol at different times.  I worked

12  the communications board for a week at a time,

13  and basically that's about it in a nutshell.

14    Q    When you say "communications board,"

15  does that mean the monitor room?

16    A    Yeah.

17    Q    Looking at the cameras?

18    A    The cameras, and you handle

19  communications for the CSOs that were on the

20  floor and incoming telephone calls.

21    Q    Okay.  During the period that you were

22  a court security officer, there were obviously

23  sometimes when you would be in court during

24  trial proceedings; is that correct?

25    A    That is correct.

**A-10**

JOEL CAMPBELL

e62f2d49-8c53-4184-8a1c-a8677927e838

1   that isn't done.  Judges don't got to juries

2   while they're impounded as a jury.  I mean, it

3   just doesn't happen.

4       Q    And you've never heard of that

5   anecdotally or informally, you know, whether

6   officially or unofficially, never heard of that

7   happening in this courthouse?

8       A    Not that I know of.

9       Q    And did you ever in the time that you

10  served as a court security officer have occasion

11  to make reports of unusual activities in the

12  courtroom to your supervisor?

13      A    Not in the courtroom, no.  I arrested

14  a guy one time and of course that takes a

15  report.

16      Q    I see.  So anything -- essentially

17  something unusual, out of the ordinary would

18  lead to a report or a --

19      A    That's correct.

20      Q    Okay.  And, again, you indicated you

21  don't have any specific recollection about

22  Mr. Long's trial or even whether you sat in it

23  at any point?

24      A    I couldn't tell you.  I mean, I

25  remember the name.  When it happened, I couldn't

1  tell you.

2      Q    Okay.  I've been informed in the

3  course of this matter that the court security

4  officers receive daily schedules, written

5  schedules, so that you know where you're going

6  to be assigned and in the event of a court

7  assignment you learn which courtroom you go to.

8  Do you recall that?

9      A    Yeah.  That came about -- we used to

10  get one schedule and everybody had to stand

11  there and write down times.  That came about

12  thanks to Bill.

13      Q    Mr. Potts?

14      A    Yeah.  And that was a great help.

15      Q    What would you personally do with your

16  hard copy schedules after the day was completed?

17      A    Throw them away.  I mean, they would

18  not be good for the next day and they weren't

19  worth a thing.

20      Q    And I take it you don't have any

21  knowledge one way or another whether Mr. Potts

22  or management maintained any copies of those

23  hard schedules?

24      A    I have no idea whether Bill saved any

25  or not.  I have no idea.

A-12

JOEL CAMPBELL

e62f2d49-8c53-4184-8a1c-a8677927e838

**DEPOSITION OF J. "SONNY" CAUDILL**

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

UNITED STATES OF AMERICA,            )
                                     )
            Plaintiff,               )
                                     )
      vs.                            )
                                     )
ROBERT A. LONG,                      )
                                     )
            Petitioner.              )
_____)

Case No. 3:02CR-0031-JVS;
Case No. 3:04CV-00286-JWS

_____

      DEPOSITION OF JAMES "SONNY" CAUDILL

_____


May 9, 2007
1:04 p.m.


Taken at:
United States District Courthouse
222 West 7th Avenue, Courtroom 4
Anchorage, Alaska




Reported by:  Leslie J. Knisley
              Shorthand Reporter



A-14

JAMES  "SONNY"  CAUDILL

6685f744-efe6-4b3e-9ab2-01a61fc344c7

Page 4

PROCEEDINGS

JAMES "SONNY" CAUDILL,

having been sworn, testified as follows:

EXAMINATION

Q    (BY MR. DARMER)  Good afternoon,
Mr. Caudill.  My name is Roman Darmer, and I'm
the court-appointed lawyer for Mr. Robert Long
in connection with the certain post-trial
proceedings that are going on in his case.  I
very much appreciate you coming in to answer
questions today.

A    You're welcome.

Q    If I could just briefly, I'm going to
ask the court reporter to mark as Exhibit 1 to
your deposition your affidavit you prepared some
time ago in connection with this mater.

(Exhibit 1 marked.)

Q    (BY MR. DARMER)  Before I ask you a
specific question about it, could you just
briefly state how long you've been a deputy
United States marshal in this district or in any
other jurisdiction?

A    I've been a deputy U.S. marshal for
just over ten years now.  I've been in the
district of Alaska for a little over four years.

JAMES "SONNY" CAUDILL

A-15

6685f744-efe6-4b3e-9ab2-01a61fc344c7

1     Q     Prior to that, where were you?

2     A     Birmingham, Alabama.

3     Q     Have you been in law enforcement prior

4  to the time you were a U.S. deputy marshal?

5     A     No, sir.

6     Q     All right.  Now, I note in your

7  affidavit, which is in front of you marked as

8  Exhibit 1, that in paragraph 1 you indicate

9  you've been assigned certain responsibilities

10  for the security of the judiciary in this

11  district --

12     A     Right.

13     Q     -- referring to Alaska.  What

14  specifically are your duties and

15  responsibilities here?

16     A     As a deputy U.S. marshal, we

17  continually have security-related matters

18  concerning the judiciary that we dealt with.

19  Approximately a year and a half ago I was

20  assigned full time as your judicial security

21  inspector, and in that role my primary mission

22  in the job is just handling security-related

23  matters for the courts, threats against judges,

24  building security, alarm system installations

25  and so forth.

**A-16**

JAMES "SONNY" CAUDILL

6685f744-efe6-4b3e-9ab2-01a61fc344c7

1    Q    Okay.  Now, you indicated you've been

2   here for four years, so you were not here, is

3   that correct, during the time that Mr. Long's

4   criminal trial actually occurred?

5    A    Right, that's correct.

6    Q    So, your thirst involvement with

7   Mr. Long's case related to the interview that

8   you participated in --

9    A    Right.

10    Q    -- that led to the affidavit here?

11    A    Yes, sir.

12    Q    Could you tell me how you first

13   learned or were requested to go have a

14   conversation with Ms. Crump related to this

15   case?

16    A    Yes, sir.  There was an affidavit that

17   came in concerning Robert Long's case, and it

18   was from Ms. Crump basically stating the

19   information concerning the judge's contact with

20   the jury during the trial.  Since that was

21   information that was contrary to what everyone

22   thought had happened, they requested myself and

23   Special Agent Payne with the FBI to go down and

24   conduct an interview with Ms. Crump, and

25   basically that's what we did.

A-17

JAMES "SONNY" CAUDILL

1     Q    Is "they" Mr. Cooper?

2     A    Right.  The courts and Mr. Cooper.

3     Q    Did you have conversation with any of

4 the judges with respect to the affidavit?

5     A    No, sir, I did not.

6     Q    Do you know if Mr. Cooper had

7 conversations with any of the judges in

8 connection -- and I'm just now talking about the

9 request to go interview Ms. Crump.

10     A    I'm not real familiar with what led up

11 exactly to the --

12     Q    Do you know why an FBI agent -- I

13 guess I'm jumping ahead.

14            Did someone accompany you on the

15 interview?

16     A    Right.  Special Agent Payne with the

17 FBI.

18     Q    Do you know how it came about that an

19 FBI agent accompanied you on this issue which

20 related to court issues?

21     A    That's fairly common.  A lot of the

22 times any time there's a threat against a judge

23 that is substantiated in any way, it's -- our

24 responsibility is primarily the security of the

25 judges.  The FBI is brought in as the

A-18

6685f744-efe6-4b3e-9ab2-01a61fc344c7

Page 8

1    investigatory side of the case.  They conduct

2    the investigation just to see if there's any,

3    you know, ill-doing.

4        Q    Criminal activity.

5        A    Right.  Yes, sir.

6        Q    I guess my question is:  By the time

7    you get involved in this and are asked to go

8    speak with Ms. Crump, Mr. Long has been

9    convicted.

10       A    Right.

11       Q    Has either finished serving his

12   sentence or he's on supervised release, but sort

13   of the criminal aspect of his case was over.

14   Was there some other concern about other

15   potential criminal activity?

16       A    I believe that the FBI was involved

17   because it was their case from the beginning.

18   They were involved throughout and they had the

19   involvement with Mr. Long, so it was just to

20   maintain continuity throughout the case, the FBI

21   was involved in this aspect also.

22       Q    Were you aware of any suggestion by

23   anyone, Mr. Cooper or anyone in the government,

24   Special Agent Payne, that Ms. Crump was in any

25   way a target or a suspect of any criminal

A-19

JAMES "SONNY" CAUDILL

6685f744-efe6-4b3e-9ab2-01a61fc344c7

1    activity?

2          A    Not a target of any criminal activity.

3    Our primary goal in going down there was just to

4    clarify what she had written in her affidavit

5    because it didn't correspond with what others

6    believed had happened during that time frame.

7    So that was our main purpose in going there,

8    just to clarify what was actually in her

9    affidavit.

10         Q    What other documents, if any, did you

11   review before you went down to do the interview?

12         A    Nothing, no other documents.

13         Q    What's the basis for your statement

14   that you had understood that what she wrote in

15   her affidavit was different or contrary to what

16   others recalled?

17         A    Just discussion with the U.S.

18   attorney's office and with Special Agent Payne.

19         Q    Okay.  So, not any kind of review of

20   the transcript?

21         A    No, sir.

22         Q    And was a script or kind of a set of

23   questions that were going to be asked prepared

24   prior to the trip down there?

25         A    No, sir.

**A-20**

JAMES "SONNY" CAUDILL

6685f744-efe6-4b3e-9ab2-01a61fc344c7

Page 10

1    Q    Did Mr. Cooper give you specific

2    questions that he wanted asked?

3    A    No, sir.  Just to go down and discuss

4    it with her and try to clarify what exactly did

5    happen and just get more information, basically

6    to add to her affidavit to see what really did

7    happen in her own words.

