# DEPOSITION OF D. LYONS

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| ROBERT A. LONG, | ) |
| | ) |
| Petitioner. | ) |
| | ) |

Case No. 3:02CR-0031-JVS;
Case No. 3:04CV-00286-JWS

---

DEPOSITION OF DEBBIE LYONS

---

May 10, 2007
10:07 a.m.


Taken at:
United States District Courthouse
222 West 7th Avenue, Courtroom 4
Anchorage, Alaska




Reported by:  Leslie J. Knisley
Shorthand Reporter

A-94

DEBBIE LYONS

5d6a6edd-4209-4719-a7e6-87395d026e98

1    A    Of course.

2    Q    If you don't understand anything I say

3 or any terms I use, please ask me to clarify.

4 There may be objections from Mr. Cooper or I may

5 object to a question he asks.  If so, if you

6 could wait until we state it for the record and

7 then you'll be given as much time as you need to

8 answer.  Also, if you need a break or water or

9 what have you, just let us know, whoever's

10 asking questions, and we can stop at an

11 appropriate time.  Okay?

12    A    Of course.

13    Q    Thank you.  I'd like to begin by

14 asking the court reporter to hand you what's

15 been marked as Exhibit 1.

16          Take a look at that, Ms. Lyons.

17    A    Yes, sir.

18    Q    Is that the subpoena that was served

19 on you in connection with this matter?

20    A    Yes, sir.

21    Q    And you're here pursuant to that

22 subpoena?

23    A    Yes, sir.

24    Q    All right.  Thank you.  Let's go ahead

25 and put the exhibits there.  We'll give them

A-95

DEBBIE LYONS

5d6a6edd-4209-4719-a7e6-87395d026e98

Page 6

1    back to the court reporter afterward.

2              Could we begin by having you tell

3    us what your dates of employment were here in

4    the court?

5        A    February 2001 through August 2004.

6        Q    And what positions did you hold during

7    that period?

8        A    At first I started as an intake clerk.

9    I was then promoted at that time to the appeals

10   division dealing with appeals.  I went into

11   court reporting.  I also helped with the IT

12   department in human resources.

13       Q    And focusing for a minute on the court

14   reporting part.  What period of time during your

15   tenure were you doing that type of work?

16       A    Probably the last two years of my

17   employment.

18       Q    Kind of '02 to '04?

19       A    I believe so, yes, sir.

20       Q    And the IT department, was that before

21   you went into court reporting?

22       A    Yes.

23       Q    All right.  I'll come back to the

24   court reporting, but let's just continue with

25   your employment history.

**A-96**

5d6a6edd-4209-4719-a7e6-87395d026e98

1        You say you left the court in

2    2004?

3        A    Correct.

4        Q    How are you employed now?

5        A    I own my own business.

6        Q    And is that in connection with court

7    reporting?

8        A    Not at all.

9        Q    Okay.  And what was the reason or your

10   basis for leaving?

11       A    I took an early buy-out so that my

12   husband said I could travel for a couple of

13   years.

14       Q    Okay.  Coming back to the court

15   reporting time that you spent here, I know that

16   you're referred to as the court's electronic

17   court reporter; is that right?

18       A    Correct.

19       Q    What does that mean?

20       A    An ECRO generally handles all of the

21   electronic recording equipment, swears in

22   witnesses, takes care of exhibits, jury matters,

23   et cetera.

24       Q    And am I correct that in this district

25   all court reporting is done by electronic

**A-97**

DEBBIE LYONS

Page 8

1    method?   There are no live court reporters?

2         A    That is correct.   In some cases some

3    of the judges do like to have court reporters.

4    So in some cases we did have court reporters.

5         Q    What training did you get in the

6    equipment before you became an ECRO?

7         A    I was trained by the supervisor of the

8    department at that time.

9         Q    Okay.   Who was that, if you recall?

10        A    I don't remember.   Sorry.

11        Q    And could you just briefly describe

12   what the equipment is in the courtroom and how

13   it actually works?

14        A    It's an electronic dual tape cassette

15   recorder that records tapes.   You take log notes

16   at that time, putting the numbers to key words

17   that respond to those particular sequences.   If

18   a person is sworn in, you take the time and

19   their name, so that someone can go back to the

20   recordings at a later date and pull up what they

21   need to pull up on the tape.   It has a counter.

22             MR. COOPER:  Can we go off record

23   for just a second?

24             MR. DARMER:  Sure.

25             (Break taken.)

A-98

DEBBIE LYONS

5d6a6edd-4209-4719-a7e6-87395d026e98

1        Q      (BY MR. DARMER)   Thank you, Ms. Lyons.

2              Let me focus on a couple pieces

3    of that last answer.   Starting with the dual

4    tape recorder.   That means that you have two

5    cassette tapes simultaneously in the machine?

6        A      Correct.

7        Q      So you're making two exact copies?

8        A      No.   One tape is running, so that once

9    that tape is ended the next tape will continue

10   on without a break.   So that the court reporter

11   doesn't have to stop or start the court

12   proceedings in order to continue on.

13       Q      And tell me again what markings you

14   place on a tape when you put it into a machine.

15       A      Tape 1, the hearing date, the name of

16   the particular hearing.

17       Q      Okay.   When one of the tapes is at the

18   end and the recording begins on the second tape

19   in the machine, what was your practice in terms

20   of dealing with the tape that had been

21   completely used up?

22       A      That tape comes out, the next tape is

23   marked 3, that tape goes in.   Once Tape 2 has

24   ended, Tape 3 will pick up again.

25       Q      And what do you do physically with

DEBBIE LYONS

5d6a6edd-4209-4719-a7e6-87395d026e98

1  Tape 1 after it has been completed?  Do you add

2  any other markings to the tape at that time?

3      A    Put the end number on that tape, so

4  that they know which number ends.

5      Q    The number referring to the number

6  from your log?

7      A    The counter on the tape cassette

8  itself.

9      Q    On the tape machine.  Do you do

10  anything else physically to the tape that's

11  complete?

12      A    It's put into the log note file box

13  that we keep for that particular hearing.

14      Q    And who has access to that file box?

15      A    ECRs, judges.  That's pretty much it

16  at that point.  The transcripts can be requested

17  from either party and then at that point are

18  transcribed, and they would get a written

19  transcription as opposed to the tape.

20      Q    How long do the physical tapes in the

21  box you just described stay in the custody or

22  possession of you, the individual ECRO, versus

23  some other location after a trial is finished,

24  say?

25      A    After that trial is finished, that box

DEBBIE LYONS

A-100

5d6a6edd-4209-4719-a7e6-87395d026e98

1    is completed, marked and put on a shelf for

2    storage.

3        Q    Generally outside of the individual

4    judge's chambers?

5        A    Yes.  It stays in the electronic court

6    reporter's office where all tapes are

7    chronologically -- or all boxes are

8    chronologically placed through the month with

9    the case number on it and the dates.

10        Q    And that office, are you referring to

11    an office here in the courthouse?

12        A    The ECRO's office, correct.

13        Q    Down in the clerk's office?

14        A    Correct.

15        Q    And who has access to that office?

16        A    Anybody in the clerk's office.

17        Q    But does it not generally include

18    court staff, individual judges' staff?

19        A    They are able to request that if they

20    like, yes, sir.

21        Q    Okay.  Are the boxes secured in any

22    way to ensure the integrity of the tapes?

23        A    They're placed on a shelf in

24    chronological order.  The ECRO office is always

25    locked.  It requires a key.  If that's what

Page 12

1    you're trying to get to, yes.

2        Q    I'm trying to understand --

3        A    It is a secured area.  The ECROs,

4    clerk of court and I believe the assistant clerk

5    of court have the keys.  As far as judges' staff

6    or judges' law clerks or their clerks, they do

7    not have a key to that generally.  They would

8    knock on the door; we would open that door.

9    It's not unlocked.  It's always a locked door.

10       Q    And certainly government agencies,

11   such as the U.S. Attorney's office, doesn't have

12   access?

13       A    No access, no, sir.

14       Q    They'd have to go through the clerk of

15   court?

16       A    Correct.

17       Q    And is it fair to say that the

18   individual ECROs would have no reason to go into

19   that room unless they were placing a completed

20   set in the room or if there had been a request

21   for a particular transcript?

22       A    At that time -- I'm not sure how it is

23   now -- our office was there, so our desks were

24   there.  So we had a storage area off to the side

25   that we kept those, but there were four or five

Page 15

1    transcriber might have had a question about a

2    word or a term or something that occurred and

3    was looking for help in transcription, is it

4    fair to say that you never had occasion to go

5    back to deal with the actual physical tapes

6    themselves?

7         A    No, sir.  I never had an occasion for

8    that.

9         Q    And is it also the case that you

10   never -- or did you ever that you can recall go

11   back and try to re-record or delete or in any

12   way alter anything that was on any of the tapes?

13        A    Never.

14        Q    Did anyone ever ask you to do such an

15   addition, deletion, modification to any tape

16   that had been completed?

17        A    No, sir, and I would have not.  That

18   would have cost me my job and the court.

19        Q    And I have to ask this question:  Did

20   any judge ever make that request of you?

21        A    No, sir.

22        Q    Okay.  Continuing to follow up on your

23   answer about the process.  You mentioned there

24   was a log that was created; is that correct?

25        A    That is correct.

A-103

DEBBIE LYONS

5d6a6edd-4209-4719-a7e6-87395d026e98

1    Q    Okay.  Thank you.  I just want to go

2    back to another answer you gave a moment ago

3    about what parts of the proceedings were

4    recorded.  I think you were answering my

5    question about, well, for example, if someone

6    requested a particular witness testimony.

7                   Stepping back for a minute about

8    a trial -- and let's use a trial as an

9    example -- what was your policy and procedure in

10   terms of when you started recording at the

11   beginning of the day and when you would stop

12   recording at various points during that day?

13   A    In the morning, once you arrived in

14   court, we did a test.  We numbered that test.

15   Once court was called to open, you started your

16   recording at that time.

17   Q    And what do you mean by "court called

18   to open"?

19   A    When the judge arrives to court.  When

20   I would open court.

21   Q    And, again, I want to make sure the

22   record is very clear.  That means when the judge

23   is on the bench in open court calling the

24   session to order?

25   A    When the judge comes through that

DEBBIE LYONS

5d6a6edd-4209-4719-a7e6-87395d026e98

1    door, I said, All rise.  At that point, once I

2    heard that door click, that started the

3    recording.