8    Q    Okay.  Were you aware before you went

9    down to do the interview that Ms. Crump had been

10   the third-party custodian for Mr. Long during

11   the pendency of his criminal case?

12   A    Yes, sir.  Somebody along the way --

13   this case has been discussed several times

14   throughout the year just in conversations in our

15   office, and at some point it was brought up that

16   Ms. Crump and he were good friends.

17   Q    Okay.  In that capacity is it your

18   understanding that Ms. Crump's address and phone

19   number was on file and known in the courthouse?

20   A    I'm sure it probably was.  I don't

21   have much -- I don't have much information

22   concerning that.  We knew where she worked and

23   that was where we located her at and had a

24   conversation with her after her working hours

25   were over.

A-21

JAMES "SONNY" CAUDILL

6685f744-efe6-4b3e-9ab2-01a61fc344c7

1    Q    Was there any attempt to communicate

2    with her beforehand, either by letter or by

3    phone call, to set up an appointment to let her

4    know that you'd be coming down to talk to her?

5    A    Not to my knowledge.  I'm not -- I

6    don't know of any other previous conversations

7    or contact.

8    Q    Who had primary responsibility -- I

9    understand your testimony that you and the FBI

10   because of your different roles were both

11   involved, but who had primary responsibility for

12   actually sort of getting this interview done?

13   A    Special Agent Payne was primarily in

14   charge of the interview.  I went with him as a

15   representative of the Marshal's Service.

16   Q    So, was it Special Agent Payne who

17   determined sort of the day you were going to go

18   and the time?

19   A    Primarily.  We discussed when it would

20   be favorable to both of our schedules and that

21   was a date and time that worked well with our

22   schedules at the time.

23   Q    Was there any discussion about trying

24   to sort of catch her off guard, trying to catch

25   her at a time when she didn't expect you?

A-22

JAMES "SONNY" CAUDILL

1    A    No, sir.  It was mainly just to go

2  there and speak with her and just clarify the

3  information that was in the affidavit and just

4  sit down with her for a few minutes and in her

5  own words discuss it.

6    Q    What discussion was there between you

7  and Special Agent Payne with Mr. Cooper, if any,

8  about who would be responsible for note taking

9  and preparing a report in connection with the

10  interview?

11    A    During the drive down, Special Agent

12  Payne and myself discussed that a little bit and

13  just for continuity he did the note taking and

14  he prepared the report.  And then we just

15  discussed the information so we would both

16  understand -- actually he sent me a copy of it

17  just so I could look it over and discuss with

18  him if there were any changes.

19    Q    And you're referring to the 302 report

20  that was ultimately prepared, which I'll show

21  you in a second?

22    A    Right.  Yes, sir.

23    Q    What is the marshal's policy, if any,

24  in terms of when a deputy U.S. marshal is out on

25  a fact-finding interview in terms of taking

A-23

JAMES "SONNY" CAUDILL

6685f744-efe6-4b3e-9ab2-01a61fc344c7

1   notes and preparing a report?

2      A    Primarily one individual will take

3   notes, and usually whichever agent or deputy --

4   they're the primarily deputy or agent for that

5   case, they handle the majority of the report

6   writing and note taking.

7      Q    Was there any discussion before you

8   went down to do the interview about how to

9   handle the situation in the event Ms. Crump

10  declined to cooperate?

11     A    No, sir.  That was something we both

12  understood to be her prerogative and she had the

13  option of speaking with us or not.  And she

14  spoke with us.  She was very forthcoming, very

15  open about our conversation with her.

16     Q    I gather from reviewing the 302 report

17  and from other testimony that you had a less

18  than friendly response from Ms. Crump's

19  supervisor at the coffee shop?

20     A    Yes, sir.

21     Q    Was it your intent, prior to going

22  down, to conduct the interview in the coffee

23  shop?

24     A    You know, we had basically planned

25  just to go into the coffee shop, sit down, and

A-24

JAMES "SONNY" CAUDILL

6685f744-efe6-4b3e-9ab2-01a61fc344c7

1    then if she had the opportunity to come sit with

2    us for a little while, just have a conversation

3    there about it on the spot, because we didn't

4    really foresee it taking but maybe 15 or 20

5    minutes to have a discussion about the

6    affidavit.

7              Whenever we went in, of course,

8    the owner of the establishment didn't like us

9    being there or contacting and talking with

10   Ms. Crump and basically asked us to leave.  We

11   asked Ms. Crump if we could wait until after she

12   was finished up with her shift, which was only

13   about 30, 40 minutes away and she said, sure.

14   She said she would be happy to speak with us

15   afterwards, and we waited in the vehicle outside

16   for her.

17        Q    Because the plan had been to talk with

18   her for 15 or 20 minutes in the coffee shop, I

19   take it you weren't concerned about the type of

20   questions that were going to be asked or the

21   nature of the questions, that it required some

22   sort of confidential location where third

23   parties would not be able to overhear somehow?

24        A    Right.  We had hoped that there would

25   be a corner or someplace where we could speak

JAMES "SONNY" CAUDILL

A-25

1  with her in private or semi-private, but we

2  weren't real concerned about anyone hearing the

3  discussion because it wasn't anything that was

4  of a secret matter anyway.

5      Q    Now, as it turns out, obviously you

6  did meet her after her shift ended.

7      A    Yes, sir.

8      Q    How did it come about that the

9  interview was conducted in one of your

10  vehicles -- or the vehicle you came down in as

11  opposed to at a table or in a corner of the

12  coffee shop as you just --

13     A    Well, since the owner of the

14  establishment did not want us to stay there and

15  discuss anything with her, we asked Ms. Crump if

16  she would come outside and speak with us

17  afterwards.  Our vehicle was parked just outside

18  the front door, so it was the most convenient

19  other location to discuss the interview.

20     Q    Did Ms. Crump indicate any kind of

21  discomfort or concern about stepping into the

22  vehicle to be interviewed?

23     A    No, sir.

24     Q    You indicated that you kind of went

25  down with the expectation that it would take 15

JAMES  "SONNY"  CAUDILL

A-26

6685f744-efe6-4b3e-9ab2-01a61fc344c7

1    or 20 minutes.  It didn't sound like you thought

2    it was going to be all that big a deal.

3        A    Right.

4        Q    But as it turns out, it took quite a

5    bit more time than that, right?

6        A    Once we started the interview, it took

7    a little bit over an hour, I believe.  And a lot

8    of the time, you know, as far as thinking it

9    would take 15 or 20 minutes, it just depends on

10   of course how long they desire to sit and speak

11   with us.  A lot of times we anticipate it might

12   be a 20-minute interview, but of course the

13   individual can cut it as short as a minute or it

14   could be hours in length.

15       Q    And here just the opposite happened,

16   right?  Far from declining to cooperate, she was

17   fully cooperative?

18       A    Yes, sir, she was.

19       Q    Was it the nature of the questioning

20   or the nature of the answers that led the

21   interview to go on for the length that it did?

22       A    I believe it was the nature of the

23   answers more so.  Whenever Special Agent Payne

24   started to inquire about the affidavit, she

25   started telling us the background of the story

A-27

JAMES "SONNY" CAUDILL

6685f744-efe6-4b3e-9ab2-01a61fc344c7

1  of what happened, as Agent Payne put it in his

2  302.  She started explaining the fact that she

3  had told Mr. Long about what she had seen and he

4  wanted to put it into an affidavit.  But

5  basically once it was actually put down on

6  paper, that all the information wasn't there

7  from what she had given him initially.  So she

8  basically took the time with us to expand on

9  that and fill in the gaps that had been left out

10 initially on the affidavit.

11      Q    So to provide more of the facts?

12      A    Right.  Yes, sir.

13      Q    Can you tell me where in the car

14 everybody was sitting?

15      A    Special Agent Payne was in the

16 driver's seat, Ms. Crump was in the passenger's

17 seat, and I was in the back seat.  We felt like

18 she would be more comfortable if she was sitting

19 up front with him.

20      Q    And were the car doors locked after

21 she got in?

22      A    No, sir.  She was free to leave at any

23 time.

24      Q    And whose vehicle was it?

25      A    It was Agent Payne's.

**A-28**

JAMES "SONNY" CAUDILL

6685f744-efe6-4b3e-9ab2-01a61fc344c7

1    Q    Okay.  Was the affidavit shown to her?

2    A    Yes, sir.  She looked over it and

3  basically explained to us that whenever -- that

4  she sat down with Mr. Long, gave him the

5  information of what had taken place, and he

6  wrote up the affidavit.  She at some point

7  discussed with him the fact that certain

8  information was left out.  And either she

9  believed or was led to believe that that

10  information would come out eventually once there

11  was discussion in court about what had taken

12  place.  And she just inquired about that, if it

13  would -- should be in the affidavit or not.

14    Q    Did you or Agent Payne make any

15  statements to her about how the information you

16  were obtaining from her was going to be used?

17    A    No, sir.  Basically we just explained

18  to her that we were there to discuss her

19  affidavit with her and to clarify information

20  and just basically to find out if what actually

21  happened that had been placed on the affidavit,

22  if all of the information was true and correct.

23    Q    But you knew that it was likely to be

24  used as part of an opposition or a pleading that

25  Mr. Cooper was going to be filing in the

1    post-trial motion practice that Mr. Long had

2    ongoing; is that right?

3        A    Basically we assumed that it would

4    come out at some point, and we explained to her

5    that also, that we were there just to expand on

6    it and to try to clarify.

7        Q    She didn't decline to answer any

8    question, correct?

9        A    No, sir.  She answered everything

10   completely to the best of her knowledge and what

11   she remembered at the time.

12       Q    And based on your training and

13   experience as a law enforcement officer, did you

14   find her credible?

15       A    Yes, sir, she seemed like she was

16   answering truthfully.  It seemed like she was

17   very up front about what had been left out and

18   how she felt it was perceived and the affidavit

19   in general.