4        Q    And then at what point, if any, would

5    the recording stop during the rest of that day?

6        A    The recording would not stop unless we

7    went off the record and then it was paused for a

8    brief moment, and then once we went back on the

9    record, play was taken care of and then we would

10   continue until the very end of the hearing.

11       Q    Let's take those in pieces.  When the

12   proceedings would go off the record, what would

13   you do on the log sheet and what would happen in

14   terms of the recording system?

15       A    I would pause the computer or the tape

16   player, number that so that you knew at that

17   number we were off record.

18       Q    And indicate that in the log?

19       A    Indicate that in the log note, and

20   then once we were back on record, number on

21   record.

22       Q    And would you also include the amount

23   of time that had transpired or not necessarily?

24       A    You would place the time at 9:05, off

25   record; 9:10, on record.  That you would know

DEBBIE LYONS

Page 28

1   the periods of time they were off record

2   generally.

3        Q    What about with respect to other types

4   of stops that occur naturally in the course of a

5   trial day?  That's one possibility, when the

6   judge said, let's go off the record for a moment

7   to deal with counsel or the parties.  I take it

8   there are other examples when the proceedings

9   stopped?

10       A    We would stop for lunch.

11       Q    Okay.  So tell us what would happen,

12  for example, step by step.

13       A    I would stop the recording, note the

14  time.

15       Q    When the judge said, let's take a

16  lunch break?

17       A    Yes, sir.

18       Q    And then stop the recording, make a

19  notation, leave the room, go to lunch, and then

20  when would you start it up again?

21       A    Once I heard the door click and the

22  judge come through, I would call the court to

23  order.

24       Q    Is it a correct statement, Ms. Lyons,

25  that there was never -- again, I'm speaking

DEBBIE LYONS

5d6a6edd-4209-4719-a7e6-87395d026e98

1   broadly, so correct me if it's wrong.  There

2   would never be a time when the judge was on the

3   bench when you wouldn't also be in the

4   courtroom -- this is during a trial, of

5   course -- ready to press and start the recording

6   in the proceeding; in other words, if the judge

7   was in the courtroom, you would be in the

8   courtroom as well?

9        A    Correct.

10       Q    You can't imagine any scenario where

11  the judge could be in the courtroom and you

12  would not be in the courtroom?

13       A    I don't believe so, if it was an

14  official hearing.

15       Q    I'm talking about a trial now.  For

16  purposes of this discussion, let's talk about

17  trials as opposed to a hearing or just a --

18       A    The ECRO is always in the room before

19  the judge to make sure everything was handled,

20  water pitchers were filled, everybody had

21  everything they needed, all the equipment was in

22  order before the hearing, and then the judge

23  would come on.  Everything was recorded at that

24  point.

25       Q    Okay.  There wouldn't be any instance

A-107

DEBBIE LYONS

5d6a6edd-4209-4719-a7e6-87395d026e98

Page 31

1    Q    And the same would hold true at the

2    end of the day or any other time when there's a

3    break and then a return to the record?

4    A    Yes, sir.

5    Q    Let me ask you a little bit about how,

6    if at all, that procedure would change when a

7    jury was involved.

8              First of all, what was your role

9    as an ECRO relative to the handling of a jury

10   when you were in the middle of a jury trial?

11   A    I'm not sure I understand the

12   question.

13   Q    In term of just the managing of

14   getting them in, getting them out, did you have

15   any role whatsoever?

16   A    Yes, sir.  Once the judge would take

17   the bench, if he was ready for the jury, I would

18   go out of the room, recording would still be

19   running, and bring the jury into the court.

20   Q    Okay.  So is it fair to say that the

21   jury would never be brought in the room, at

22   least in your experience, until, No. 1, you had

23   called the proceeding to order, started the

24   recording in whatever method was being used at

25   the time, the judge was on the bench?

A-108

5d6a6edd-4209-4719-a7e6-87395d026e98

1       A    Correct.

2       Q    The jury would be brought in,

3  recording was continued and then the proceedings

4  would go forward?

5       A    Correct.

6       Q    What would happen -- and thus any

7  interaction would have been captured on the

8  record unless for some reason the judge said,

9  let's go off the record?

10      A    Correct.

11      Q    Okay.  How about at the end of a

12  session, say, at the end of a morning before a

13  break or at a lunch break when the jury was

14  going to leave the room, tell me the procedure

15  you followed in terms of the record and the

16  jury.

17      A    The procedure was the judge

18  would -- we would adjourn and reconvene at

19  whatever hour.  I would stop the tape at that

20  point.  Once the judge left the bench, I would

21  take the jury back into the jury room.

22      Q    And let's be very clear about that.

23  So the judge says, why don't we take a lunch

24  break; we're back at 1:00.

25      A    Correct.

**A-109**

DEBBIE LYONS

Page 34

1    Q    Can you think of any scenario in which

2    the judge and the jury could be in the courtroom

3    when the ECRO, in this case you, was not in the

4    courtroom?

5    A    Not to my knowledge.

6    Q    In your experience here, the ECRO was

7    the person dealing with the jury in terms of

8    bringing the jury in and out?

9    A    Correct.

10    Q    Not the judge's law clerk, not the

11    judge's secretary, not the CSOs?

12    A    Correct.  If we had CSOs available, we

13    would then ask them to get the jury.  If I

14    couldn't leave the bench to go, then, yes, we

15    would ask CSOs to go get the jury.

16    Q    Is it fair to say, though, that that

17    wouldn't change the procedure in terms of the

18    running of the tapes?

19    A    No, sir, no procedural changes would

20    be made at that time.

21    Q    So the judge adjourns court, leaves

22    the bench, tape is still running, you at that

23    point stop the -- if the CSO was going to escort

24    the jury out, when would the recording stop?

25    A    I stop the tape when the judge leaves

DEBBIE LYONS

5d6a6edd-4209-4719-a7e6-87395d026e98

1    the bench.

2        Q    Okay.  But if you were the one

3    escorting the jury out, would you have stopped

4    the tape before you escorted the jury out?

5        A    Correct.

6        Q    After you made the notation, jury out?

7        A    Correct.

8        Q    Okay.

9                MR. DARMER:  Let's go off the

10   record.

11               THE WITNESS:  Can we take a rest

12   room break?

13               MR. DARMER:  Oh, absolutely.

14               (Break taken.)

15       Q    (BY MR. DARMER)  Just to go back on a

16   couple questions to clarify, Ms. Lyons.

17               First of all, how long were you

18   actually with Judge Sedwick as his ECRO?

19       A    We were never assigned a particular

20   judge.  We rotated.

21       Q    So it was just whatever trial needed

22   to be covered?

23       A    Yes.

24       Q    And who would make the assignments?

25       A    The supervisor.

A-111

1    Q    Is there a supervising ECRO?

2    A    Correct.

3    Q    And who was that during your time

4    here?

5    A    I believe it was Elisa Singleton at

6    that time.

7    Q    Is it Lisa or Elisa?

8    A    Elisa, I think.

9    Q    Would she also act as an ECRO herself?

10    A    Correct.

11    Q    I note that Judge Singleton is one of

12    the federal district judges in this district. do

13    you know of any relationship between Elisa

14    Singleton and Judge Singleton?

15    A    No, sir.  No relation.

16    Q    You know that for a fact?

17    A    I do that for a fact.

18    Q    And you know that because you're

19    friends with Ms. Singleton?

20    A    Correct.

21    Q    You know about her background?

22    A    Correct.

23    Q    Okay.  Thank you.  We've talked quite

24    a bit about your procedures for recording, both

25    when it was in audio tape format and then later

DEBBIE LYONS

5d6a6edd-4209-4719-a7e6-87395d026e98

Page 43

1    Q    In which case then he would be on your

2  case information sheet --

3    A    Correct.

4    Q    -- and that would get reflected on

5  here?

6    A    Correct.

7    Q    So, for example, if a second attorney,

8  a second assistant United States attorney had

9  made an appearance, in this case to assist

10  Mr. Cooper, you would have expected to reflect

11  that on the case information sheet after they

12  made an appearance in front of the Court?

13    A    Yes.

14    Q    Which would then be reflected in the

15  transcript?

16    A    Yes.

17    Q    Okay.  I see there's a reference to

18  the transcription service on the front page of

19  this one?

20    A    Yes, sir.

21    Q    Did you have any role in what

22  transcription service was selected to transcribe

23  particular proceedings as the requests would

24  come in?

25    A    We had an approved list of

A-113

DEBBIE LYONS

Page 44

1    transcription services that we used.  Depending

2    on the time line, we would call to see who could

3    accommodate the Court.  If we needed them right

4    away, we would have to have somebody who could

5    do them with haste, therefore, that

6    transcription service would be picked.  If it

7    was just a 30 day out, it would be to the next

8    person on the list.  It was a rotating basis.

9        Q    Okay.  Thank you.  Going back -- I

10   want to go back to your description of your

11   procedure in terms of when you began taping and

12   stopping the tape as a trial went on.  I'm now

13   going to ask you some questions in the context

14   of Mr. Long's trial specifically.  I recognize

15   that you said you don't have any specific

16   recollection of it, but I'll ask you some more

17   questions anyway.

18            Do you recall any instance in

19   Mr. Long's trial in which the judge was having

20   any kind of interaction with the jury that was

21   not at a time when the record, the electronic

22   recording or the digital recording, since it

23   seems like maybe both were used in that trial,

24   were going?

25       A    I'm sorry, I don't recall.

A-114

DEBBIE LYONS

5d6a6edd-4209-4719-a7e6-87395d026e98

Page 45

1     Q     If such an occurrence hypothetically

2   speaking had occurred, would that strike you as

3   strange or unusual?

4     A     I would assume, yes.

5     Q     Can you think of any other instance in

6   which the judge was having any kind of

7   interaction with the jury that wasn't --

8   obviously in your experience as an ECR -- that

9   wasn't on the record?

10    A     Never.  No.

11    Q     Did you ever receive any kind of

12  instruction from any judge that you can recall

13  to go off the record during a time when the

14  Court was having any kind of interaction with

15  the jury?

16    A     No, sir.

17    Q     Would that have struck you as unusual?

18    A     It would be highly inappropriate, yes.

19    Q     But you don't recall getting any kind

20  of --

21    A     No, sir.

22    Q     And if you got a request that you

23  thought was inappropriate in terms of the

24  record, what was the policy or practice you were

25  supposed to follow?