20       Q    And was she also careful to explain

21   when she didn't have a clear recollection of

22   certain facts as opposed to other times when she

23   had a more clear recollection?

24       A    Yes, sir.  There were times when she

25   said that she just couldn't remember the dates

A-30

JAMES "SONNY" CAUDILL

6685f744-efe6-4b3e-9ab2-01a61fc344c7

1   or the time or when she felt like something

2   might have happened.

3      Q   And I take it she didn't strike you as

4   a particularly sophisticated individual?

5      A   No, sir.  Just seemed like an

6   every-day person.

7      Q   Not particularly highly educated or

8   certainly not with any legal training of any

9   kind?

10      A   No legal training, but she seemed

11   intelligent.  Seemed like she had a good grasp

12   of what was going on.

13      Q   At any point during the interview did

14   either you or Agent Payne feel the need to give

15   her any kind of admonition in terms of the

16   nature of her answers or the type of answers she

17   was giving?

18      A   Basically we just explained to her

19   that since it was an affidavit, it was a sworn

20   statement, that everything on there should be

21   factual.  But the information that was on there

22   didn't seem like anything was nonfactual; it

23   just seemed like she hadn't explained in depth

24   what had transpired.  We just explained to her

25   that everything she told us should be the truth

**A-31**

JAMES "SONNY" CAUDILL

6685f744-efe6-4b3e-9ab2-01a61fc344c7

1    A    No, sir.

2    Q    At the conclusion of the interview was

3    there any statement or suggestion made to her

4    that kind of dealt with the issue of perjury and

5    that she's lucky that her answers were what they

6    were, otherwise she might have been facing a

7    possible perjury charge?

8    A    I don't remember that.  It was a very

9    positive conversation.  Phone numbers were

10   exchanged at the end of the conversation, and we

11   told her that if she remembered anything else or

12   if she remembered any details to feel free to

13   give us a call.  It was a very positive

14   interview.

15   Q    And were the phone numbers exchanged

16   in the nature of more if she remembered anything

17   as a result of having her memory jogged she

18   should call you as opposed to you had given her

19   specific questions you wanted her to go back and

20   think about?

21   A    No, sir.  It was mainly just if she

22   remembered anything over the next few days while

23   she was thinking about what had taken place.

24   You know how it is.  Whenever you're not sitting

25   and having a conversation with somebody, things

JAMES "SONNY" CAUDILL

A-32

6685f744-efe6-4b3e-9ab2-01a61fc344c7

1    pop into your mind.

2        Q    Right.  And a substantial amount of

3    time had gone by, right, since the time of the

4    affidavit --

5        A    Right.

6        Q    -- and the time of your interview?

7        A    That's correct.

8        Q    Was there any suggestion by either you

9    or Agent Payne to the effect that if you hadn't

10   been satisfied with the answers or you felt that

11   they were inconsistent with her affidavit that

12   you would have arrested her on the spot or taken

13   her away on that day?

14       A    No, sir.  No, sir.  I don't believe

15   that was ever -- it was never stated nor I don't

16   believe it was implied in any way.

17       Q    I take it you had no such

18   conversations before the interview with Agent

19   Payne or Mr. Cooper or anyone else in the

20   U.S. Attorney's office about perjury issues or

21   charges?

22       A    No, no.  There was never any charge

23   information discussed.  It was just more of a

24   fact-finding interview.

25       Q    Okay.  Following the interview, who

A-33

JAMES "SONNY" CAUDILL

1    did you report the results of it to?

2         A    Actually Special Agent Payne wrote up

3    the report after the fact and e-mailed it to me,

4    and I reviewed it, and contacted him and told

5    him that I thought everything was stated as it

6    had taken place.  And that was the end of my

7    contact with the interview and the information

8    from that point on.

9         Q    So, is it correct, then, to say that

10   you had no substantive changes or

11   recommendations to the draft 302 that he had

12   sent to you?

13        A    No, it was a very complete, organized

14   draft of the interview as it had taken place, so

15   he had done a good job.

16        Q    Now, did you have an oral debrief or

17   follow-up conversation with Mr. Copper or

18   anybody in the U.S. Attorney's office after the

19   interview?

20        A    I don't believe we had a debrief.  I

21   have discussed it in passing with Mr. Cooper

22   several times, but no formal oral debrief or

23   anything.

24        Q    What about with anyone within the U.S.

25   Marshal's Service here in the district?

A-34

JAMES "SONNY" CAUDILL

1  information for myself.

2      Q    How did you prepare this affidavit?

3      A    Basically it was typed up with the

4  information from Special Agent Payne's

5  interview.  We just took that and basically put

6  more concise information on it here just to

7  relay the information just so that I would have

8  a copy of what I was swearing to also.

9      Q    And the "we" then being you and

10  Mr. Cooper?

11      A    Yes, sir.

12      Q    Who physically typed it?

13      A    You know, I don't recall.  I don't

14  recall if I typed it or if Mr. Cooper's office

15  did.

16      Q    Was your affidavit provided to Special

17  Agent Payne before you finalized it?

18      A    I don't believe so.  I don't know if

19  it was or not.  If it was, it would have been

20  through the U.S. Attorney's office.

21      Q    But you had Special Agent Payne's

22  302 --

23      A    Right.

24      Q    -- with you in the course of your

25  preparation of this?

A-35

JAMES "SONNY" CAUDILL

6685f744-efe6-4b3e-9ab2-01a61fc344c7

1    A    Right.

2    Q    And that's what you were looking to

3    for the basic facts?

4    A    Right.

5    Q    And did this affidavit go through

6    numerous drafts?

7    A    Like I said, I don't recall if I did

8    the formal drafting of it or if the U.S.

9    Attorney's office did through the information

10   I'd given them.  It's been a couple years ago or

11   year and a half ago, so I don't recall the

12   details.

13   Q    That's the mantra of everything in

14   this case.  It was all years ago.

15        I'm going to just refer you to a

16   couple of sentences.  The first reference is

17   page 3, paragraph 7, the second sentence.

18   There's a reference to, Mrs. Crump stated

19   repeatedly during the interview that she did not

20   believe she ever saw or heard the judge do

21   anything improper during the trial of Mr. Long.

22   A    Right.

23   Q    Again, on page 4, paragraph 8 --

24   excuse me -- paragraph 9 there's a reference to,

25   Ms. Crump stated again that she did not believe

JAMES "SONNY" CAUDILL

A-36

6685f744-efe6-4b3e-9ab2-01a61fc344c7

1    that she saw the judge do anything improper.

2         A    Right.

3         Q    There may be other references in your

4    affidavit to that.  I take it it's your

5    testimony that she did in fact make such

6    statements?

7         A    Right.  Yes, sir.  Several times she

8    stated that, because whenever we gave her the

9    affidavit and she read through it, it was -- she

10   basically said that whenever she gave Mr. Long

11   the information initially that he sat down and

12   took the information and typed it up.  I believe

13   she scanned through it and saw that information

14   was left out and she inquired about that, but

15   went ahead and signed it anyway.

16              She said whenever she went back

17   and read it just at face value for the

18   information that it was, she said it did sound

19   negative and that there was some improper

20   actions that had taken place.  I believe she

21   wanted to reiterate several times in the

22   conversation that that was not the case, that

23   nothing that she saw during the proceedings

24   seemed improper to her or she thought could be

25   construed as anything improper at all, but that

JAMES "SONNY" CAUDILL

6685f744-efe6-4b3e-9ab2-01a61fc344c7

1    it sounded like it was with the affidavit the

2    way it was worded.  So there were numerous times

3    that she stated that she didn't think anything

4    improper had actually taken place.

5         Q    So it's your testimony that that type

6    of flavor of testimony or statements by Ms.

7    Crump was coming from her as opposed to answers

8    in response that you and Agent Payne might have

9    posed in terms of do you think any improper

10   conduct occurred?

11        A    No, it was coming from her definitely.

12   Of course, the questions that we were asking her

13   were -- her responses were -- she said that

14   quite a few times, because we tried to go over

15   it in depth to make sure that there wasn't any

16   improper actions that had taken place.  So she

17   just repeatedly --

18        Q    Did you get the sense that she made

19   responses like that because she was concerned

20   that you all thought that she had done something

21   bad or wrong?

22        A    I think she was concerned -- because

23   once she took the time to read the affidavit

24   just as it stood on its own, she felt that it

25   sounded like she was saying that there were some

JAMES "SONNY" CAUDILL                    A-38

1  improper actions.  But I think she really wanted

2  to reiterate that she didn't feel that there

3  was.  She wanted to make sure that we understood

4  that she wasn't lying on the affidavit, because

5  I think she was concerned about that.

6        Q    And is that because you had made some

7  kind of admonition to her at the beginning about

8  what could happen if she was found to be lying?

9        A    I remember that we discussed an

10 affidavit being a -- that you were having to

11 tell the truth, that you were sworn.  She

12 understood that.  I think she was concerned more

13 so -- you know, Special Agent Payne is a lot

14 like myself.  He's kind of laid back, kind of

15 soft-spoken.  Neither of us are very aggressive

16 whenever we're interviewing someone, especially

17 for information like this.  And I don't feel

18 like she ever felt pressured and I don't -- I

19 believe we mentioned that, of course, it being a

20 sworn statement that she did have to tell the

21 truth, but we were never pressuring her to --

22       Q    Respond in a particular way?

23       A    Right.  Yes, sir.

24       Q    Based on your training and experience,

25 having interviewed hundreds, maybe thousands of

JAMES "SONNY" CAUDILL

6685f744-efe6-4b3e-9ab2-01a61fc344c7

1   people during your law enforcement career, do

2   you think Ms. Crump is in a position to

3   determine one way or another whether what she

4   saw was improper or not?