                                        A-115

DEBBIE LYONS

5d6a6edd-4209-4719-a7e6-87395d026e98

Page 47

1    keep saying that, so I'll just refer to whatever

2    system was being used -- you indicated it was

3    triggered by when the judge came on the bench?

4        A    Correct.

5        Q    Is it the case that, in trials now,

6    counsel and the defendant were always present

7    when the recording began?

8        A    Yes.

9        Q    How do you know that?

10       A    I would make a note of it on my log

11   notes, I believe.  If there was anything

12   unusual, it would be noted accordingly.

13       Q    Well, is it also the case that the

14   judge wouldn't come in until everybody was

15   assembled?

16       A    That's correct.

17       Q    Counsel, ECR, witness, CSO?

18       A    That is correct.

19       Q    And, I mean, that's just in your

20   experience, that's the procedure that was

21   followed?

22       A    Correct.

23       Q    Not just by Judge Sedwick, but by all

24   the judges?

25       A    Yes.

A-116

DEBBIE LYONS

5d6a6edd-4209-4719-a7e6-87395d026e98

1    Q    How would the judge know -- let's use

2    an example -- at the end of a lunch break, he

3    said, let's get back at 1:00; would you

4    regularly communicate with the judge to say,

5    okay, everybody is ready?

6    A    I would communicate with his

7    secretary, not generally with the judge.

8    Q    And what would you do?

9    A    I would call chambers, tell them that

10   we were ready.

11   Q    And generally you would do that just

12   prior to the time that either you were supposed

13   to come back from lunch or from the break or

14   what have you?

15   A    I would do that -- I would come back

16   from lunch or whatever to prepare the courtroom.

17   Make sure everything was set up and ready to go.

18   Once all the parties would arrive, I would call

19   the judge -- or I would call the chambers,

20   connect with his secretary.  On occasion I would

21   get the judge, and let him know that all parties

22   were ready and we were waiting for him.

23   Q    But in terms of communication with the

24   judge, that would be just if he happened to pick

25   up the phone in chambers?

A-117

DEBBIE LYONS

5d6a6edd-4209-4719-a7e6-87395d026e98

1      A     Correct.

2      Q     And part of your preparation, making

3  sure that the courtroom was prepared, was, are

4  counsel for the parties in place?

5      A     Correct.

6      Q     And so you wouldn't be calling

7  chambers if Government counsel is outside or the

8  defense lawyer or the defendant are outside;

9  everyone had to be in place?

10     A     Correct.  And there were occasions

11 when everybody wasn't ready and chambers would

12 be calling the courtroom to see what was going

13 on, why we weren't ready.

14     Q     Why you hadn't called to say everybody

15 is ready?

16     A     Correct.

17     Q     And is it fair to say that in that

18 situation you might have to walk out and say,

19 counsel, come in, or deal with whoever wasn't in

20 place?

21     A     Correct.

22     Q     Given that procedure, is it fair to

23 say that -- or are you aware of any instances

24 that you can recall when you began recording or

25 putting the proceedings on the record when

A-118

DEBBIE LYONS

5d6a6edd-4209-4719-a7e6-87395d026e98

Page 50

1    counsel for the parties were not present in the

2    courtroom?

3        A    I do not recall --

4        Q    -- that type of instance?

5        A    I -- I don't recall.

6        Q    And does that strike you as likely or

7    unlikely?

8        A    There is a possibility that it could

9    happen and it would be postponed to a later

10   date, and I would then let whoever know that

11   parties didn't arrive, you know.

12       Q    But in that situation the

13   record -- the judge wouldn't have come out and

14   the record wouldn't be going; is that correct?

15       A    The judge would come out.  He would

16   then postpone the hearing or set it for another

17   time.

18       Q    Because a party or a counsel wasn't

19   present?

20       A    Correct.

21       Q    I now want to focus you on a trial,

22   where you're in a trial, so you've got some

23   counsels in the courthouse, but during a break

24   or coming back from a break.  Can you imagine

25   any circumstance in which the record in a trial

DEBBIE LYONS

A-119

5d6a6edd-4209-4719-a7e6-87395d026e98

1    would be continued or taken when the parties

2    were not present?

3        A    Not without proper counsel, no, sir.

4        Q    And you would not have -- if for any

5    reason someone was missing, would you indicate

6    that in your log sheets?

7        A    We wouldn't have never started the

8    proceeding without counsel being present in a

9    trial.

10       Q    So, for example, in Mr. Long's trial

11   did you ever remember a situation where Mr. Long

12   and his counsel were not present in the

13   courtroom and the proceedings were?

14       A    I do not recall.

15       Q    And would that strike you as unusual?

16       A    Yes.

17       Q    Okay.  I'm next going to ask the

18   reporter to hand you what's been marked as

19   Exhibit 8.

20            MR. COOPER:  Could I see 3

21   through 7?

22            MR. DARMER:  Can we go off the

23   record for just one second?

24            MR. COOPER:  Sure.

25            (Break taken.)

                                        A-120

DEBBIE LYONS

5d6a6edd-4209-4719-a7e6-87395d026e98

1      Q    And I take it you've never had

2   discussions with anyone about -- or have you had

3   any discussions about the facts and

4   circumstances contained in that affidavit?

5      A    No, sir, I have not.  I've never seen

6   it.

7      Q    Does reading that affidavit refresh

8   your recollection as to any episode or situation

9   in Mr. Long's trial in which there were

10   communications between the judge and the jury

11   during which Mr. Long and his counsel and/or

12   Government counsel were not present?

13      A    No, sir, it does not.

14      Q    Okay.  Having reviewed that

15   declaration, does that strike you as the sort of

16   thing you would have recalled about a trial even

17   though you've transcribed hundreds or maybe

18   thousands of trials?

19      A    Yes, sir, I believe so.

20      Q    Based on everything we've talked about

21   today in terms of your practices and procedures

22   as an ECR, do you have any view as to whether or

23   not such an instance could occur off the record

24   from the proceedings?

25      A    I do not believe so.

A-121

5d6a6edd-4209-4719-a7e6-87395d026e98

# DEPOSITION OF M. McGOWAN

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| ROBERT A. LONG, | ) |
| | ) |
| Petitioner. | ) |
| | ) |

Case No. 3:02CR-0031-JVS;
Case No. 3:04CV-00286-JWS

DEPOSITION OF MARC McGOWAN

May 9, 2007
2:45 p.m.

Taken at:
United States District Courthouse
222 West 7th Avenue, Courtroom 4
Anchorage, Alaska

Reported by:  Leslie J. Knisley
             Shorthand Reporter

A-123

MARC McGOWAN

1267eafd-c96e-4c44-baab-d216d2d38093

Page 4

1                    PROCEEDINGS

2                   MARC MCGOWAN,

3       having been sworn, testified as follows:

4                    EXAMINATION

5       Q    (BY MR. DARMER)  Good afternoon,

6  Mr. McGowan.

7       A    Hi.

8       Q    My name is Roman Darmer.  I'm the

9  appointed counsel for Robert Long in connection

10  with certain post-trial matters he has pending

11  before the court.

12       A    Okay.

13       Q    I appreciate you coming in to speak

14  with us this afternoon.

15            Mr. McGowan, how long have you

16  been a court security officer in this district?

17       A    Since July of 1994.

18       Q    Okay.  And what are your duties and

19  responsibilities as a CSO?

20       A    Provide security for the court, check

21  people coming in, make sure nobody brings in

22  unauthorized -- they don't bring anything in

23  they're not supposed to, provide security for

24  the juries when they're in deliberation,

25  security for the courtroom when they're in

A-124

MARC McGOWAN

Page 6

1    physical copy you get each day?

2        A    I rip it up at the end of the day.

3        Q    Okay.  And do you know if that's the

4    practice of the other CSOs?

5        A    I don't know.

6        Q    Are you aware or have you heard

7    anything formally or informally about any judge

8    in this district ever having any communications

9    with jurors outside of the presence of a court

10   security officer?

11       A    You mean like when the jury is

12   in delib --

13       Q    No, no.  During trial.

14       A    Oh, no, I've never seen that.

15       Q    Ever heard anything like that?

16       A    Never.

17       Q    Is it your understanding that that

18   couldn't occur because of the nature of the

19   CSO's involvement in the trial?

20       A    In every trial that I have been in the

21   judges have all issued the same thing, that if

22   the jury wants to communicate with the judge,

23   you send him a note, period.  They will not

24   communicate with the jury in any way, shape or

25   form other than through a note.

A-125

MARC McGOWAN

1267eafd-c96e-4c44-baab-d216d2d38093

# DEPOSITION OF M. OTTE

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

UNITED STATES OF AMERICA,    )
                            )
        Plaintiff,           )
                            )
    vs.                      )
                            )
ROBERT A. LONG,              )
                            )
        Petitioner.          )
_____ )

Case No. 3:02CR-0031-JVS;
Case No. 3:04CV-00286-JWS

_____

        DEPOSITION OF MARC OTTE
_____


                May 10, 2007
                2:35 p.m.


                Taken at:
    United States District Courthouse
    222 West 7th Avenue, Courtroom 4
            Anchorage, Alaska


Reported by:  Leslie J. Knisley
              Shorthand Reporter

MARC OTTE

82709acb-b4fa-4307-993c-58fed5ab0c24

Page 4

PROCEEDINGS

(Exhibit 1 marked.)

MARC OTTE,

having been sworn, testified as follows:

EXAMINATION

Q    (BY MR. DARMER)  Could you please state your name for the record?

A    It's Marc Otte, O-t-t-e.

Q    And how are you employed, Mr. Otte?

A    I'm a chief deputy with the United States Marshal's Office.

Q    And how long have you been employed in the Marshal's office in this district?

A    Nine years in this district.

Q    And how long as the chief deputy?

A    A little over a year.

Q    Okay.  My name is Roman Darmer, and I'm the court-appointed counsel for Robert Long in connection with certain post-trial matters he has in this district.  Thank you for coming in today.

A    You bet.