5       A    She's not.  She really isn't from what

6   legal background she has.  She was just telling

7   us what she felt, that everything she saw she

8   felt like that it was not improper discussions

9   because she was saying that what she remembered

10  the judge stating was very short and brief, and

11  basically things would be discussed in the

12  future or that they would have to read through

13  their packets or something of that nature.

14      Q    Given that answer, though, that you

15  didn't really believe she was in a position to

16  determine one way or another whether what she

17  had seen or heard was improper, what was your

18  view as to why that was relevant to include in

19  your declaration?

20      A    Because that was our primary reason

21  for being there, to see what she had actually

22  seen and to -- it was just the way she worded it

23  on several occasions that she didn't feel

24  like -- and it was probably in response to our

25  questions, but that she didn't feel like

JAMES "SONNY" CAUDILL

A-40

6685f744-efe6-4b3e-9ab2-01a61fc344c7

Page 33

1    anything improper had taken place.  I think

2    probably watching enough Court TV and things

3    like that, a lot of people do realize what is

4    proper and is not proper in the courtroom.

5        Q    And that understanding is often

6    incorrect, though?

7        A    Right.

8        Q    Or based on misunderstanding or

9    misperceptions, right?

10        A    Right.

11        Q    Were any of your questions or the

12    questions of Special Agent Payne phrased in

13    terms of, you know, you're accusing Judge

14    Sedwick of misconduct, or you're accusing Judge

15    Sedwick of a serious action, anything like that?

16        A    I don't remember any questions being

17    phrased in that way.

18        Q    Or suggesting somehow that by making

19    the statements she had that she was besmirching

20    or somehow impinging on his good reputation?

21        A    No, no, sir.

22        Q    And it's your testimony you hadn't had

23    any discussions or communications with Judge

24    Sedwick --

25        A    No.

                                        **A-41**

JAMES "SONNY" CAUDILL

6685f744-efe6-4b3e-9ab2-01a61fc344c7

1      Q    -- about this at all?

2      A    Right, that's correct.  I did not.

3      Q    Okay.  At the conclusion of the

4 interview, did you or Agent Payne tell her or

5 give her any direction as to who she could or

6 could not speak to about this?

7      A    No, sir.

8      Q    Okay.  And as far as you know, were

9 there any other attempts to contact or

10 communicate with Ms. Crump after that?

11     A    Not from myself.  I'm not sure if

12 anybody else attempted to, but not to my

13 knowledge.

14     Q    And she never called you back?

15     A    No, sir.

16     Q    And you never had occasion to call her

17 back?

18     A    No, sir, I did not.

19     Q    Let me ask you -- a slight different

20 topic for a moment.  I realize you've only been

21 in this district for four years.

22     A    Right.

23     Q    Can you explain to me the

24 administrative process for assignment of

25 particular marshals or CSOs to particular

JAMES "SONNY" CAUDILL

6685f744-efe6-4b3e-9ab2-01a61fc344c7

Page 35

1    courtrooms when trials occur?

2        A    You know, with our office it's

3    almost -- we have so few deputies in this

4    district, almost every deputy and every court

5    security officer will at one point, especially

6    on a lengthy trial, be in there just because of

7    the rotation and the manpower that's available.

8    There's no real criteria for selecting a deputy

9    or a CSO that's going to go into a certain

10   courtroom.  It's more availability than

11   anything.

12       Q    And that's been true your entire time

13   here?

14       A    Right.  Yes, sir.

15       Q    So there's not a lead deputy or lead

16   CSO for a particular trial or a particular

17   courtroom?

18       A    No, sir.  No, sir.  Our supervisor in

19   our operations side would basically assign

20   somebody at the beginning of the day to start

21   the trial, and then usually it's every hour or

22   so there would be a rotation, and I believe the

23   court security officers do it the same way.

24   They rotate fairly regularly during the course

25   of a trial.

A-43

JAMES "SONNY" CAUDILL

6685f744-efe6-4b3e-9ab2-01a61fc344c7

1    Q    The rotation to get people bathroom

2    breaks and a break?

3    A    Right.  Yes, sir.

4    Q    And as far as you know, is there any

5    written record of who was assigned to a

6    particular courtroom, either at the beginning

7    and then as the trial days go on?

8    A    The court security officers keep a

9    fairly accurate record of who is, like, roving,

10   who is in different courtrooms throughout the

11   day.  I'm not sure exactly how long they keep

12   those documents, but they're pretty good about

13   keeping up with who is where.

14   Q    Is that because they want to make sure

15   people get their appropriate breaks or just

16   because they want to know where people are

17   during the day?

18   A    I'm not sure exactly.  It's one of

19   their policies that they keep a record.  And it

20   also shows who's coming into the courthouse,

21   who's coming into our cell block, different

22   things like that.  So it's not just a record

23   of --

24   Q    The trial goings on.

25   A    Right.  It's daily activities.

A-44

JAMES "SONNY" CAUDILL

**DEPOSITION OF T. CRUMP**

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )
                                   )
     vs.                           )
                                   )
ROBERT A. LONG,                    )
                                   )
          Petitioner.              )
_____    )

Case No. 3:02CR-0031-JVS;
Case No. 3:04CV-00286-JWS

_____

                DEPOSITION OF TINA CRUMP

_____

                    May 9, 2007
                    11:17 a.m.


                    Taken at:
          United States District Courthouse
          222 West 7th Avenue, Courtroom 4
                Anchorage, Alaska




Reported by:   Leslie J. Knisley
               Shorthand Reporter


A-46

TINA CRUMP

Page 5

1    answer, make sure you answer with words because

2    the court reporter can't pick up gesture or nods

3    or something like that.  If we don't hear an

4    answer, we'll ask you to state an answer for the

5    record, okay.

6              Also, it's better if we don't

7    talk over each other, so that the court reporter

8    can get a clean record.  I'll try my best and

9    I'm sure Mr. Cooper will, not to interrupt you,

10   if you'll do the same.  If at any time you don't

11   understand a question or don't understand a word

12   or something that's being referred to, please

13   ask for a clarification.  The most important

14   thing here is that we get a clean and clear

15   record.  We want you to make sure you understand

16   the question that you're trying to answer.

17             Do you have any questions at all

18   before we begin?

19        A    No.

20        Q    Now, you're appearing here

21   voluntarily; is that correct?

22        A    Yes.

23        Q    Are you clear today, not on any kind

24   of medications or anything that would cloud your

25   judgement or ability to understand what's going

TINA CRUMP

A-47

9e55b50f-6f15-4ff6-8a1f-ea1de6c04425

1    day and that I needed to call, you know, to set

2    up the appointment with you.

3        Q    Right.  Now, Ms. Crump, you attended

4    the trial of Mr. Long; is that correct?

5        A    Yes.

6        Q    And did you attend all three days,

7    four days?

8        A    I believe, I mean, I was his third

9    party.  When I wasn't with him, he was with

10   Mr. Dieni, so we'd switch off and on.  I would

11   drive him back and forth to the -- I was his

12   driver.

13       Q    And you were going back and forth to

14   Seward each night?

15       A    Yes.

16       Q    Did anyone else come up with you on

17   those days?  Any relatives of yours or any other

18   friends?

19       A    No, no.  Just him and I.

20       Q    And were you actually present in the

21   courtroom during all the trial proceedings?

22       A    Yes.

23       Q    Okay.  Now, you're aware that the

24   issue we want to discuss with you today is the

25   issue of what you saw -- what you say you saw in

TINA CRUMP

9e55b50f-6f15-4ff6-8a1f-ea1de6c04425

Page 8

1    terms of a communication between Judge Sedwick

2    and some of the jurors; you're aware of that,

3    right?

4        A    Yes.

5        Q    Okay.  And at some point did you

6    complete an affidavit about what you saw?

7        A    Yes.

8        Q    Okay.  I'm going to ask the court

9    reporter to mark that affidavit, and then I'm

10   going to ask you some questions about it, okay.

11                (Exhibit 1 marked.)

12       Q    (BY MR. DARMER)  Ms. Crump, the court

13   reporter has handed you what's been marked as

14   Exhibit 1 to your deposition.  Could you take a

15   look at that document.  Feel free to read it

16   over.  Why don't you go ahead and take a read.

17       A    Okay.

18       Q    Okay?

19       A    Yes.

20       Q    Have you had a chance to read it over?

21       A    Uh-huh.

22       Q    And referring you to the second page

23   of the document, please, there's a handwritten

24   signature over your name; is that your

25   signature?

**A-50**

TINA CRUMP

9e55b50f-6f15-4ff6-8a1f-ea1de6c04425

1  A  It is.

2  Q  And there's a handwritten date,

3 5/18/05.  Is that the date you signed it?

4  A  It is.

5  Q  And are the statements in here true

6 and correct reflections of what you observed in

7 the courtroom?

8  A  Pretty much.  I mean, on here -- I

9 didn't type this honestly.  I did not type this.

10  Q  Let me ask you about that:  Tell me

11 the circumstances by which this affidavit was

12 prepared.

13  A  I was working as a waitress at the

14 Marina Restaurant and there was -- the

15 conversation -- it's mostly correct on here.

16 There was a conversation going on in the coffee

17 shop.  Sitting around a U-shaped bar, people

18 were talking back and forth and I was working.

19    Then all of a sudden the part

20 came up here, you know, and I just mentioned,

21 oh, that's not correct.  You can't do that.

22 Well, what do you mean?  Well, something similar

23 happened, you know, with your court case.

24    Told him a little bit about it,

25 what I had seen, remembered, and then I just

TINA CRUMP

A-51

9e55b50f-6f15-4ff6-8a1f-ea1de6c04425

1  went off, you know.  Pouring coffee, never

2  thought anything of it.  Didn't think too much

3  about it because I didn't think it was anything.