Q    I'd like to begin by handing you what's been marked Exhibit 1 to your deposition, which I'll represent to you is an affidavit

A-128

MARC OTTE

82709acb-b4fa-4307-993c-58fed5ab0c24

# DEPOSITION OF S. PAYNE

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA


UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )
                                   )
     vs.                           )
                                   )
ROBERT A. LONG,                    )
                                   )
          Petitioner.              )
_____)

Case No. 3:02CR-0031-JVS;
Case No. 3:04CV-00286-JWS


---

DEPOSITION OF STEVE PAYNE

---


May 10, 2007
1:45 p.m.


Taken at:
United States District Courthouse
222 West 7th Avenue, Courtroom 4
Anchorage, Alaska


Reported by:  Leslie J. Knisley
              Shorthand Reporter


A-130

STEVE PAYNE

1    PROCEEDINGS

2    STEVE PAYNE,

3    having been sworn, testified as follows:

4    EXAMINATION

5    Q    (BY MR. DARMER)  Good afternoon,

6    Special Agent Payne.  My name is Roman Darmer,

7    and I'm the court-appointed counsel for Robert

8    Long in certain post-trial proceedings that are

9    pending before the court.  I do appreciate you

10    agreeing to appear here this afternoon so I can

11    ask you some questions.

12            If we could begin with a little

13    bit of background.  Could you please tell us how

14    you're presently employed and how long?

15    A    Sure.  I'm a special agent with the

16    FBI, and I'm been employed with the FBI for

17    approximately ten-and-a-half years.

18    Q    And what unit are you currently in?

19    A    I'm currently assigned to the State

20    Street Task Force which is on the violent crime

21    and drug squad.

22    Q    And directing your attention to the

23    time period 1992 and 1995, what unit were you

24    assigned to?

25    A    I was not with the FBI between 1992

STEVE PAYNE

Page 6

1    computer exam on some evidence.  I think that

2    was it, but I'm not even a hundred percent sure

3    of that.

4         Q    Okay.  That would have been because

5    you have expertise in that area or because it

6    was a group you were then assigned to?

7         A    Because of training and expertise I

8    have, yes.

9         Q    But those are just random assignments,

10   not because of --

11        A    They were just assigned based on your

12   training and expertise.  One of what we call the

13   collateral duties, which is something other than

14   my regular investigative duties that I was

15   assigned to do in the office for about seven

16   years, was computer forensic exams.

17        Q    Okay.  Thank you.  Why don't I go

18   ahead and have this document marked as Exhibit 1

19   by the court reporter and ask you to take a look

20   at it.

21             (Exhibit 1 marked.)

22        Q    (BY MR. DARMER)  Feel free to take a

23   look at it at your convenience, Agent Payne.

24             I'll represent to you that it's a

25   copy of the 302 report that was prepared, I

STEVE PAYNE

A-132

1  think, by yourself with respect to the interview

2  of Ms. Crump that we're going to talk about here

3  today.

4      A    Yes, sir, it appears to be a copy of

5  that, yes.

6      Q    And do you recall preparing that 302?

7      A    Yes, I do.

8      Q    And have you reviewed that 302 prior

9  to your testimony here today?

10      A    Yes, I have.

11      Q    Have you reviewed any other documents

12  or data in anticipation of this deposition?

13      A    I did briefly review Ms. Crump's

14  affidavit or sworn statement.  I'm not sure

15  exactly what it's called.

16      Q    Why don't we go ahead and have this

17  marked as Payne Exhibit 2.

18              (Exhibit 2 marked.)

19      Q    (BY MR. DARMER)  Feel free to take a

20  look at what's been marked Exhibit 2, Agent

21  Payne.  Can you confirm that that is the

22  affidavit of Ms. Crump that you reviewed prior

23  to your testimony?

24      A    Yes, it appears to be.

25      Q    Okay.  Sticking for a moment with any

STEVE PAYNE

d162cacd-88a6-4ebf-9982-b0ec0eabc614

1  preparation you did for your testimony; did you

2  speak to anyone prior to your testimony?

3       A    Just Assistant USA Dan Cooper.

4       Q    But no one other than Mr. Cooper?

5       A    No, sir.

6       Q    Okay.

7       A    Well, of course I had to let my boss

8  know what I was doing.

9       Q    I meant substantively.

10      A    I figured you did.

11      Q    Okay.  Why don't you start by telling

12  me with respect to Exhibit 1 what you recall

13  about how you came to be involved in an

14  interview of Ms. Crump on or about November 4th

15  of 2005.

16      A    Okay.  Myself and Deputy Caudill drove

17  down to Seward, which is where we believed that

18  she was living and working.  And we were able to

19  make contact with her at her place of

20  employment, which I think was the Marina

21  Restaurant there in Seward.

22            We identified ourselves to her

23  and asked her if she would be willing to speak

24  with us about some questions we had in this

25  matter, and she didn't hesitate.  She said,

STEVE PAYNE

A-134

d162cacd-88a6-4ebf-9982-b0ec0eabc614

Page 9

1  sure, that was no problem.  She just wanted to

2  check and see if she could get a break.  She

3  needed to talk to her boss.  We had, sure, that

4  was no problem.

5           We had made contact with her.  We

6  were seated at a table toward one of the back

7  corners of the restaurant, and it was very

8  sparsely populated.  There wasn't anybody else

9  in there that I had noticed other than maybe the

10 owner and a couple of folks at the far end of

11 the room.

12          And then the owner came over and

13 she was rather aggressive and told us, among

14 other things, that she thought it was wrong for

15 us to contact her there while she was working,

16 et cetera, and she wouldn't allow her to take a

17 break and talk to us during her shift.

18          So Deputy Caudill and I said,

19 okay, no problem.  And we asked Tina if she was

20 still willing to talk to us after her shift.

21 She said, yes, so we just waited for her

22 outside.

23    Q    Let me stop you there for a moment.

24 First of all, who asked you to go down and do

25 the interview?

A-135

STEVE PAYNE

d162cacd-88a6-4ebf-9982-b0ec0eabc614

1      A      It was AUSA Cooper.

2      Q      Do you know why or what the reason for

3  the request was?

4      A      Essentially, and I frankly don't

5  remember a lot of details, but the gist of it as

6  I recall was that we needed to follow up on this

7  particular matter and see if we could get any

8  additional details and stuff as far as what the

9  circumstances were around the potential ex parte

10  contact.  It was kind of a normal investigative

11  interview really.

12      Q      Was it your understanding that the

13  results of the interview were going to be used

14  as part of a response to some kind of motion or

15  other court proceeding?

16      A      I don't remember if AUSA Cooper

17  specifically told me that or not, and frankly I

18  don't remember really thinking about that.  I

19  don't remember thinking about this particularly

20  differently than any other interview that I do,

21  which is usually going to be used in a criminal

22  case in which we were going to go to court.

23      Q      Well, this was slightly different,

24  wasn't it, because it was your understanding

25  that Mr. Long had completed at this point -- by

STEVE PAYNE

A-136

d162cacd-88a6-4ebf-9982-b0ec0eabc614

Page 12

1    wouldn't probably even have asked any questions

2    like that.  I knew we had criminal case open on

3    this individual at one point in time.  I knew

4    that the matter had gone to trial, and I knew

5    that this was follow-up on that original case.

6              So, our standard protocol,

7    frankly, is to generally comply with the

8    requests that the U.S. Attorney's office makes.

9    So I don't recall having any discussions on that

10   particular issue and, frankly, I don't recall it

11   really crossing my mind at that point.

12        Q    Where was the original case agent as

13   of November of 2005?

14        A    The original case agent, I think, was

15   Jack Morrison, and I'm pretty sure that he

16   transferred out before that.  I don't remember

17   exactly when, but off the cuff I would say he

18   had probably left the division six to 12 months

19   before that.

20        Q    So had you essentially inherited the

21   file, become the case agent?

22        A    Yes, sir, that's correct.

23        Q    Did this case remain open because of

24   the nature of the underlying charges or for some

25   reason?

A-137

STEVE PAYNE

d162cacd-88a6-4ebf-9982-b0ec0eabc614

1    A    I don't remember if it was closed when

2    it was reassigned to me or not.  In other words,

3    I don't remember if it was reopened and assigned

4    to me or if it was already open and reassigned

5    to me.  I don't remember.

6    Q    Okay.  But is it fair to say that in

7    your view if a request came from the U.S.

8    Attorney, whether or not it was closed or open,

9    your office would have complied?

10    A    As a general rule, yes.

11    Q    What was your understanding of why

12    Deputy United States Marshal James Caudill was

13    going to accompany you on this interview?

14    A    There are a couple of reasons for

15    that.  I think first and foremost probably

16    because the marshal's service had been involved

17    in the original case because it was

18    potentially -- our case was opened as a

19    potential threat against a member of the federal

20    bench, which is a violation for which we have

21    jurisdiction federally.

22              We generally work those kinds of

23    cases in concert with the cooperation of the

24    marshal's service.  It's my understanding that

25    that happened in the original case.  So, normal

A-138

STEVE PAYNE

Page 14

1   protocol would be that if some kind of follow-up

2   investigation needed to be done, those

3   individuals would be contacted and asked to help

4   us out.  So that's the first and foremost

5   reason.

6          The second is that we generally

7   try and have two agents present when we're

8   interviewing somebody who we're not a hundred

9   percent sure whether they're a witness, a victim

10  or a potential subject.  And in her case, as

11  well, also because she's female and I'm

12  obviously a male, so we need to have a second or

13  third agent present for those.

14      Q    Was the fact -- was that the primary

15  reason that two federal agents were sent to do

16  the interview, rather than the fact that Ms.

17  Crump was in any way considered a target or a

18  subject of an investigation?

19      A    The prior involvement of the marshal's

20  service and the fact that it was a cross-gender

21  interview.  Absolutely, those were was the two

22  primary reasons, but kind of a tertiary reason

23  was also at least I myself didn't know exactly

24  what her role may or may not have been in this.

25          Plus we're an extended distance

A-139

STEVE PAYNE

d162cacd-88a6-4ebf-9982-b0ec0eabc614

Page 15

1   from our office and from the marshal's office,

2   so it's just standard procedure for us to take

3   two agents on a case like this.  If none of the

4   deputies had been available or if their office

5   had decided that they weren't going to

6   participate for some reason or another, then I

7   would have had to find another agent from my

8   office to go.  I couldn't have done it myself.

9        Q    How did you determine to do the

10  investigation on November 4th of 2005 and begin

11  it by showing up at the coffee shop on that

12  date -- or her place of employment?  Excuse me.