4            Then all of a sudden he said,

5  wait, wait, wait, wait, wait; what do you mean

6  exactly?  I said, well, I came back in the

7  courtroom and, you know, there wasn't too many

8  people in there.  I thought maybe I shouldn't be

9  in here and was kind of thinking, well, maybe I

10 should leave.  Because I would go out and then

11 everybody would come -- you know what I mean --

12 and there was --

13      Q    You're referring to out of the

14 courtroom at the trial?

15      A    Out of the courtroom.  I came in and I

16 was standing there.  I thought, well, because

17 Mr. Dieni and Mr. Long were together, so I

18 didn't have to be a third party.  So I didn't

19 really know what I was supposed to be doing.

20            I left and I came back in and,

21 like I said, there was just a few people in

22 there.  And so I snuck over and sat down and,

23 you know, stayed there.  Then I told him

24 happened here.

25      Q    Him who?

A-52

TINA CRUMP

9e55b50f-6f15-4ff6-8a1f-ea1de6c04425

1    A    Mr. Long.  And told him the rest of

2    the story.  He typed it up, and he wanted me to,

3    you know, he said, read over this.  I says,

4    well, pretty much, you know.  So I was working

5    and stuff and just kind of -- I didn't, you

6    know, sign my name to it.  And that was all.  I

7    didn't realize this, you know, I thought this

8    is -- I did not realize it was going to come to

9    this, you know.

10    Q    Let me make sure I understand a couple

11    of things.

12    A    But not that it was a lie or anything

13    like that.  But like I said, if I would have

14    known that this was going to do this, I would

15    have typed my own affidavit out.  Because, you

16    know, on part of this it says -- I just would

17    have worded it a little different, that's what I

18    can say on this, in my own writing.

19    Q    When you say you would word it a

20    little differently, what do you mean?  Would you

21    add different facts or would you change any

22    facts?

23    A    Change a few little facts on here --

24    not facts, actually the way it was prepared.

25    Because it's assuming things on this paper that,

TINA CRUMP

A-53

9e55b50f-8f15-4ff6-8a1f-ea1de6c04425

1    on?

2        A    No medications, nothing.

3        Q    Okay.  Now, as I indicated earlier,

4    you and I have spoken a couple times on the

5    phone prior to today in order to set up this

6    time for you to have your deposition taken; is

7    that right?

8        A    Yes.

9        Q    And other than that, we haven't had

10   any conversations about the substance of the

11   proceeding or of the testimony; is that correct?

12       A    Yes, none at all.

13       Q    Have you spoken with anyone else in

14   connection or in preparation for coming here

15   today?

16       A    Just my mom.  She's watching my

17   children.  That's all.

18       Q    But, I mean, about the substance of

19   the testimony or about the events relating to

20   Mr. Long?

21       A    No.

22       Q    And have you spoken to Mr. Long about

23   your testimony here today, other than the fact

24   that you were coming?

25       A    No, not about -- just telling me what

TINA CRUMP

1  you know, it's like the judge and jury were

2  talking about mental statuses and this and that,

3  and that was -- it's presumed, it looks bad the

4  way it was written.

5          Whereas, in fact, what I did see

6  is a person raised their hand, okay, they were

7  sitting there.  A person is raising their hand,

8  what are you going to do?  And they asked, you

9  know, are we supposed to be, you know -- are we

10  supposed to be evaluating him on his mental

11  status?  What are we supposed to do?  And the

12  judge basically said, you have a packet, refer

13  to your packet.  Refer to your packet, you know,

14  and that's it.

15          I didn't, you know, and that was

16  it.  There was nothing to do.  The jury was

17  confused on what they were supposed to do and he

18  told them, look, you've got a set of

19  instructions right there, and that's it.  Refer

20  to your packet.  That was basically, you know,

21  the stuff that went on there, and then this

22  sounds worse than it is.

23          And when I was asked before by

24  the marshals, they asked me, do you think that

25  this caused a, you know -- a -- how do you say

1    this?  Do you think it helped or hindered his

2    case?  And I said, by saying that, no.  The way

3    this sounds, it's that Judge Sedwick by saying,

4    you know, talking about mental status, that it

5    made it have -- I don't know -- altered his case

6    or something.  Made him guilty or something.

7                    I'm sorry.  I'm speaking

8    terrible.  I haven't had enough coffee today.

9    But that's what it was on that.

10        Q    Let me see if I can try to break some

11    of that down.

12        A    Okay.

13        Q    First of al, you're not an attorney;

14    is that correct?

15        A    No.

16        Q    And you have no legal training?

17        A    No.

18        Q    Have you ever participated either as a

19    juror or a witness in any other trial other than

20    Mr. Long's?

21        A    Currently I'm going to be going to

22    court on another case, but it's my own.

23        Q    Prior to the time --

24        A    Just as a third party.  With my

25    brothers, I was a third party for them and for

TINA CRUMP

A-55

9e55b50f-8f15-4ff6-8a1f-ea1de6c04425

Page 14

1    Mr. Long.  That's all.

2        Q    When you say "third party," you mean

3    for purposes of their bail bond, being able to

4    be a surety for them that they come to court?

5        A    Yes.

6        Q    Okay.  Going back to your affidavit

7    for a moment.  Is it correct that the factual

8    statements in here related to what you saw in

9    terms of the questions being asked --

10       A    Yes.

11       Q    -- and the statements by Judge

12   Sedwick, that those are accurately reflected in

13   your affidavit, but that some of the

14   characterizations of that in here are what you

15   might have changed or done differently had you

16   been drafting it yourself?

17       A    Yes.

18       Q    Are there any factual changes or

19   additional facts that you would want to have in

20   here to make it more complete with respect to

21   what you saw or what you heard?

22       A    Yes.

23       Q    And what would that be?

24       A    When I came back in the room, it says

25   there was just two -- where does it say

A-56

Page 19

1    be discussing his mental status?  And, refer to

2    your packet.  And like that, and that's the

3    questions.  I wouldn't put in here specifics.

4         Q    I see.  As opposed to what you view as

5    general --

6         A    Yeah.

7         Q    Okay.

8         A    And where it says, only Judge

9    Sedwick -- which is one, two, three, four lines

10   down, only Judge Sedwick, the jury and the two

11   guards were in there.  There was a few other

12   people, like I say, in the audience there.  I

13   don't know who they were.

14        Q    Is it correct that other than yourself

15   and Mr. Long and the defense lawyer, you didn't

16   know any of the other spectators?

17        A    I didn't know any of them.

18        Q    Are you aware whether or not they were

19   friends or people who knew Mr. Long?

20        A    I don't think they knew Mr. Long

21   because he didn't say hi or anything to them.

22   If I recall, they were in suits and stuff, you

23   know, so I'm not sure.

24        Q    Who they were?

25        A    Yes.

                                        A-57

TINA CRUMP

9e55b50f-6f15-4ff6-8a1f-ea1de6c04425

1    of shocked actually when I found out that I was

2    going to be up here today.

3        Q    Okay.  One more question about when

4    this was prepared.  You indicated that the

5    discussion occurs in the coffee shop.

6        A    Uh-huh.

7        Q    And you provided the information to

8    Mr. Long about what you'd seen.

9        A    Yes.

10        Q    How soon after that did he present you

11    with the draft affidavit?

12        A    I think, if I can remember correctly,

13    I think it was a couple of days.  A day or two,

14    I guess.

15        Q    And did you read it carefully before

16    you signed it?

17        A    Honestly, no.  I mean, I kind of read

18    it and I was working and pouring coffee, and I

19    kind of read it and kind of glanced over it.

20    And I thought, well, basically I thought it was,

21    you know, correct, basically.  But like I said,

22    I should have read it carefully.  I should have

23    maybe typed my own affidavit.

24        Q    Okay.  And you came to that conclusion

25    later after the agents came to speak with you?

TINA CRUMP

9e55b50f-6f15-4ff6-8a1f-ea1de6c04425

1    A    Yes.

2    Q    Okay.  And did you at the time that

3  you signed the affidavit know what purpose it

4  was going to be used for?

5    A    Probably his case, but I didn't -- I

6  didn't -- I thought maybe it was going to be --

7  what do you call?  Just, well, I thought it

8  might be used in his case -- not in his case,

9  but in his evidence or something over here if he

10  ever needed it.

11    Q    But you didn't know exactly how it was

12  going to be used?

13    A    No.

14    Q    Is it fair to say that Mr. Long had a

15  lot going on in his various litigations related

16  to his case?

17    A    Yes.

18    Q    Did you keep track of all those?

19    A    No, no.

20    Q    You just heard about them from time to

21  time?

22    A    Yes.  But like I said, he would come

23  in and he would type there.  When he came in

24  there, he didn't really talk about his case a

25  lot.  It was always somebody bringing the

TINA CRUMP

A-59

9e55b50f-8f15-4ff6-8a1f-ea1de6c04425

Page 24

1  subject in and everybody would get going on a

2  subject.  You know, just the morning gossipy

3  stuff.  But he would sit and type about his

4  stuff.

5      Q    Ms. Crump, is there any doubt in your

6  mind that you did see the judge have a

7  communication with the jurors on that day in the

8  federal courthouse in Anchorage?

9      A    What I believe I saw was, like I say,

10 coming in the -- what I told you is what I saw

11 there.  It's not -- I don't know if it was ex

12 parte or whatever it was.  I don't know if it

13 was that.  I just came in.  I didn't see the

14 lawyers there.  I was kind of wondering if I

15 shouldn't be in here.  Sat down.  One juror

16 raised his hand, he said that, and that was the

17 end of it.  Pretty soon everybody came in and

18 that was all.

19     Q    You used the pronoun "he said"

20 something.  Do you recall whether it was a male

21 or a female juror who --

22     A    I believe it was a male.  I think

23 there was another lady over here.  They were

24 sitting like this (indicating), and there was a

25 male over here that asked that.  I believe

TINA CRUMP

9e55b50f-6f15-4ff6-8a1f-ea1de6c04425

Page 25

1    another lady raised her hand -- I don't know --

2    after he said something like, follow the packet,

3    look at your packet.