13       A    As I recall, both myself and Deputy

14  Caudill had some travel or plans coming up.  I

15  really think I had a trip or something that I

16  had to go to either the very next week or

17  shortly thereafter, because when I talk to AUSA

18  Cooper I remember telling him, no problem, I

19  think we can probably accommodate your request,

20  but we'll have to do it soon because of my

21  schedule.

22            I don't remember the exact dates

23  or why, but I just remember having to get it

24  done.  I really think I even typed up the

25  interview the same day we got back, I think,

A-140

STEVE PAYNE

d162cacd-88a6-4ebf-9982-b0ec0eabc614

Page 16

1   because it was kind of a late night, as I

2   recall.

3        Q    For the record, the exhibit does

4   indicate a transcription of 11/4/2005 and an

5   investigation on the same day.

6        A    Okay.  Then my memory is better than I

7   had thought it might be.

8        Q    Was it your decision not to try to

9   contact Ms. Crump by telephone or otherwise

10  prior to the date of the interview to set

11  something up?

12       A    It may have been.  I don't remember

13  having a lot of substantive discussion with

14  Deputy Caudill about that.  I don't think we had

15  a phone number for her.  I don't remember having

16  any real discussions about that with him.

17       Q    Were you aware that she had been the

18  third-party custodian for Mr. Long during the

19  period of his pretrial bail release?

20       A    I don't recall if I was aware of it at

21  the time, but certainly there were some comments

22  to that effect in the affidavit.  So I can't

23  remember if back then I actually knew that or

24  thought about it or if it weighed on our

25  decision to do what we did.

A-141

STEVE PAYNE

d162cacd-88a6-4ebf-9982-b0ec0eabc614

Page 17

1    Q    But, in any event, you didn't make any

2    efforts to contact her to set something up the

3    day before the interview?

4    A    No.

5    Q    Did you have any concerns that she

6    somehow would not be cooperative with you?

7    A    I remember not knowing and sometimes

8    that happens.  You just don't know what

9    someone's role is and sometimes people surprise

10   you, and you would expect them to be cooperative

11   and they're not for some reason.

12   Q    Did you discuss with Deputy Marshal

13   Caudill what your procedure was going to be in

14   terms of note taking and interview writing

15   before you went on the interview?

16   A    Yes, I did.

17   Q    What was that?

18   A    I just suggested that I could take the

19   notes and write up this particular interview

20   because we already had an open case file, and

21   also because there have been times -- and I

22   don't know all the rules and regs -- but I think

23   at times they don't always have a warm fuzzy

24   over the deputies doing investigative work.  So

25   we try to help out with that where we can if

STEVE PAYNE

A-142

d162cacd-88a6-4ebf-9982-b0ec0eabc614

1    it's shared observations.

2        Q    And since you write reports as a

3    matter of course?

4        A    Uh-huh, yes.

5        Q    Okay.  You gave a brief description of

6    the less than friendly reception you received

7    from the owner of the restaurant.  Is it fair to

8    say that Ms. Crump's response in contrast inside

9    of the restaurant was friendly and cooperative?

10       A    Yes.  She seemed a little bit

11   surprised, but she wasn't hostile at all.

12       Q    And did you tell her why you hadn't

13   tried to contact her beforehand?

14       A    I don't recall.  I don't think so, but

15   I don't recall if I specifically said that or

16   not.

17       Q    And before you went down for the

18   interview, did you have an understanding or

19   expectation of how long the interview was going

20   to take?

21       A    Just a rough guess really.

22       Q    What was that?

23       A    I was anticipating maybe about an

24   hour, but it always depends on a lot of factors,

25   not the least of which is how cooperative the

STEVE PAYNE

Page 19

1    individuals are and how many follow-up questions

2    you think of.

3        Q    You mentioned you reviewed the

4    affidavit of Ms. Crump before you went down and

5    also had a conversation with Mr. Cooper.

6        A    Yes.

7        Q    Had you prepared any kind of draft

8    outline or list of questions that you wanted to

9    ask?

10        A    I think I did.  I think I did just

11    sketch out some questions to be sure to ask.  I

12    do that sometimes before interviews.  I can't

13    say for sure, but I think so.

14        Q    Did Mr. Cooper give you specific

15    questions he wanted to have answered?

16        A    I don't think so.  I think, as I

17    recall, he just wanted us to flesh out the

18    details of the affidavit and basically determine

19    if there was substance to it or if we could get

20    additional information other than the affidavit,

21    because the affidavit was so general that it was

22    difficult to really tell what was going on, and

23    there wasn't enough to corroborate the

24    allegations.

25        Q    Had you undertaken any other

A-144

STEVE PAYNE

d162cacd-88a6-4ebf-9982-b0ec0eabc614

1    investigation of the surrounding facts and

2    circumstances in terms of the court record or

3    anything like that before you undertook the

4    interview?

5        A    No, I didn't review any court

6    documents, no.

7        Q    Transcripts?

8        A    No, sir.

9        Q    Did you attempt to speak with the

10   electronic court reporter or any court

11   personnel?

12       A    No, sir.

13       Q    Did you take a copy of the affidavit

14   with you?

15       A    Yes, I did.

16       Q    Had you written or marked up a copy of

17   the affidavit?

18       A    We may have.  I remember talking with

19   Deputy Caudill about doing the interview and

20   some of the questions that we wanted to ask her,

21   the areas that we wanted to try and flesh out

22   because, again, the affidavit was pretty

23   general.  I don't specifically recall writing on

24   one, but I may have.

25       Q    Prior to the time that you undertook

STEVE PAYNE

A-145

1    the interview, did you have any discussions with

2    AUSA Cooper or anybody else about what steps, if

3    any, you would be prepared to take if Ms. Crump

4    determined not to be cooperative or be

5    interviewed by you?

6         A    No, I don't recall having any

7    conversations like that at all.  Again, we

8    really didn't know what her role was going to

9    be, and we certainly weren't going to go down

10   there and arrest her if she didn't cooperate or

11   anything like that.

12        Q    I take it, then, your testimony is

13   that there were no discussions about possible

14   charges of any kind or perjury charges or

15   anything of that sort, whether there might be

16   probable cause?

17        A    Discussions with who?

18        Q    Mr. Cooper, anybody within the FBI,

19   anybody with the marshal's service.

20        A    I'm pretty sure that we did talk to

21   Ms. Crump about that.  I don't recall talking to

22   AUSA Cooper about that.  So off the cuff, I

23   think just Ms. Crump was probably the only

24   person that we had any conversations like that

25   with.

                                           **A-146**

STEVE PAYNE

d162cacd-88a6-4ebf-9982-b0ec0eabc614

1    As I recall, when we were

2  speaking with her and we started asking her

3  about the affidavit and just saying, can you

4  give us more details about this area or that

5  area, do you remember what was said, do you

6  remember who may have said it, those types of

7  questions, again, to get the details that

8  frankly are just not in the affidavit.  She was

9  very willing to help and she did seem to be

10  generally trying to remember these details even

11  though at times her recollection wasn't as good

12  as maybe we would have liked.

13    Anyway, I remember her saying --

14  asking some questions about, you know, why is

15  this important?  Why are you here?  Da, da, da,

16  da, da.  And we were telling her that we needed

17  to flesh this stuff out because affidavits are

18  important things and when you swear to

19  something, if you're not telling the truth and

20  it can be shown that you're doing so

21  intentionally, then you can potentially be

22  charged with perjury.  And so this is important

23  not just for Mr. Long but also for her because

24  this was her affidavit, and she'd sworn that

25  this was all the truth.

A-147

STEVE PAYNE

d162cacd-88a6-4ebf-9982-b0ec0eabc614

1      Q    And that's a conversation you had with

2   her at some point during the course of the

3   interview?

4      A    Yes.  And, again, that's kind of the

5   gist of it.

6      Q    Do you recall when that conversation,

7   recognizing it's not verbatim, was that at the

8   beginning as sort of an admonition or was it at

9   some other point?

10     A    I think most of it, maybe even all of

11  it, happened toward the end of the interview

12  because we had already been asking her some

13  questions about different parts of the

14  affidavit.  And as I recall, after we'd asked

15  kind of a series of questions on this stuff, her

16  question was essentially, you know, why is this

17  important?  And I think that's what launched us

18  into the discussion.

19     Q    Let me go back because I think I've

20  jumped ahead a little bit.

21          You indicated that Ms. Crump --

22  you said you weren't able to interview her in

23  the coffee shop, so you suggested that you wait

24  for her until after her shift was over?

25     A    Uh-huh, that's correct.

STEVE PAYNE

d162cacd-88a6-4ebf-9982-b0ec0eabc614

Page 24

1       Q    And did you in fact wait?

2       A    Yes, we did.

3       Q    And you met her outside the

4    restaurant?

5       A    Yes, that's correct.

6       Q    She voluntarily came up to you after

7    her shift was over?

8       A    Yes.

9       Q    And where was it you conducted the

10   interview?

11      A    In my Bureau vehicle.

12      Q    And that's a Bureau-provided vehicle,

13   not your personal vehicle?

14      A    Yes, sir, that's correct.

15      Q    What kind of vehicle is that?

16      A    It's a sport utility vehicle.

17      Q    And why was the interview conducted

18   inside of a vehicle?

19      A    It just seemed like an expeditious

20   place to do it.  It was close by; it was in

21   public view.  And we weren't necessarily looking

22   to have a discussion with her like in a

23   restaurant or some setting like that where she

24   might potentially be embarrassed to be seen

25   talking with a couple of middle-aged guys that

A-149

STEVE PAYNE

d162cacd-88a6-4ebf-9982-b0ec0eabc614

1    are obviously strangers in town.

2        Q    Well, I mean, was there anything in

3    the affidavit or in the questions related to

4    that that you felt was confidential and

5    shouldn't be heard by third parties?

6        A    That certainly is also a factor.

7    There are several reasons why and that would

8    certainly be one of the factors.  Again, we were

9    also trying to minimize the inconvenience for

10   Ms. Crump and not have her drive around or go to

11   great lengths to find another place.

12       Q    Was the plan discussed with Deputy

13   Marshal Caudill before you went down to Seward

14   that the interview would take place in your

15   vehicle?

16       A    I don't recall initially planning to

17   do it that way, no.  I think initially we were

18   hoping to just talk to her in the restaurant and

19   then when that didn't work out, as I recall, we

20   were trying to come up with potential

21   alternatives while we were sitting in the

22   vehicle.