4                Now, there was something else

5    that was said, and I cannot say this was --

6    where this was in the trial.  I cannot say and I

7    don't want to -- at one time I remember there

8    was a person that said, could we have the whole

9    transcript?  Asked for the whole transcript

10   instead of the little excerpts, because on the

11   screen there were sections that were yellowed

12   out or whatever.  I know that some of the people

13   had asked, could we have the whole transcript?

14       Q    But with respect to that --

15       A    I can't tell you exactly where that

16   is.  That's another statement that was made, but

17   I don't remember if -- I can't say that

18   everybody was there or not on that.  But that's

19   what I do remember.

20       Q    Whereas with respect to the other

21   comments which you've described here today and

22   which you've related in your affidavit, you have

23   a specific recollection for those, you didn't

24   see Mr. Long and his defense lawyer in the

25   courtroom at the time they were made?

A-61

TINA CRUMP

9e55b50f-6f15-4ff6-8a1f-ea1de6c04425

1    A    Right.

2    Q    Is that fair to say?

3    A    Yes.

4    Q    Okay.  Let me ask you about the

5 interview or the discussion you had later with

6 the marshal or the agents that you've described

7 here today.

8            Do you remember approximately

9 when that took place?

10    A    No.

11    Q    Where did that take place?

12    A    I would say -- well, I shouldn't say

13 no.  I think it was a couple years ago, I

14 believe.  I don't know the date or time or

15 anything.

16    Q    A couple years after you executed your

17 affidavit?

18    A    Yeah, it was after that, maybe a year.

19 Honestly, I don't recall.  I was working and

20 they came in the restaurant and sat in the back,

21 had suits and stuff.  I went back there to wait

22 on them, and they told me who they were.

23    Q    What did they say?

24    A    They were very nice, actually.  They

25 said, I need to speak with you.  Okay, you know.

TINA CRUMP

A-62

9e55b50f-6f15-4ff6-8a1f-ea1de6c04425

1    And they said, I'm so and -- I can't remember

2    their names.  So-and-so agent.  And I said, oh,

3    no, what did I do?  What did I do?  I don't know

4    that I did anything.  They said, this is

5    regarding Mr. Long.  I thought, okay.  I didn't

6    really know what that was about at the time.  I

7    didn't have -- I didn't know it was going to be

8    about an affidavit or anything at that exact

9    moment.  They were very nice, and my boss wasn't

10   very nice to them.

11        Q    Because you were working at the time?

12        A    Because they asked if she could watch

13   the place for about a half-hour, you know, just

14   pour coffee and stuff like that while I talked

15   with them.  And she got all bent out of shape

16   about it.  So what they did is they left, you

17   know, and after I got off work, they were

18   waiting outside.

19        Q    Had they attempted to contact you by

20   telephone or letter to set up the call before

21   you saw them in the coffee shop on that day?

22        A    No.

23        Q    That was the --

24        A    I mean, I hadn't received anything in

25   the mail or talked to them.  I didn't know who

TINA CRUMP

A-63

9e55b50f-6f15-4ff6-8a1f-ea1de6c04425

Page 28

1    they were.

2        Q    Okay.  And you agreed to speak with

3    them after your shift got out?

4        A    Yes, I did.

5        Q    And how many were there?

6        A    There was two.

7        Q    Where did you ultimately meet with

8    them to talk about what they wanted to talk to

9    you about?

10       A    In their car -- or I think it was like

11   a --

12            MR. COOPER:  Can we take a quick

13   break for just a second?

14            MR. DARMER:  Absolutely.

15            (Break taken.)

16            (Question was read back.)

17       A    It was a van, I believe.

18       Q    (BY MR. DARMER)  Where was the van?

19       A    Right outside the Marina Restaurant.

20       Q    And they asked you to step into the

21   van to talk with them?

22       A    Yes, yes.

23       Q    And did you feel that you had a choice

24   in terms of stepping into the van to talk with

25   them?

A-64

TINA CRUMP

9e55b50f-6f15-4ff6-8a1f-ea1de6c04425

Page 29

1    A    No.  I knew they were going to talk

2    with me and either I could go in the van with

3    them or we could probably meet somewhere else.

4    They were very polite, but I knew that we were

5    going to talk especially since they waited

6    outside.  You know, I thought they were gone.

7    Q    How long had they waited?

8    A    They might have went and had lunch

9    somewhere else, but a couple of hours, two or

10   three hours, I think, because my shift was done

11   and I walked outside the door and they were both

12   standing by the door.  I thought, oh, okay.

13   Q    Once you got into the van, who was

14   asking you the questions?

15   A    I don't remember.  I don't.

16   Q    Was it still just the two individuals?

17   A    Yes.

18   Q    Did you see any kind of tape recording

19   or other recording device in the van while you

20   were in it?

21   A    I don't recall seeing one, but -- I

22   was sitting here in the passenger's seat, and

23   there was a person in the driver's seat, and

24   there was a person right here, sitting right

25   here behind (indicating).  And the person up

TINA CRUMP

A-65

9e55b50f-6f15-4ff6-8a1f-ea1de6c04425

1  here was writing, and I believe he said it was

2  going to be recorded.  I didn't see anything,

3  though.

4      Q    Just to make sure for the court

5  reporter that we're clear about where people

6  were sitting.  You say you were sitting in the

7  passenger's seat.  You mean the front

8  passenger's seat of the van?

9      A    Yes.

10     Q    And one of the other individuals was

11 in the driver's seat of the van?

12     A    Yes.

13     Q    And you pointed sort of over your

14 shoulder and said, the other one was back there.

15 Can you describe where that person was?

16     A    In the center.

17     Q    Of the seat behind, back seat?

18     A    Uh-huh.  He was kind of right back --

19 he was closer to me, and he was sitting kind of

20 in the center, as far as I can remember, right

21 in the center.

22     Q    You made reference to someone writing.

23 Which person in which seat was writing?

24     A    The person in the driver's front seat

25 was writing, taking notes, and the person in the

TINA CRUMP

A-66

9e55b50f-6f15-4ff6-8a1f-ea1de6c04425

Page 32

1      Q     Were you shown any documents?

2      A     No -- oh, I'm sorry.  Yes, the

3  affidavit.  I'm sorry.

4      Q     The one that's been marked as Exhibit

5  1?

6      A     Yes.

7      Q     Were you shown any other documents?

8      A     No.

9      Q     And what was the nature of the

10  questioning?

11     A     About the affidavit that I wrote.

12     Q     Okay.  So, did they take you through

13  line by line, or how did it go?

14     A     They didn't -- they asked me just a

15  set of questions.  I -- it was basically like

16  your questions.  I mean, just generalized

17  questions.  What did you see?  You know.  It

18  wasn't just line for line off this.  It was not.

19     Q     And approximately how long did this

20  interview go on?

21     A     About an hour and a half, two hours,

22  and they said they apologized for taking, you

23  know, so long.  But I was answering the

24  questions and stuff, so it took a little bit of

25  time.

A-67

TINA CRUMP

9e55b50f-6f15-4ff6-8a1f-ea1de6c04425

1    Q    At any point did you ask for a break

2    or to make a telephone call or to leave?

3    A    No, I just wanted to get finished with

4    everything at that time.

5    Q    And that's a fair amount of time to be

6    sitting in there.  Were there some questions

7    that were asked more than once?

8    A    Yes.  I mean, to get definition on

9    them, there were.

10    Q    Can you remember any of the ones that

11    were asked more than one time?

12    A    The questions maybe about what I saw

13    in the courtroom, details, okay.  Now, what

14    about this?  What about that?  Like I said, I

15    don't really recall, but I remember on certain

16    areas like that they were wanting detail, you

17    know, to specify, because on some parts it's not

18    clear.

19    Q    Did they tell you why they had been

20    sent to interview you?

21    A    Yes.

22    Q    What did they say?

23    A    It wasn't until later.

24    Q    Later in the interview?

25    A    Yes.  They said that they'd been sent

TINA CRUMP

**A-68**

9e55b50f-6f15-4ff6-8a1f-ea1de6c04425

1    because --

2        Q    When you say "they," could you refer

3    to the one who was actually speaking?

4        A    The one in the front of the van, the

5    front driver's seat.  They asked me if I knew

6    why they had been sent.  I said, well, because

7    of the affidavit.  They said, now -- they asked

8    me, did you write this?  I said no.  They said,

9    did you type it?  No.  And they said, do you --

10   the reason we're here is because of how -- the

11   insinuation of this.  It sounds like this.  I

12   said, kind of.  They said, but the way you tell

13   the story yourself is different than this.  I

14   said no.  They said, well, this one insinuates

15   things, whereas if you -- if I would have typed

16   it myself it would have been much more clear.

17              Like, this is more harsh.  If you

18   visualize how this was typed, he was talking,

19   you know, discussing things.  Whereas this one

20   is saying, look -- they had a question and he

21   said, refer to the packet.  So that's why they

22   were here.

23       Q    "He" being the judge?

24       A    Yes.  "He" being the judge.

25       Q    And when you indicate that one of the

A-69

TINA CRUMP

9e55b50f-6f15-4ff6-8a1f-ea1de6c04425

1  agents said that the affidavit insinuated

2  certain things, is that a word that they used?

3      A    Yes.

4      Q    And was he more clear about what it

5  insinuated?

6      A    Yes.  That the judge and the jury was

7  actually discussing in detail Mr. Long's state

8  of mind, talking back and forth about questions

9  of the trial, like maybe the judge was trying

10 to, you know, twist the jury into a decision,

11 you know, making him guilty or something, you

12 know.  That it kind of sounded like that.

13     Q    In other words, that it suggested that

14 somehow the outcome of the trial was going to be

15 affected?

16     A    Yes.

17     Q    And what was your response to that?

18     A    They asked me that question.  Do you

19 think by this conversation the outcome was

20 affected?  And I said, by what I heard, no.