23       Q    Is it your testimony that the manager

24   of the coffee shop didn't want you to interview

25   Ms. Crump in the restaurant at all whether or

1    not it was during her shift or after?

2         A    That was certainly my impression, yes.

3         Q    And are there any other restaurants or

4    public establishments in the surrounding

5    downtown area?

6         A    There certainly are.  I couldn't tell

7    you which ones they are or where they are, but

8    I'm sure there are, yes.

9         Q    Does your vehicle have tinted or dark

10   windows?

11        A    Yes, it does.

12        Q    And did Ms. Crump indicate any kind of

13   discomfort about getting into the vehicle for

14   the interview?

15        A    No, sir.

16        Q    Where were the various parties seated

17   in the vehicle?

18        A    I was in the driver's seat, Deputy

19   Caudill was in the front passenger's seat, and

20   Ms. Crump was in the rear passenger's seat.

21        Q    And what were you using for note

22   taking?

23        A    I had a pad of paper.

24        Q    And do you use legal pads or do you

25   use sort of an old-fashioned bound memo book for

STEVE PAYNE

A-151

d162cacd-88a6-4ebf-9982-b0ec0eabc614

Page 29

1  objection for a moment, and let's go off the

2  record if we can.

3                    (Break taken.)

4                    MR. DARMER:  Would the court

5  reporter please repeat back the last question?

6                    (Question was read back.)

7      A    The purpose would be to record certain

8  authorized contacts, which would potentially

9  include the collection of evidence.

10     Q    (BY MR. DARMER)  Is it also the case,

11 Agent Payne, that if an interview was authorized

12 to be recorded, that would be reflected

13 somewhere in the 302 report prepared in

14 connection with the interview?

15     A    As a general rule, yes.

16     Q    Okay.  Now, approximately how long did

17 the interview go on for?

18     A    A little bit longer than what we

19 anticipated, and I'm thinking it was about an

20 hour to an hour and a half, but I'd have to

21 refer to my --

22     Q    At any point, by the way, in this

23 testimony feel free to refer to Exhibit 1.  No

24 need to guess.

25     A    Yeah, my estimate was pretty accurate.

STEVE PAYNE

A-152

1    Based on the report I prepared, it was about an

2    hour and 20 minutes.

3        Q     Did you show her her affidavit in the

4    course of the interview?

5        A     Yes, I did.

6        Q     Okay.  Did you have an extra copy for

7    her?

8        A     I don't think so.

9        Q     And did Marshal Caudill not take notes

10   as had previously been planned?

11       A     That's correct.

12       Q     You were taking notes during the

13   conversation?

14       A     Yes.

15       Q     Who was leading the questioning?

16       A     It was a cooperative effort, but I

17   probably was taking the lead on most things.

18       Q     Now, based on the 302 record contained

19   in Exhibit 1, which is a single-spaced,

20   three-page report, it appears that Ms. Crump

21   went into substantially more detail on the

22   events in question than is reflected in the

23   affidavit; is that correct?

24       A     Yes.

25       Q     Is it fair to say that you found her

A-153

STEVE PAYNE

d162cacd-88a6-4ebf-9982-b0ec0eabc614

1    expanded explanation and detail to be credible?

2        A    Yes.

3        Q    You found her to be truthful and

4    forthright?

5                MR. COOPER:  Objection to the

6    form of the question.  You may answer.

7        A    I believed that she was giving us

8    truthful responses, yes, and I certainly didn't

9    have any information to prove the contrary.

10       Q    (BY MR. DARMER)  And after the

11   interview, thereafter, I understand that you

12   prepared this -- I think we indicated on the

13   record you prepared this written 302 report on

14   the same day as the actual interview.

15       A    Yes, sir.

16       Q    Okay.  So the facts were very clear in

17   your mind?

18       A    Yes, sir.

19       Q    I take it you did not undertake any

20   follow-up investigation of any of the facts that

21   she had stated in the course of the interview?

22       A    Not before I prepared the interview

23   report, no.

24       Q    What about thereafter?

25       A    No, nothing that I would consider

1    substantive.

2        Q    Did you do anything?

3        A    I don't recall doing anything of

4    significance, no.

5        Q    If there had been any investigative

6    work of substance, as you describe it, which I

7    take it would include follow-up interviews with

8    anyone else or otherwise trying to check facts,

9    is it fair to say there would have been

10   additional 302 reports prepared?

11       A    Yes, sir.

12       Q    And is it your testimony here today

13   that this -- being familiar with the file and

14   being sort of the inheriting case agent, there

15   are no other reports in this file after the date

16   of this one?

17       A    Yes.  I don't think I prepared any

18   additional 302s nor am I aware of any that were

19   sent to the file.

20       Q    By any other agent?

21       A    That's correct.

22       Q    Okay.  We spoke a few moments ago

23   about the discussion that was had with Ms. Crump

24   about the importance of swearing under oath and

25   the possibility that false testimony could be

STEVE PAYNE

A-155

d162cacd-88a6-4ebf-9982-b0ec0eabc614

Page 34

1    Q    Do you have sort of a standard -- I

2    won't use the pejorative term spiel -- but

3    standard sort of statement you make to fact

4    witnesses prior to the time you undertake

5    interviews?

6    A    Essentially, yes.

7    Q    Does it include things like, you're a

8    federal agent and there can be consequences for

9    making false statements?

10   A    Yes, sir.

11   Q    Okay.  And no different -- did you say

12   anything to Ms. Crump that was different or

13   deviated from sort of that standard sort of

14   introduction you give when you do fact witness

15   interviews?

16   A    Well, I don't -- I really don't think

17   that either myself or Deputy Caudill used that

18   sort of standard spiel, to use your terminology,

19   with Ms. Crump because she was cooperative, and

20   to be perfectly candid, at least in my case and

21   in most of the agent's cases that I work with,

22   the standard spiel, you know, you have to tailor

23   it to the situation.

24            I'd love to say one size fits

25   all, but it just doesn't.  So I don't recall

A-156

STEVE PAYNE

d162cacd-88a6-4ebf-9982-b0ec0eabc614

1   making any sort of spiel like that to her, and

2   if there was any reference to potentially making

3   a false statement to an agent, it was a passing

4   reference that was made under the -- or along

5   the same lines as the perjury and explaining to

6   her the importance of telling the truth and

7   providing those details and making sure that

8   when you sign something that says this is what

9   happened, that it really truly is accurate.

10  There was never any threat made to her that if

11  she didn't cooperate, she would be taken to jail

12  or anything like that.

13      Q    Did Ms. Crump seem to be nervous or

14  agitated or upset?

15      A    She definitely did not seem to be

16  upset or agitated.  She did seem to be a little

17  bit nervous and, frankly, I think that was just

18  because she was concerned that Mr. Long might be

19  mad at her for cooperating.

20      Q    And did you come to that understanding

21  because of something she said?

22      A    Yes.

23      Q    Now, I don't see anything about that

24  in the 302.  Is that just something that she

25  said in passing?

A-157

STEVE PAYNE

d162cacd-88a6-4ebf-9982-b0ec0eabc614

Page 36

1      A      Yes, sir, essentially.

2      Q      I take it the 302 does not purport to

3  be a verbatim recitation of every statement that

4  was made; is that correct?

5      A      That's correct.

6      Q      But it's your testimony that it

7  includes all substantive statements related to

8  her affidavit?

9      A      Yes, sir.

10     Q      Did you or Deputy Marshal Caudill tell

11  her at the end of the interview that she should

12  not share what she had said to you with anybody

13  else, Mr. Long or anybody else?

14     A      Yes, sir.

15     Q      And, in substance, what did you advise

16  her?

17     A      Essentially just that we would

18  strongly recommend that she not discuss our

19  meeting, our interview and certainly the

20  contents of it with anyone, because we don't

21  normally share that information and generally in

22  my experience there's no advantage to sharing

23  that information.  Especially in her case she

24  was concerned that he might be upset because she

25  was cooperating to begin with.

**A-158**

STEVE PAYNE

1      Q     But you knew going into the interview

2    that you were going to share the information

3    with AUSA Cooper?

4      A     Absolutely.

5      Q     And did you understand that AUSA

6    Cooper was likely to use the information as part

7    of a response to some court filing of Mr. Long?

8      A     I don't recall specifically thinking

9    about it, but certainly it's logical that he

10   would do that, yes.

11     Q     Did you tell Ms. Crump that a report

12   of the interview was going to be prepared?

13     A     I may have.  I don't recall.

14     Q     At any point was Ms. Crump advised

15   that she could leave the vehicle or step out and

16   make a phone call or talk to somebody if she

17   wanted to?

18     A     I don't think so.  Frankly, it wasn't

19   necessary.  She was there voluntarily and she

20   got in the vehicle voluntarily.  Usually those

21   are the kinds of things we tell somebody who is

22   present involuntarily and is on the verge of

23   being arrested, and she certainly didn't fit

24   that criteria.

25     Q     She never asked to take a break or to

1  walk outside?

2  A    No, sir.

3  Q    And I take it you have not had any

4  contact or communication with her since that

5  time?

6  A    No, sir.

7  Q    Okay.  Special Agent Payne, I take it

8  that your testimony is you have no basis to take

9  issue with any of the facts as she reported them

10  to you one way or another?

11  A    I'm not sure I understand exactly what

12  you're asking.

13  Q    You have no way of knowing whether

14  what she described to you was accurate or not?

15  A    I don't have any evidence to

16  corroborate the information she provided, no.

17  Q    Or on the contrary, to disprove any of

18  it?

19  A    That's correct, yeah.

20          MR. DARMER:  I have nothing

21  further.

22          MR. COOPER:  Thank you.  I have

23  no questions.

24          (Proceedings concluded at 2:35 p.m.)

25

A-160

STEVE PAYNE

d162cacd-88a6-4ebf-9982-b0ec0eabc614

**DEPOSITION OF B. POTTS**

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

UNITED STATES OF AMERICA,    )
                             )
          Plaintiff,         )
                             )
     vs.                     )
                             )
ROBERT A. LONG,              )
                             )
          Petitioner.        )
_____)
Case No. 3:02CR-0031-JVS;
Case No. 3:04CV-00286-JWS

---

DEPOSITION OF BILL POTTS

---

May 9, 2007
3:31 p.m.