21     Q    And then you went on to try to clarify

22 the facts of what you heard?

23     A    Yes, and that was most of the other

24 stuff.

25     Q    Did they ask you to retract or change

TINA CRUMP

A-70

9e55b50f-6f15-4ff6-8a1f-ea1de6c04425

Page 36

1    anything that you said in the affidavit?

2        A    No.

3        Q    And did either of the agents indicate

4    to you that a written report of your interview

5    would be prepared?

6        A    Yes.

7        Q    What did they say?

8        A    They said they were going to -- a

9    report was going to be written.  I do not recall

10   which one.  I think it was the one in the back.

11   I'm not positive.  Like I said, it's been a long

12   time.  Said, well, you're lucky.  I said, why?

13   They said, because if you had committed perjury

14   right now, we would have taken you in.  I said,

15   what?

16                They says, well, your statements

17   were like the other ones.  You're lucky because

18   your statements were like the other people's --

19   or others or something like that.  I thought to

20   myself, they've already done this to other

21   people.  But that's what he said.  You're lucky

22   that you did not commit perjury here.

23       Q    Do you know what perjury is?

24       A    Lying and not telling the truth and

25   writing stuff down and lying about it.  I

TINA CRUMP

A-71

9e55b50f-6f15-4ff6-8a1f-ea1de6c04425

1    thought, well, then somebody else must have

2    written something similar to this, because how

3    would they know if I was telling the truth or

4    not by this type of statement.  I thought, is

5    that a scare tactic to make sure I didn't lie.

6         Q    When did one of them make a statement

7    about perjury?

8         A    At the very end.

9         Q    Did you say anything to them in

10   response?

11        A    No.  I just said, really, you would

12   take me in?  And they said, right now.

13        Q    What was your understanding of what

14   they meant by "take you in"?  Arrest you?

15        A    Yes.

16        Q    And were you intimidated?

17        A    I was surprised because I know I

18   didn't lie, and I would say on here to the best

19   of my memory and stuff.  I didn't lie on this.

20        Q    And after the individual made the

21   statement about you're lucky and talking about

22   perjury, did they ask you any other questions or

23   any follow-up questions of any sort?

24        A    Not that I remember.  Like I said,

25   that comment was made.  They were polite.  They

TINA CRUMP

A-72

1    shook my hand, thanked me for the time and

2    everything like that.  That statement, you know,

3    it did scare me a little bit because I

4    thought -- at first I was astonished and I

5    thought they were really going to take me in now

6    for something if I hadn't answered correctly.

7    Even though I was telling the truth on this, I

8    thought, wow, I didn't realize them coming down

9    they had the author -- I mean, of course they

10   did, but to come and just arrest somebody and

11   take them away for --

12       Q    You don't have any understanding as to

13   how an agent can actually accomplish an arrest

14   for perjury or anything else; is that right?

15       A    Well, yeah, at that time I thought,

16   wow, I mean, I was kind of surprised.  Because I

17   didn't know they were going to show up and all

18   of a sudden, you're lucky or you're going away.

19   You know, that was it.  They were polite when

20   they left and shook my hand.  Thanked me for the

21   time and apologized for taking so much time and

22   that was all.  The last time I saw them.

23       Q    At any point did they suggest to you

24   that you were entitled to or should be advised

25   by a lawyer during the interview?

A-73

TINA CRUMP

9e55b50f-6f15-4ff6-8a1f-ea1de6c04425

1      A    No.

2      Q    At any point during the interview,

3  before the end that you've just described, did

4  they make any kind of statements suggesting that

5  they didn't believe you or that they were having

6  trouble with what you were saying?

7      A    No.  They just asked me questions

8  around the subjects that they were not sure of.

9  What do you mean exactly by this?  Now, what do

10  you mean by this?  You know, clarification.

11      Q    At any point did you feel that you

12  were being asked to change or give a different

13  answer than what you'd given them before?

14      A    No.

15      Q    Were you surprised that it took as

16  long as it did?

17      A    Yes.  They said it would take a few

18  minutes of my time, but it took a lot longer.

19      Q    And you indicated that the individual

20  in the front was writing.  Was he writing with

21  pen on a pad like I have in front of me, a legal

22  pad with lines, or was it something else?

23      A    Just a smaller book, I believe, taking

24  notes and stuff.  He was also looking at it and

25  asked me questions, like maybe he had -- he

TINA CRUMP

9e55b50f-6f15-4ff6-8a1f-ea1de6c04425

Page 40

1    would take little notes and like he had

2    something written down since, you know, he was

3    doing the interviewing.

4         Q    Did either of them have a computer or

5    a personal digital assistant or a Blackberry

6    type device or anything like that?

7         A    If they did, it was the person in the

8    back.

9         Q    Did you see anything like that?

10        A    I didn't turn around to look.  I just

11   sat there waiting for questions and stuff.

12        Q    Were you restrained in any way?

13        A    No, no.  I was just nervous, you know,

14   because I wasn't -- not really -- you know,

15   someone comes in a restaurant and you have no

16   idea and all of a sudden you're being asked all

17   these questions by people in suits.  You think,

18   gee, what would cause someone to drive such a

19   long distance?  I asked them, where did you come

20   from?  They said, well, I came from Anchorage.

21   You drove all the way down here to see me?  They

22   said, yes.

23        Q    You indicated earlier today that you

24   were the, quote, third party, unquote, in Mr.

25   Long's case; is that correct?

                                          A-75

TINA CRUMP

9e55b50f-6f15-4ff6-8a1f-ea1de6c04425

Page 41

1       A    Yes.

2       Q    And you had to come down to court to

3   agree to perform that function for him at the

4   beginning of his case; is that right?

5       A    Yes.

6       Q    And you had provided information about

7   yourself to the court in that regard?

8       A    Yes.

9       Q    Did that include your address and your

10  phone number?

11      A    Everything.  I mean, they asked me all

12  kinds of questions.

13      Q    So as far as you knew, your phone

14  number was something that the agent and the

15  government had access to based on your role as

16  the third party?

17      A    Yeah, they even knew what time I got

18  off work.  I don't -- yeah.

19      Q    And because of that, were you

20  surprised they had just shown up in the coffee

21  shop before the time you got off work that day?

22      A    I was surprised that I wasn't notified

23  beforehand because -- maybe you're not supposed

24  to do that or whatever.  It would have been

25  nicer, you know, because I could have arranged

TINA CRUMP

A-76

9e55b50f-6f15-4ff6-8a1f-ea1de6c04425

Page 42

1    to have somebody -- you know, if they were there

2    at a certain time, work for me or get a

3    different shift or something to help them out.

4        Q    How were you able to participate in

5    the interview after your shift let off in terms

6    of your child care responsibilities?

7        A    My mom was watching my kids.

8        Q    So that wasn't a problem?

9        A    No.

10       Q    Okay.  Did either of the agents

11   indicate that you would have an opportunity to

12   review the report they were going to write based

13   on the interview?

14       A    No.

15       Q    Did either of them indicate to whom

16   they were going to provide the report?

17       A    I believe they said Mr. Cooper, I

18   believe.  I'm not positive.

19       Q    Okay.

20       A    I believe so.

21       Q    Did anyone else join the interview in

22   terms of by telephone during the course of the

23   hour and 20 minutes or however long it was?

24       A    No, there was no phone.  I didn't see

25   anybody with a cell phone or anything.

                                        A-77

TINA CRUMP

Page 90

1      A      Oh, you're welcome.

2              MR. COOPER:  Let's go off the

3      record for just a minute.

4              (Break taken.)

5              MR. COOPER:  Thank you for coming

6      in today.  I appreciate it.  It's a long ways

7      from Seward.  I don't have any further questions

8      at this time.

9              MR. DARMER:  I have a couple

10     follow-up questions.

11              FURTHER EXAMINATION

12     Q      (BY MR. DARMER)  Right before we went

13     off the record Mr. Cooper asked you whether you

14     were pretty sure that the incident you've

15     described in which the judge was having this

16     interaction with the jury occurred after your

17     testimony.

18     A      Right.

19     Q      Are you sure that it happened after

20     your testimony?

21     A      I'm not positive, honestly.  I'm not

22     trying to say -- I really don't recall,

23     honestly.

24     Q      And you indicated earlier you're not

25     even sure whether the trial was three or four

A-78

TINA CRUMP

9e55b50f-6f15-4ff6-8a1f-ea1de6c04425

Page 91

1   days; is that right?

2       A    It might have been three days.

3   Honestly, I don't recall.  It just seems like I

4   did a lot of driving in the short time back and

5   forth every night.  We were leaving at 5:00 in

6   the morning and arriving.  As soon as we got

7   done -- I did all the driving up and back, so it

8   seemed like it was just forever.

9           I probably should have taken

10  notes and stuff, but I really didn't think.  I

11  thought it was done with at that point.  So I --

12  like I said, I'm trying to answer the best I

13  can.

14      Q    And we appreciate that.  One more

15  thing I want to go back to.

16          Mr. Cooper asked you a number of

17  questions trying to identify what exactly the

18  judge was saying to the jurors, and he asked you

19  a number of questions about the mental state

20  question.

21      A    Right.

22      Q    Is it correct that in that same

23  interchange, that same exchange that you saw

24  between the judge and the jurors, there was a

25  reference to some question about doing something

A-79

TINA CRUMP

9e55b50f-6f15-4ff6-8a1f-ea1de6c04425

1  I believe it was different, but I'm not

2  positive, honestly.  I'm not positive.  I'm

3  really not positive.  I remember another juror

4  raising her hand.  I believe it was a lady.

5  When he said, follow the packet, everything just

6  kind of -- there was nothing else.  Just the

7  packet.  Follow -- everything you need is in the

8  packet basically, so...