Taken at:
United States District Courthouse
222 West 7th Avenue, Courtroom 4
Anchorage, Alaska


Reported by:  Leslie J. Knisley
              Shorthand Reporter


A-162

BILL POTTS

0c54fcf4-b45c-4a07-84e6-7c6acb52e38c

Page 4

PROCEEDINGS

BILL POTTS,

having been sworn, testified as follows:

EXAMINATION

1      Q   (BY MR. DARMER)  Good afternoon,

6  Mr. Potts.  My name is Roman Darmer, and I'm the

7  appointed counsel for Robert Long, who has some

8  post-trial matters pending before this court.

9  We appreciate you coming in this afternoon.

10             Could you begin by telling us how

11  long you've served as a court security

12  officer in this district?

13      A   I joined this district on the 18th of

14  May 1987, so I'm just a few days short of 20

15  years.

16      Q   And what is your current position

17  within the office?

18      A   My current position is the lead CSO,

19  lead court security officer for this building.

20      Q   And how long have you maintained that

21  position?

22      A   Since June of 1996.

23      Q   And have you had other supervisory

24  positions within the CSO office before that?

25      A   No, I was just a CSO prior to June of

BILL POTTS

A-163

0c54fcf4-b45c-4a07-84e6-7c6acb52e38c

Page 5

1    '96.

2        Q    And who is responsible for selecting

3    the senior lead CSO?

4        A    That's a job that's assigned to my

5    corporate headquarters of Akal Security.  Of

6    course I was not working for Akal when I became

7    the lead CSO.  The regional contract manager is

8    tasked with making the selection for the lead

9    CSO for each work location.

10       Q    And is it Akal?

11       A    A-k-a-l Security, yes.

12       Q    And they are the corporate entity that

13   is the contractor with the -- is it the court or

14   the GSA for security in the building?

15       A    They're a contractor for the United

16   States Marshal's Office -- U.S. Marshal's

17   Service.  Excuse me.  And they are the current

18   contractor.

19       Q    There were contractors before?

20       A    There were previous contractors, yes,

21   sir.

22       Q    Could you describe your duties and

23   responsibilities as the lead CSO?

24       A    Basically my job is to supervise the

25   other court security officers during their daily

BILL POTTS

A-164

0c54fcf4-b45c-4a07-84e6-7c6acb52e38c

1    duties and also to act as a functioning court

2    security officer.  I have quite a few

3    administrative responsibilities.  Timekeeping

4    for all the CSOs, helping them file travel

5    vouchers and making sure their annual physicals

6    are completed on a timely basis, make sure their

7    annual weapons qualifications are completed.

8    That sort of thing.

9         Q    But you actually do do some actual in

10   court or manning some of the various posts?

11        A    Yes.

12        Q    Okay.  Let me ask you first -- well,

13   first, do you have any specific recollection of

14   the criminal trial of Robert Long, which took

15   place in late May of 2002?

16        A    No, I don't have any specific memory.

17   I can vaguely recall that Mr. Long was on trial

18   here, but as to the substance of the case and

19   any direct knowledge of it, I have none.

20        Q    And at the time of Mr. Long's trial in

21   May 2002 -- and for the record that's what I

22   meant when I asked him before.  It was not late

23   2002; it was May 2002.

24             During that period, were you also

25   serving occasionally as an actual CSO, or were

A-165

BILL POTTS

0c54fcf4-b45c-4a07-84e6-7c6acb52e38c

1    you primarily doing administrative?

2         A    I was not working as a functioning CSO

3    at that time.  I was supervising from the

4    control room and doing administrative duties.

5         Q    So, there was no way you would have

6    participated as a CSO in the Long trial?

7         A    No.

8         Q    Okay.  Directing your attention to the

9    way that the CSOs are scheduled and your

10   resources deployed at that time.

11                  I understand that there are

12   certain schedules that are prepared for the CSOs

13   on a daily and also at that time on a weekly

14   basis?

15        A    That's correct.

16        Q    And were you personally responsible

17   for preparing those schedules?

18        A    I prepared the weekly schedule and the

19   daily schedule in sort of a boilerplate fashion.

20   The late shift controller in the control room

21   actually completes the daily schedule penciling

22   in the CSOs' names who -- assigning them to

23   specific courtrooms at specific times for the

24   following duty day.

25        Q    And I have been informed, and please

BILL POTTS

0c54fcf4-b45c-4a07-84e6-7c6acb52e38c

Page 8

1    correct me if I'm wrong, that each day the CSOs

2    who are present in the building on that day

3    cycle through various posts that may include

4    Post 1, Post 2, courtroom security or patrol,

5    and that it's those who are in courtroom

6    security that are the ones who then would be

7    slotted into actual courtroom duty if there was

8    something that matched that on the court

9    schedule?

10    A    That is correct.

11    Q    Okay.  How was the daily schedule

12    physically prepared?  Was it prepared

13    electronically or in handwritten form?

14    A    Are you speaking of the actual

15    assigning of the CSOs in court for a specific

16    day?  That's done in handwriting.

17    Q    That's what I was referring to.

18    A    Yes.

19    Q    By the late shift CSO on the prior

20    day?

21    A    Yes.

22    Q    Based on their review of the court

23    schedule for the coming day?

24    A    Yes, sir.

25    Q    And they handwrite that on the

BILL POTTS

Page 9

1    schedule and do they make copies for the CSOs?

2        A    Yes, they make a copy for each CSO and

3    it's distributed then to the CSOs who are still

4    on duty.  The copy is available to them in the

5    CSO locker room, and then the shift that's

6    already gone home, they pick up their copies of

7    that schedule the next morning when they come

8    in.

9        Q    To your understanding at that time was

10   there any copy of that daily schedule with the

11   handwritten notations relating to court

12   assignments, was a copy of that maintained in

13   any kind of permanent file?

14       A    No, sir.

15       Q    Okay.  And there would be no

16   electronic file of that because it was done by

17   hand based on the CSO's review of the schedule?

18       A    That's correct.

19       Q    Going back to the weekly schedule

20   which we discussed a moment ago.  Was that

21   prepared electronically or by hand?

22       A    Electronically.

23       Q    And you were responsible for preparing

24   that?

25       A    Yes.

A-168

BILL POTTS

0c54fcf4-b45c-4a07-84e6-7c6acb52e38c

1        Q     And is it correct that that simply

2    reflected the various CSOs assigned to the

3    various posts in a rotating order throughout the

4    week?

5        A     Yes, sir.

6        Q     And over what period -- was that a

7    four-week?  Six-week?  How long was the cycle?

8        A     It was a -- the schedule repeated

9    itself every four weeks.  Actually at that time

10   every eight weeks, but then I shortened it later

11   to four weeks.

12       Q     Is it fair to say that looking at that

13   weekly schedule all you could see is certain

14   individuals who during certain periods were

15   supposed to be available to be assigned to

16   courtroom postings if there was something

17   scheduled during that period?

18       A     That is correct.

19       Q     I take it there were sometimes

20   deviations from the schedule?

21       A     Yes.

22       Q     Based on just other needs or

23   circumstances?

24       A     Yes, sir.  For example, if one of the

25   CSOs was scheduled to be in court at a specific

BILL POTTS

0c54fcf4-b45c-4a07-84e6-7c6acb52e38c

1    time and had a medical appointment to go to, for

2    instance, or had some other unforeseen event

3    come up, one of the other CSOs could have easily

4    been substituted for him.

5        Q    Okay.

6        A    Him or her.

7        Q    So, there would be no guarantee that

8    the person assigned to court standby on a

9    particular day would necessarily be a person in

10   a court proceeding or a trial that happened to

11   be going on on that day?

12       A    That's correct.  Yes, sir.

13       Q    And did you maintain those weekly

14   schedules, hard copies of those after each cycle

15   was complete?

16       A    No.

17       Q    And I take it that the weekly schedule

18   might have changed from time to time over the

19   years?

20       A    Yes.  Change of personnel.  We've

21   changed the posting times, post rotation

22   sequence -- or the post rotation frequency has

23   changed a couple times.

24       Q    So, is it a correct statement that

25   nothing related to the weekly schedules that

BILL POTTS

A-170

0c54fcf4-b45c-4a07-84e6-7c6acb52e38c

1   might have been in place or used back in 2002 is

2   presently available in any kind of electronic or

3   hard copy form today?

4        A    That is correct.

5        Q    Okay.  If I could direct your

6   attention for a moment to in-courtroom security

7   in the courthouse, and for now I'll limit myself

8   to in the actual district court courtrooms.

9             It's my understanding that at the

10  time of Mr. Long's trial there were cameras in

11  the district court courtrooms?

12       A    Yes.

13       Q    And were those cameras -- at the time

14  of Mr. Long's trial did those cameras have any

15  kind of recording capability?

16       A    Only in emergency situations.

17       Q    And to the extent that they did not

18  have recording capability, but operated as

19  cameras, where could the action being filmed be

20  viewed?

21       A    At the CSO control room in the U.S.

22  Marshal's Office.

23       Q    Okay.  And at that time, in 2002, did

24  the camera feed from the courtrooms include any

25  audio portion?

A-171

0c54fcf4-b45c-4a07-84e6-7c6acb52e38c

Page 13

1      A     No.

2      Q     And it's my understanding that there

3  are certainly more than just the cameras related

4  to the courtrooms that also are visible in the

5  court security officer control room?

6      A     Yes, that's correct.

7      Q     Okay.  And is it true that the

8  in-courtroom cameras did not get the ability to

9  actually record on a regular nonemergency basis

10 until sometime late -- or sometime after late

11 2002?

12     A     Yes, sir, that's correct.

13     Q     Just to go back for a moment to your

14 testimony that back in the 2002 time frame the

15 cameras could record in limited emergency

16 situations, would that have to be triggered by a

17 CSO?

18     A     No.  It could have been triggered by

19 the CSO.  There was a capability to manually

20 start the recorders from the control room.

21 Also, there is a security device in each of the

22 courtrooms that the judge can activate that

23 would cause the recording to start.

24     Q     Okay.  Very well.

25             MR. DARMER:  Can we go off the

BILL POTTS

A-172

0c54fcf4-b45c-4a07-84e5-7c6acb52e38c

# DEPOSITION OF R. REINHARDT

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA


UNITED STATES OF AMERICA,        )
                                 )
              Plaintiff,         )
                                 )
        vs.                      )
                                 )
ROBERT A. LONG,                  )
                                 )
              Petitioner.        )
_____)

Case No. 3:02CR-0031-JVS;
Case No. 3:04CV-00286-JWS


---

DEPOSITION OF RON REINHARDT

---


May 9, 2007
3:04 p.m.