9      Q    Is it fair to say, Ms. Crump, that

10 you haven't thought about or done anything to go

11 back in your mind about the facts of this trial

12 since the agents interviewed you several years

13 ago?

14     A    I have not.  That's why I was real

15 surprised that this happened now.  You know,

16 trying to, you know, like when you said, you're

17 going to have a deposition.  I said, on what?

18 You said, on your affidavit.  I was like, wow,

19 okay, five years ago.  If I had known something

20 about this, what was going to occur, I could

21 have taken notes to have a better recollection

22 of five years ago.  I'm sorry.  I apologize to

23 both of you.

24     Q    Is it also a fact that you've been

25 working full time since the time of the trial?

TINA CRUMP

9e55b50f-6f15-4ff6-8a1f-ea1de6c04425

Page 95

1    A    Except for this last about seven

2    months.  I home-schooled my oldest boy who is

3    autistic.  He's having some problems in school.

4    Other than that, I've been working two jobs.

5    One, two jobs, you know.

6        Q    And you have primary responsibility

7    for your older child?  He lives with you?

8        A    Yes.

9        Q    Do you have other children as well?

10       A    I have two other ones.

11       Q    How old are they?

12       A    One is 9; one will be 11; and he'll be

13   turning 13.

14       Q    And you're just home-schooling the

15   older one?

16       A    For now, yes.

17       Q    So it's fair to say you've got quite a

18   lot on your plate?

19       A    Yes.

20            MR. DARMER:  No further

21   questions.  Thank you very much.

22            MR. COOPER:  Thank you.

23            (Proceedings concluded at 12:58 p.m.)

24

25

**A-81**

TINA CRUMP

9e55b50f-6f15-4ff6-8a1f-ea1de6c04425

.

# DEPOSITION OF S. DeHART

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

UNITED STATES OF AMERICA,    )
    )
        Plaintiff,    )
    )
   vs.    )
    )
ROBERT A. LONG,    )
    )
        Petitioner.    )
_____)

Case No. 3:02CR-0031-JVS;
Case No. 3:04CV-00286-JWS

DEPOSITION OF STEVE DeHART

May 9, 2007
2:32 p.m.

Taken at:
United States District Courthouse
222 West 7th Avenue, Courtroom 4
Anchorage, Alaska

Reported by:  Leslie J. Knisley
           Shorthand Reporter

A-83

STEVE DeHART

d77a1f4f-6c21-41e7-8809-eca4d68442fe

1              PROCEEDINGS

2            STEVE DEHART,

3      having been sworn, testified as follows:

4              EXAMINATION

5      Q    (BY MR. DARMER)  Good afternoon,

6  Mr. DeHart.  As I indicated just outside, my

7  name is Roman Darmer.  I'm the appointed counsel

8  for Robert Long --

9      A    Okay.

10     Q    -- who has certain post-trial

11 proceedings pending, and this deposition is to

12 ask you some questions related back to the time

13 of Mr. Long's trial back in 2002.

14            So, if I could begin by asking

15 you how long you've been in your current

16 position as a court security officer in the

17 district.

18     A    Yes, I've been working here at the

19 courthouse here in Anchorage since February of

20 2000.

21     Q    Okay.  What are your duties and

22 responsibilities in that capacity?

23     A    Well, as you indicated, I'm what they

24 call a court service officer, and primarily our

25 job is to man a couple of hard posts, to

STEVE DeHART

**A-84**

d77a1f4f-6c21-41e7-8809-eca4d68442fe

1  maintain security into the courthouse.  And then

2  of course we do attend court on folks that are

3  out on bond, and more recently we are attending

4  court with the deputies with the guys that are

5  in custody.

6      Q    And essentially you've been doing all

7  of those things since 2000?

8      A    Yes, to varying degrees.  Some of the

9  policies change, but for the most part, yes.

10     Q    Okay.  Do you have a specific

11  recollection of Mr. Long's criminal trial, which

12  was in late May of 2002?

13     A    I do not.  The only recollection I

14  have is that in fact there was one involving

15  Mr. Long.

16     Q    Okay.  Do you have any recollection of

17  whether you served during that trial, which I

18  believe was a four-day trial, as a CSO for any

19  part of it?

20     A    No.  The best of my recollection is I

21  was not ever in that trial that I can recall.  I

22  was here when some of it was going on.

23  Obliviously I do recall that.  But to the best

24  of my knowledge, I do not recall ever being in

25  his trial personally.

**A-85**

STEVE DeHART

d77a1f4f-6c21-41e7-8809-eca4d68442fe

# DEPOSITION OF S. KIMBALL

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

UNITED STATES OF AMERICA, )
                                 )
         Plaintiff,          )
                                 )
    vs.                         )
                                 )
ROBERT A. LONG,             )
                                 )
         Petitioner.         )
                                 )

Case No. 3:02CR-0031-JVS;
Case No. 3:04CV-00286-JWS

DEPOSITION OF SHANON KIMBALL

May 9, 2007
2:02 p.m.

Taken at:
United States District Courthouse
222 West 7th Avenue, Courtroom 4
Anchorage, Alaska

Reported by: Leslie J. Knisley
Shorthand Reporter

A-87

413a41ca-4d39-4ad8-99eb-1175ce6adf22

Page 4

1                          PROCEEDINGS

2                      SHANON KIMBALL,

3          having been sworn, testified as follows:

4                         EXAMINATION

5          Q    (BY MR. DARMER)  Good afternoon,

6    Ms. Kimball.  My name is Roman Darmer.  I'm the

7    appointed lawyer for Robert Long in connection

8    with certain post-trial proceedings that are now

9    under way.  This deposition is one of the

10   discovery items that has been authorized by the

11   court.  Thank you very much for coming here this

12   afternoon.

13              I have a few questions for you

14   relating to -- well, let me ask you first:  How

15   long have you been employed as a court security

16   officer here in the district?

17        A    Since April of 2000.

18        Q    Okay.  And what are your duties and

19   responsibilities as a court security officer?

20        A    Basically maintaining order in the

21   court, making sure that nobody gets to the

22   judge.  Our job is security for the court family

23   and mainly the judge.

24        Q    And that includes monitoring or

25   sitting in on all jury trials and other

**A-88**

SHANON KIMBALL

413a41ca-4d39-4ad8-99eb-1175ce6adf22

Page 5

1    proceedings, hearings?

2        A    Yes, we are in all courtrooms when

3    they're active.

4        Q    So you were employed here in the

5    district as a CSO during the time of Mr. Long's

6    trial back in 2002?

7        A    Yes.

8        Q    Did you participate as a CSO in any of

9    the days of the proceedings of that trial?

10       A    Yes.

11       Q    Do you recall which days?

12       A    No.

13       Q    Okay.  How do you have a recollection

14   that you did participate, you did actually sit

15   in the courtroom or stand in the courtroom as a

16   CSO at all?

17       A    I remember Mr. Long being in the

18   courtroom.

19       Q    And is it possible that -- I mean,

20   there were many pretrial -- do you recall that

21   there were many pretrial hearings and other

22   matters leading up to the trial?

23       A    Yes.

24       Q    So is it possible you were a CSO on

25   one of the earlier proceedings?

A-89

SHANON KIMBALL

413a41ca-4d39-4ad8-99eb-1175ce6adf22

Page 6

1      A      It's possible I could have been in one
2  of the earlier proceedings.
3      Q      Let me go back and ask you about the
4  policy.  Is there a set of policies and
5  procedures for how the CSO system -- what do you
6  call it -- the unit keeps track of which CSOs
7  were assigned to a particular courtroom on a
8  particular day?
9      A      We're all put on a court schedule done
10  by the control room, and it's a rotating
11  schedule throughout the day.
12      Q      And when you say "the control room,"
13  what do you mean?  Is that a person?
14      A      Yes.
15      Q      A senior court security officer?
16      A      Whoever is trained in there.  There's
17  a handful of us that are trained to operate the
18  control room.
19      Q      When you say you're put on a list, is
20  that a written or electronic list?
21      A      It's a written list that is formulated
22  after we get the court calendar.
23      Q      And certain proceedings may require
24  more than one CSO, that sort of thing, and you
25  have to decide how the resources should be

A-90

SHANON KIMBALL

1    allocated?

2        A    Yes.

3        Q    Are a minimum number assigned to a

4    jury trial, for example, versus just a pretrial

5    proceeding or a motions calendar?

6        A    The same are assigned.

7        Q    Which is two?

8        A    One.

9        Q    Okay.  And what are the --

10   approximately how long are the units or amount

11   of time that any one CSO sits within a

12   particular proceeding?

13       A    An hour to an hour and 45 minutes.

14       Q    Do you know what happens to that list

15   after the conclusion of that particular day?

16       A    It's destroyed.

17       Q    How do you know that?

18       A    Because I'm usually the one that does

19   the schedule and I destroy it at the end of the

20   day.

21       Q    Are hard copies of that schedule

22   handed to each of the CSOs, or is it posted

23   somewhere?

24       A    Each CSO has their own copy.

25       Q    When you say you destroy the copy, do

1   you collect the copy of the schedule that was

2   distributed to each of the CSOs or you're merely

3   referring to your own?

4       A    I'm referring to my own and the one

5   that is in the control room.

6       Q    Do you know what the practice is of

7   the other CSOs in terms of the destruction of

8   the schedule after the completion of that day?

9       A    They throw it away.

10      Q    Just because that's -- you just know

11  that's what their practice is?

12      A    Yes.

13      Q    And are you aware of any instances in

14  which a schedule has been maintained for any

15  reason after the completions of that particular

16  day?

17      A    No.

18      Q    You said the person who is in the

19  control room is the one who prepares it?

20      A    Yes.

21      Q    Is that prepared electronically on a

22  computer?

23      A    The actual shifts throughout the day

24  are done on a computer.  The court schedule is

25  handwritten.

                                            **A-92**

413a41ca-4d39-4ad8-99eb-1175ce6adf22