Taken at:
United States District Courthouse
222 West 7th Avenue, Courtroom 4
Anchorage, Alaska


Reported by:  Leslie J. Knisley
              Shorthand Reporter


A-174

RON REINHARDT

d9f1e393-9eec-431d-a683-8e31e87d9a7d

1   as much lately.

2          Q     But I take it in all the years you've

3   been a CSO, to the extent you have been serving

4   in the courtroom as opposed to the control room,

5   you have never encountered a situation where a

6   judge and a jury was in the courtroom --

7          A     No.

8          Q     -- engage each other when counsel for

9   the two sides were not present?

10         A     No.

11         Q     Okay.  Thank you.

12                MR. DARMER:  I have no further

13  questions.

14                MR. COOPER:  I have no questions.

15  Thank you, Ron.

16                     (Proceedings concluded at 3:09 p.m.)

17                     (Proceedings reconvened at 3:25 p.m.)

18                FURTHER EXAMINATION

19         Q     (BY MR. DARMER)  Mr. Reinhardt, I had

20  a follow-up question on your testimony relating

21  to your control room duty, which you referred to

22  as being your primary posting in the 2000 to

23  2003 time period.

24         A     To the best of my recollection, yes.

25         Q     Is one of the functions of the control

RON REINHARDT

1    room CSO to observe the live-action cameras that

2    are posted in the various positions in the

3    courthouse?

4         A    That's one of over 70 cameras we

5    watch, yes.

6         Q    And is it your understanding that at

7    that time the cameras within the courtroom were

8    live only?

9         A    They were not recorded.

10        Q    No recording?

11        A    Correct.

12        Q    And is it also your understanding

13   there's no audio?

14        A    There is no audio.  There's audio feed

15   lines into the control room, but they're not

16   plugged into anything.

17        Q    All right.  So to the extent that you

18   were in the control room during that period --

19   strike that.

20             You indicated that there are many

21   cameras that feed into the control room.

22        A    There's about 70.

23        Q    And so the individual who has

24   responsibility in the control room is charged

25   with looking at all of those on a roving basis;

# DEPOSITION OF E. SINGLETON

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

UNITED STATES OF AMERICA,           )
                                    )
            Plaintiff,              )
                                    )
      vs.                           )
                                    )
ROBERT A. LONG,                     )
                                    )
            Petitioner.             )
_____)

Case No. 3:02CR-0031-JVS;
Case No. 3:04CV-00286-JWS

_____

            DEPOSITION OF ELISA SINGLETON

_____

                   May 10, 2007
                   1:00 p.m.


                   Taken at:
        United States District Courthouse
        222 West 7th Avenue, Courtroom 4
              Anchorage, Alaska




Reported by:  Leslie J. Knisley
              Shorthand Reporter

A-178

ELISA SINGLETON

b5b657a9-8795-461e-98f9-cecd3e152a18

1                        PROCEEDINGS

2                   (Exhibit 1 marked.)

3                   ELISA SINGLETON,

4       having been sworn, testified as follows:

5                      EXAMINATION

6       Q    (BY MR. DARMER)  Good afternoon,

7  Ms. Singleton.  My name is Roman Darmer, and I'm

8  the attorney for Robert Long, who has certain

9  post-trial motions pending before the court.

10 Thank you very much for coming in.

11             I'd like to first hand you what's

12 been marked as Deposition Exhibit 1 and ask you

13 to take a look at that.

14      A    Okay.  I have that in front of me.

15      Q    Is that a copy of the subpoena that

16 was served on you for your presence here today?

17      A    Yes.

18      Q    And how are you employed?

19      A    Yes, except that I did not get the

20 proof of service page.

21      Q    Okay.

22      A    I am a case manager for the U.S.

23 District Court here in Anchorage.

24      Q    How long have you been employed by the

25 court?

                                        A-179

ELISA SINGLETON

b5b657a9-8795-461e-98f9-cecd3e152a18

Page 5

1       A     Since February of, I believe, 2000

2    probably.  It's been a little over seven years.

3       Q     And have you held any other positions

4    other than case manager at the court?

5       A     Yes.  I was an in-court ECRO,

6    electronic court reporter operator, and I was

7    the calendaring coordinator for that division.

8       Q     What time period were you an ECRO?

9       A     I guess I probably moved out of that

10   position around January of '06.  There wasn't a

11   firm date.  It was more of a gradual transition.

12      Q     Are you familiar with Judge Singleton

13   of this district?

14      A     Yes.

15      Q     I just note for the record that your

16   last name is Singleton.  Is there any familial

17   relationship of any kind between yourself and

18   Judge Singleton?

19      A     No.

20      Q     Thank you very much.

21           MR. DARMER:  I have no further

22   questions.

23           MR. COOPER:  I have no questions.

24   Thank you.

25           (Proceedings concluded at 1:05 p.m.)

ELISA SINGLETON

A-180

# DEPOSITION OF L. SNEDDON

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff,             )
                                   )
      vs.                          )
                                   )
ROBERT A. LONG,                    )
                                   )
            Petitioner.            )
_____)

Case No. 3:02CR-0031-JVS;
Case No. 3:04CV-00286-JWS

_____

TELEPHONIC DEPOSITION OF LEWIS SNEDDON
_____


May 9, 2007
2:58 p.m.


Taken at:
United States District Courthouse
222 West 7th Avenue, Courtroom 4
Anchorage, Alaska




Reported by:  Leslie J. Knisley
              Shorthand Reporter




A-182

8f175a09-80d2-4cff-8b91-86fc652e5eda

1    Q    And you sat through it as a CSO?

2    A    Yes, sir.

3    Q    Do you have a recollection as to

4  when -- what part of it you sat through?

5    A    I do not.  We do so many.  This is a

6  daily duty for us, so any time we have one we

7  sit through it.  I sat threw bits and pieces of

8  it.  I vaguely remember it.

9    Q    And I take it you can't recall the

10  particular either witness or part of the trial

11  that you sat through to give us a sense of

12  chronologically what part of the trial you sat

13  in on?

14    A    No, sir, I can't do that.  I have

15  absolutely no recollection of that.  We switch

16  off probably hourly or thereabouts and I don't

17  recall.  I sat in on a portion of it, but I

18  can't tell you which one I sat in on.

19    Q    Did the portion you sat in on include

20  any period in which the court took breaks,

21  either began or ended any breaks?

22    A    Sir, I can't answer that.  I have no

23  recollection of that.

24    Q    And do you have any recollection of

25  any instance during the pieces of the trial you

LEWIS SNEDDON

A-183

8f175a09-80d2-4cff-8b91-86fc652e5eda

1    sat in on where Judge Sedwick was having any

2    communication with the jury outside of the

3    presence of the lawyers?

4        A    Absolutely not.  I have no

5    recollection of that.

6        Q    And have you ever heard of similar --

7    of such a communication occurring either with

8    Judge Sedwick and the jury or any other judge in

9    the courthouse?

10       A    No, sir.

11       Q    Okay.  I'm informed that a schedule is

12   provided to each of you at the beginning of the

13   day in terms of laying out where you'll be or

14   what post you'll be assigned to?

15       A    We do.  We have a daily schedule, and

16   it varies from day-to-day, so to tell you where

17   I was on a specific day, I don't know.  We do

18   this for a living and it's day-to-day and we do

19   it as needed.  I couldn't tell you where I was.

20       Q    What's your practice in terms of the

21   daily schedule after that particular day is

22   concluded?  Do you maintain them?  Discard them?

23   Do you have a practice?

24       A    We work day to day and our schedules

25   varies.  We're not in the same place.  It's

LEWIS SNEDDON

A-184

8f175a09-80d2-4cff-8b91-86fc652e5eda

# DEPOSITION OF M. H. WHITE

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )
                                )
     vs.                        )
                                )
ROBERT A. LONG,                 )
                                )
            Petitioner.         )
_____)

Case No. 3:02CR-0031-JVS;
Case No. 3:04CV-00286-JWS

DEPOSITION OF MICHAEL H. WHITE

May 10, 2007
3:10 p.m.

Taken at:
United States District Courthouse
222 West 7th Avenue, Courtroom 4
Anchorage, Alaska

Reported by:  Leslie J. Knisley
              Shorthand Reporter

A-186

MICHAEL H. WHITE

1  case?

2      A    Yes.  Some, yeah.  I was in several

3  days or --

4      Q    Parts of days?

5      A    Parts of days, yeah.

6      Q    Do you have a specific recollection of

7  that because of the nature of the case, or do

8  you remember all the specific trials you've been

9  in?

10     A    No.  Just on my schedule.  I was

11 scheduled to be in here and I guess that's what

12 you're asking.

13     Q    Well, no.  I'm asking now about the

14 trial back in 2002.  Do you have a specific

15 recollection of having been a CSO for some parts

16 of that trial back in that time period?

17     A    I'm trying to think.  I'm not really

18 sure.  I think he was in here several times.

19     Q    So you can't be sure which of the

20 different proceedings --

21     A    Yes, right.

22     Q    And I take it you don't maintain any

23 kind of personal records of which trials you

24 actually sit in on or are in as a CSO?

25     A    No.

                                        A-187

MICHAEL H. WHITE

e332f562-4c10-4c41-91dc-3f954a6e982e

1        Q    I'm informed that you security

2    officers receive a schedule each day?

3        A    Yes.

4        Q    That directs you to various postings

5    at various times?

6        A    Yes.

7        Q    Do you maintain those after the day is

8    completed?

9        A    No.

10        Q    You throw those away?

11        A    Yes.

12        Q    So you would have no ability to

13    re-create your whereabouts at the time of

14    Mr. Long's trial back in 2002?

15        A    No.

16        Q    Okay.  At some point were you

17    interviewed by Mr. Otte relating to an issue of

18    a potential ex parte communication between a

19    judge and a jury in Mr. Long's case?

20        A    I don't remember the details.  I

21    remember hearing of that from some of the -- but

22    I don't remember it.

23        Q    You don't necessarily remember talking

24    about it to Mr. Otte?

25        A    No.

A-188

MICHAEL H. WHITE

e332f562-4c10-4c41-91dc-3f954a6e982e