NELSON P. COHEN
United States Attorney

DANIEL R. COOPER, JR.
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska  99513-7567
(907) 271-5071
daniel.cooper@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 3:02-cr-0031-JVS |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **UNITED STATES' EXHIBIT B** |
| | ) | **TO OPPOSITION TO** |
| ROBERT A. LONG, | ) | **MOTION FOR** |
| | ) | **MISCELLANEOUS RELIEF** |
| Defendant. | ) | **[Docket 311]** |
| | ) | |

The United States files herewith as Exhibit B to its Opposition to

Motion for Miscellaneous Relief the trial transcript of Day 1 of Mr. Long's trial,

//

//

//

pages 1-1 through 1- 67, plus appendices.

RESPECTFULLY SUBMITTED on October 15, 2007.

NELSON P. COHEN
United States Attorney

s/ Daniel R. Cooper, Jr.
Assistant U. S. Attorney
222 West 7th Ave., #9, Rm. 253
Anchorage, AK 99513-7567
Phone: (907) 271-3376
Fax: (907) 271-2344
E-mail: Daniel.Cooper@usdoj.gov
AK #8211109

**CERTIFICATE OF SERVICE**

I hereby certify that on October 15, 2007,
a copy of the foregoing UNITED STATES'
EXHIBIT B TO OPPOSITION TO MOTION
FOR MISCELLANEOUS RELIEF(Docket 311)
was served electronically on Roman E. Darmer II.

s/ Daniel R. Cooper, Jr.

**FILED**

1    UNITED STATES DISTRICT COURT    JUL 2 5 2002

2    DISTRICT OF ALASKA   UNITED STATES DISTRICT COURT
                                     DISTRICT OF ALASKA

3    UNITED STATES OF AMERICA,    )    Case No. A02-0031-CR   JWS   By:____Deputy
                                  )
4                      Plaintiff, )    Anchorage, Alaska
                                  )    Tuesday, May 28, 2002
5             vs.                 )    8:43 o'clock a.m.
                                  )
6    ROBERT A. LONG,              )    **TRIAL BY JURY - DAY 1**
                                  )
7                      Defendant. )
     _____  )

8

9                         VOLUME I
                PARTIAL TRANSCRIPT OF PROCEEDINGS

10

11        BEFORE THE HONORABLE JOHN W. SEDWICK
        UNITED STATES DISTRICT JUDGE, and a jury

12   APPEARANCES:

13   For the Plaintiff:           DANIEL COOPER, ESQ.
                                  Assistant U.S. Attorney
14                                U.S. Attorney's Office
                                  222 West 7th Avenue, Room 253
15                                Anchorage, Alaska    99513
                                  (907) 271-5071

16   For the Defendant:           MICHAEL DIENI, ESQ.
17                                Assistant Federal Public
                                     Defender
18                                550 West 7th Avenue, Suite 1600
                                  Anchorage, Alaska   99501
19                                (907) 646-3400

20   Court Recorder:              DEBBY LYONS
                                  U.S. District Court
21                                222 West 7th Avenue, #4
                                  Anchorage, Alaska    99513
22                                (907) 677-6151

23   Transcription Service:       NODAK ROSE TRANSCRIPTS
                                  P.O. Box 1752
24                                Bismarck, North Dakota   58502
                                  (701) 223-2096

25   Proceedings recorded by electronic sound recording.  Tran-
     script produced by transcription service.

1-2

1           ANCHORAGE, ALASKA -- TUESDAY, MAY 28, 2002

2      (Call to Order of the Court at 8:43 o'clock a.m.)

3  (CD 1, 08:43:00)

4      (This Portion Not Requested)

5  (CD 1, 02:57:30)

6      (Jury present)

7      THE COURT:  At this time then, I'll ask that the

8  Clerk administer an oath to the jury before I excuse all of

9  the other prospective jurors.

10      THE CLERK:  Ladies and gentlemen, please rise and

11  raise your right hand.

12                **TRIAL JURY SWORN**

13      THE CLERK:  Please be seated.

14      THE COURT:  All right.  Ladies and gentlemen, the

15  rest of you in the gallery are excused.  I very much appreci-

16  ate your having come in for our jury selection here this morn-

17  ing.  This is a public proceeding so you are, of course, wel-

18  come to remain for as much of it as you choose to attend, but

19  you do no longer have to remain present because your responsi-

20  bility has been discharged.

21      Ladies and gentlemen of the jury, you are now

22  charged with the responsibility of hearing and deciding this

23  case in accordance with the Court's instructions.  My first

24  instruction, and one of the most important instructions that I

25  have for you is this:

1-3

1          Your obligation here is to fairly and impartially

2    decide this case.  In order that you're in the best possible

3    position to do that, it is imperative that you give careful,

4    complete and thoughtful attention to all of the evidence which

5    is presented by the parties.

6          What I say now is intended to serve as an introduc-

7    tion to the trial of the case.  It is not a substitute for the

8    detailed instructions on the law which I will give to you at

9    the close of the case and before you retire to consider your

10   verdict.  Earlier, I read to you the charges set out in the

11   indictment.  You should distinctly understand that the indict-

12   ment is simply a charge, or in this case a set of three

13   charges, and it is not in any sense evidence of any of the

14   charges.

15          Mr. Long has pled not guilty to all of the charges

16   in the indictment.  The Government, therefore, has the burden

17   of proving all essential elements of the charges in the in-

18   dictment beyond a reasonable doubt.  The purpose of the trial

19   is to determine whether the Government meets this burden.

20          The law presumes a defendant to be innocent of a

21   crime.  The presumption of innocence alone is sufficient for a

22   not guilty verdict unless the jurors are satisfied beyond a

23   reasonable doubt of the defendant's guilt, after careful and

24   impartial consideration of all the evidence in the case.  It

25   is not required that the Government prove guilt beyond all

1-4

1   possible doubt; the test is one of reasonable doubt.

2        A reasonable doubt is a doubt based upon reason and

3   common sense and may arise from a careful and impartial con-

4   sideration of all the evidence or from lack of evidence.

5   Proof beyond a reasonable doubt is proof that leaves you

6   firmly convinced that the defendant is guilty.  If after a

7   careful and impartial consideration with your fellow jurors of

8   all the evidence you are not convinced beyond a reasonable

9   doubt that the defendant is guilty, it is your duty to find

10  the defendant not guilty.

11       On the other hand, if after a careful and impar-

12  tial consideration with your fellow jurors of all the evid-

13  ence you are convinced beyond a reasonable doubt that the

14  defendant is guilty, it is your duty to find the defendant

15  guilty.

16       Each of the charges in this case is based upon a

17  provision in the United States Code, specifically Title 18,

18  Section 115(a)(1)(B), which reads in part that's pertinent

19  here:

20       "Whoever threatens to assault, kidnap or murder a

21       United States official, a United States judge, or a

22       federal law enforcement officer with intent to im-

23       pede, intimidate or interfere with such official

24       judge or law enforcement officer while engaged in

25       the performance of official duties, or with intent

1          to retaliate against such official judge or law en-

2          forcement officer on account of the performance of

3          official duties, shall be punished as provided by

4          law."

5     As to each of the three charges in the indictment,

6 the burden is always on the Government to prove beyond a rea-

7 sonable doubt every essential element.  The law never imposes

8 upon a defendant in a criminal case the burden or duty of

9 calling any witnesses or presenting any evidence.

10    The trial will proceed in the following order:

11    First, the parties have the opportunity to make

12 opening statements.  The Government will have an opportunity

13 to speak first and then Mr. Long's attorney will have an op-

14 portunity to speak.  What is said in the opening statements is

15 not evidence.  The lawyers' statements simply serve as an in-

16 troduction to what the lawyers believe the evidence will show

17 and what the parties believe the evidence will support in

18 terms of the facts that you should find.

19    Second, the Government will introduce evidence in

20 support of the charges it has set forth in the indictment.

21    Third, after the Government has presented its evi-

22 dence, the defendant may present evidence, but he is not

23 obliged to do that.

24    Fourth, at the conclusion of all the evidence, each

25 party has the opportunity to present oral argument in support

1-6

1  of its case.  What is said in these closing arguments, like

2  what is said in the opening statements, is not evidence.  The

3  closing arguments will be designed to present to you the con-

4  tentions of the parties as to what they believe the evidence

5  has shown and what inferences may be drawn from the evidence.

6  Because the burden of -- of proof rests entirely on the Gov-

7  ernment, the Government has the right open and close the argu-

8  ment.

9        After that, I will instruct you on the applicable

10  law and you will then retire to consider your verdict.  Your

11  verdict must be unanimous as to the charge for each of the

12  three counts.

13        Your purpose as jurors is to find and determine the

14  facts.  Under our system of criminal procedure, you are the

15  sole judge of the facts.  If at any time I should make any

16  comment regarding the facts, you're at liberty to disregard

17  it.  It is especially important that you perform your duty of

18  determining the facts diligently and conscientiously for ordi-

19  narily there is no means of correcting an erroneous determina-

20  tion of the facts by a jury.

21        On the other hand and with equal emphasis, I in-

22  struct you that the law as given by the Court constitutes the

23  only law for your guidance, and it is your duty to accept it

24  and follow it.  It is your duty to follow the law as I give it

25  to you even though you may disagree with the law.

1-7

1    You are to determine the facts in the case solely

2  from the evidence in the case which will consist of the testi-

3  mony of the witnesses and any exhibits which are received in

4  evidence.

5    Questions asked by the lawyers are not evidence for

6  the evidence consists of witnesses' answers to questions.  As

7  I mentioned earlier, the lawyers' statements during opening

8  statement, argument are not evidence.

9    You must not consider anything you may have read or

10  heard about the case outside the courtroom before the trial.

11  During the trial, you must avoid reading any newspaper arti-

12  cles that might be published about the case while the trial is

13  in progress and you must also avoid listening to or observing

14  any local news broadcasts on television or radio because of

15  the possibility that mention might be made of this case during

16  such a broadcast.

17    You must not take any inquiry, test or investigation

18  on your own as to any matter or circumstance relative to the

19  case.

20    A lawyer may sometimes object to some of the testi-

21  mony or evidence being offered.  It is the lawyer's duty to

22  object to evidence when he believes that it may not properly

23  be offered and he should state an objection.  You should not

24  be prejudiced in any way against a lawyer who makes an objec-

25  tion or the party he represents.  At times I may sustain an

1-8

1  objection or direct you to disregard certain testimony or ex-

2  hibits.  You must not consider any evidence to which an objec-

3  tion has been sustained or which I might have instructed you

4  to disregard.

5          In deciding the facts of this case, you will have to

6  decide which witnesses to believe and which not to believe.

7  You may believe everything a witness says or only part of it

8  or none of it.  In deciding what to believe, you may consider

9  a number of factors including the following:

10          A witness' ability to see or hear or know the things

11  about which the witness testifies; apparent quality of the

12  witness' memory; the witness' manner while testifying; whether

13  the witness had an interest in the outcome of the case or any

14  motive, bias or prejudice; whether the witness was contra-

15  dicted by anything the witness said or wrote before trial or

16  by other evidence.  How reasonable was the witness' testimony

17  considered in light of other evidence which you do believe?

18  And any other factors that you conclude bear on believability.

19          No statement that -- or comment that I may make dur-

20  ing the course of the trial is intended to indicate my opinion

21  as to how you should decide the case or influence you in any

22  way in your determination of the facts.  At times, I might ask

23  questions of witnesses.  If I should do that, it is for the

24  purpose of bringing out matters which I feel should be brought

25  out and not in any way to indicate my opinion about the facts

1-9

1   or to indicate the weight I feel you should give to the testi-
2   mony of a witness.

3          If I find it necessary to admonish the lawyers dur-
4   ing the course of the trial, you should not show prejudice
5   toward a lawyer or his client because I have found it neces-
6   sary to admonish the lawyer.

7          Under the federal system of criminal procedure, you
8   are not to concern yourself in any way with the sentence which
9   a defendant might receive if you should find him guilty.  Your
10  function is solely to decide whether the defendant is guilty
11  or not guilty of the charges that have been brought against
12  him.  If, and only if, you find him guilty of one or more of
13  the charges would it then become my duty to pronounce sen-
14  tence.

15         During the course of the trial and until this case
16  is submitted to you, you must not discuss it with anyone, not
17  even with your fellow jurors.  This is because you must keep
18  an open mind until you have heard all of the evidence as well
19  as the parties' arguments and my instructions.  You must not
20  permit anyone to attempt to discuss this case with you or in
21  your presence, and insofar as the lawyers and parties are con-
22  cerned, you will need to avoid contact with them to avoid even
23  the appearance of an improper communication.  So don't take
24  offense if you see the parties or the lawyers in the court-
25  house here and they don't speak to you.  It's not because they

1    wish to appear unfriendly, but because they wish to avoid even
2    the suggestion of any improper communication.

3         Let me address a couple of administrative matters.
4    Ordinarily -- well, we'll adjourn today at four-thirty, and
5    ordinarily court will convene at nine o'clock in the morning
6    and run until four-thirty in the afternoon.

7         I do have some things on my calendar at eight and
8    eight-thirty on some of the other days this week, but we'll
9    endeavor to start here at nine o'clock each morning and I'll
10   try to give you advance notice if we're going to start a lit-
11   tle bit later.

12        If you find it necessary to communicate with me for
13   any reason during the trial, the communication should be in
14   writing and it should be given to the Clerk who is assisting
15   me at the time.

16        At the end of the trial, you will have to make your
17   decision based on what you recall of the evidence.  You'll ha
18   -- not have a written transcore -- transcript to consult, and
19   it is difficult and time consuming to replay the testimony on
20   the tape recorder, so please pay close attention to the testi-
21   mony as it is being given.  If you wish, you may take notes to
22   help you remember what witnesses have said, and the Clerk will
23   provide you notebooks in which to take notes if you choose to
24   do that.

25        If you do take notes, keep them to yourself until

1  you and your fellow jurors go to the jury to decide the case,
2  and do not let note-taking distract you so that you miss a
3  witness' answer because you're too busy writing lengthy notes
4  about what has previously been said.  When you leave at night,
5  you can leave the notebook on your chair here in the courtroom
6  or after deliberations begin, in the jury deliberation room
7  where they will be kept secure.  If you do not take notes, you
8  should rely on your own memory of what was said and not be
9  overly influenced by the notes taken by other jurors.

10         All right.  I think we've reached that point in the
11  proceedings now where we're ready for the opening statements.
12  As I mentioned, the Government will have the opportunity to
13  speak first, so we'll hear first from Mr. Cooper and then from
14  Mr. Dieni.  Mr. Cooper?

15         MR. COOPER:  Thank you, Your Honor.

16                      (Pause)

17              **PLAINTIFF'S OPENING STATEMENT**

18         MR. COOPER:  May it please the Court.  Counsel, Mr.
19  Long, members of the jury, good afternoon.

20         At the start of the case, or at the jury selection
21  process this morning, Judge Singleton read from the indictment
22  to you --

23         THE COURT:  No, he didn't.

24         MR. COOPER:  Excuse me.  I apologize, Judge Sedwick.
25  Been appearing too long in other courts.  Judge Sedwick read

1-12

1   the indictment to you, and so you know that the thrust of this

2   case is about some statements made on two dates, February 11th

3   and February 19th of this year by Mr. Long that were in plead-

4   ings filed in a civil case, and I'll get to the civil case in

5   just a moment to place everything in context.  But the state-

6   ments that were made that are at issue in this case are in the

7   last page, the last two paragraphs of a pleading captioned

8   "Motions to the Court Regarding the January 22nd, '02 Minute

9   Orders of the Court in Rule 407 Certification," Mr. Long wrote

10  the following words:

11          "Do it Singleton, or the Ninth Circuit Court will

12          not have time to remove you and Roberts from this

13          court as I will have your hearts in my hand.  Fuck

14          you and your federal law enforcement punks.  I've

15          been very well informed you for over a year that you

16          have only to live" -- you -- "you have only as long

17          to live as I do.  You have committed just about your

18          last criminal act against me, denied the last legal

19          and civil right and denied me appointed counsel and

20          payment and relief of denied counsel.  My time and

21          yours are just about up."

22  Dated February 12th, 2002, at Seward, Alaska; filed February

23  13th, 2002, here in Anchorage.

24          Thereafter on the 19th, Mr. Long prepared and filed

25  a statement -- excuse me -- a pleading and it's captioned

1   "Declaration to the Court of Extension of Time This Court has
2   to Act Before Plaintiff Acts Against this Governments and the
3   Court."  Now after the first page of telling and writing about
4   what Judge Singleton must do and should do, Mr. Lord -- excuse
5   me -- Mr. Long writes as follows, once again in the last two
6   paragraphs:

7           "James K. Singleton is" -- "is informed that the
8           past is not the past.  Only as plaintiff requests
9           these action does plaintiff stay his hand at this
10          time.  In the event plaintiff cannot find resources
11          to continue, no warning will be given to the federal
12          or state governments or this court of plaintiff's
13          imminent actions."

14  The two statements that the Government alleges and submits
15  that through the evidence to be introduced which I'll shortly
16  describe, will prove that these were threats made against
17  Judge Singleton and Judge Roberts in a civil action when they
18  were in the performance of their official duties.

19          The first action -- excuse me -- the first statement
20  I read was first to intimidate Judge Singleton because the
21  body of the pleading says do this, you will do this, you will
22  do that, and you will see the whole pleading in due course,
23  and against Magistrate Judge Roberts to retaliate against Mag-
24  istrate Judge Roberts for a number of things that Judge Rob-
25  erts had done in the course of the proceedings.

1-14

1        And the final statement, the last one I read, the
2   February 19th, was both to intimidate Judge Singleton to force
3   him to do something that he was not required to do, and also
4   retaliation for Judge Singleton's actions and conduct in the
5   case before him.  So that's the broad -- what -- what will the
6   evidence show?

7        Mr. Long had a dispute with the Alaska Department of
8   Motor Vehicles because they suspended and removed his driver's
9   license -- his operator's license, as the law says -- and that
10  was a result of a reciprocity agreement with the State of Cal-
11  ifornia, and the State of California had revoked his opera-
12  tor's license by reason of an alleged failure to pay child
13  support in the amount of some thirty thousand dollars.  You
14  will hear evidence that Mr. Long contested vigorously that he
15  owes that money -- that he -- his belief is that he's not the
16  father of the child at issue.

17       But that sets the factual background for what hap-
18  pens next.  When his license to operate a motor vehicle in
19  Alaska is revoked, he understandably becomes quite upset, and
20  ultimately, Mr. Long commenced in October of 1999 a civil ac-
21  tion -- that is, he sued the -- the County of Los Angeles and
22  other individuals for their action and in the -- in the nature
23  of -- of -- of abuse of his civil rights.  And it's that case
24  over which Judge Singleton presided and which led ultimately
25  to those pleadings that I've just read to you in the court.

1-15

1    You're going to learn that in the District of

2    Alaska, magistrate judges are often handed the motion practice

3    -- that is, that when a case commences, there are often a lot

4    of factual issues and legal issues that can be decided and

5    decided more efficiently by a magistrate judge and not taking

6    up the time of a United States District Court judge, and the

7    case was originally assigned to Judge Singleton and he ap-

8    pointed Magistrate Judge John Roberts to do this motion prac-

9    tice, and motion practice there was.

10    The Government will attempt to introduce in its case

11    in chief about twenty-nine or so pleadings that relate to var-

12    ious stages of the legal process.  Mr. Long brought some mo-

13    tions for what's called discovery.  He wanted certain docu-

14    ments produced, he wanted certain individuals identified.  The

15    government -- the State of Alaska, represented by Mr. Timothy

16    Terrell, who was the state lawyer appointed to represent the

17    State of Alaska Department of Motor Vehicles in this civil

18    suit, opposed those and at times also asked for extensions of

19    time so -- which -- to have certain pleadings met and to re-

20    spond and so forth.

21    And through the proceedings, Mr. Long became upset

22    because the case was not moving very quickly.  As Mr. Terrell

23    will likely testify, sometimes in U.S. District Court cases in

24    civil matters, because criminal matters always have precedence

25    on the calendar, it takes quite a bit of time to work a civil

1-16

1  case through the -- through the process.  And so as this hap-
2  pens, Mr. Long starts filing his papers and he files pleadings
3  and he becomes very upset over a number of issues as they
4  arise in the course of -- of these proceedings, and the issues
5  were many and somewhat varied, but he was very upset about the
6  lack of discovery that was being provided.  He kept on wanting
7  the court -- Judge Roberts -- to recommend and Judge Singleton
8  to rule, for instance, that a driver's license is a per -- a
9  protected species of property, and he wasn't getting the rul-
10  ings that he wanted.
11          There was also an issue over summary judgment --
12  that is a summary disposition proceeding, how a case may be --
13  may be disposed of prior to -- to a jury trial, and he was
14  upset and became more and more upset that he didn't get the
15  rulings that he wanted in this summary judgment.  Some parties
16  were dismissed, they were dismissed over his objection and he
17  continued to want to know why that was so.  He also wanted
18  appointed counsel -- he wanted the court to appoint a lawyer
19  for him because, in his view, that this was a post-conviction
20  proceeding because his license had been taken from him with-
21  out, in his view, due process, and the court refused to ap-
22  point counsel, and he became very, very upset over that.
23          And there was an incident about a trial date setting
24  conference and some remarks that he says were made by Judge
25  Roberts about setting a trial on a specific date.  And then

1-17

1    when the transcript and the tape were prepared, he didn't find

2    what he believed should have been there on the transcript or

3    on the tape, and he became very, very upset about that.

4            And there was a -- another incident at a -- at a --

5    at a -- at a conference and oral argument where he wasn't al-

6    lowed to bring his laptop computer into the courtroom.  And at

7    that same hearing where there was a third person, a court se-

8    curity officer sitting in the courtroom, and he became very

9    upset about that because he didn't know who that person was

10   and he started filing pleadings demanding to know who these

11   people were.

12           Well, the -- by reason of the upset and the frustra-

13   tions and his inability to get that which he thought he was

14   entitled to, he started in his pleadings to write evermore

15   vigorously that the judges were -- mas -- Magistrate Judge

16   Roberts was altering the transcripts, was committing what he

17   called stand-alone felonies.  At one point, he writes in a

18   discovery motion -- request for discovery -- that he was going

19   to strip that black dress from Judge Roberts either by legal

20   process or with his own hands if he had to, and continues to

21   make them evermore escalating specific statements of violence

22   against judges until we get to the final two that are at issue

23   here in this courtroom today.

24           The Government will call Mr. Timothy Terrell to put

25   into context for you the litigation.  He represented, as I

1-18

1    stated earlier, the State of Alaska devo -- Division of Motor
2    Vehicles.  Chief Deputy Wanda Phillips may be called just to
3    put in context the reason that certain United States Marshals
4    were sent down to -- into Seward to see Mr. Long and talk with
5    Mr. Long and report back to her and then what she did with
6    that report.

7            Deputy United States Marshal Ron DeWitt and Kevin
8    Guinn traveled to Seward on or about October the 5th and in-
9    terviewed Mr. Long, and they will describe for you his de-
10   meanor, the statements that he made, his empathy with Timothy
11   McVeigh, his desire to inflict punishment and physical vio-
12   lence upon law enforcement and governmental authorities.

13           And at the close of the evidence, when it's all in,
14   at that time we'll ask you to consider whether or not the Gov-
15   ernment has met its burden of proof beyond a reasonable doubt;
16   that these were statements made by Mr. -- Mr. Long in an at-
17   tempt to either intimidate Judge Singleton or retaliate
18   against Judge Roberts for what he had done and Judge Singleton
19   for what he had done.  Thank you.

20           THE COURT:  Thank you, Mr. Cooper.  Mr. Dieni?
21                           (Pause)
22           MR. DIENI:  Madam Clerk, could we lower the lights?
23                           (Pause)
24   Do we need all of them?  Let's see if we can work it that way.
25           THE CLERK:  That's all I have.

1-19

1        MR. DIENI:  Can you get it -- what you did just be-
2   fore?  Let's see if that -- 'cause we've got stuff ballooned
3   out.  Okay.

### DEFENDANT'S OPENING STATEMENT

5        Let me ask for your forgiveness right off the bat.
6   This is the first time I'm using this machine.  We'll see if
7   it works.

8        I want to take this case head on, and so in my open-
9   ing statement, I want to show you all of the highlights of
10  some of the anger that Mr. Long expressed, because quite
11  frankly, you didn't hear it from the Government's opening
12  statement.  The evidence is going to be a lot more of out and
13  out frustration from Mr. Long for what happened to him.  His
14  claim is base -- is pretty simple.

15       He was married to a woman, they separated by fifteen
16  hundred miles distance he estimated in his pleadings.  While
17  -- while they were separated but still married, she became
18  pregnant with another man, and he ended up getting stuck with
19  child support out of California.  Didn't even know he had the
20  obligation until years, years and years later.  In fact, this
21  entire fight is occurring at a time when the child at issue is
22  already an emancipated adult, and it's just a matter of deal-
23  ing with arrearages.

24       The Government underestimated the time line here.
25  And in order to understand why Mr. Long might be upset and --

1-20

1    and we admit show extreme disrespect for the court, you have

2    to understand what the time line is.

3            The Department of Motor Vehicles took away his

4    driver's license in June of 1997.  He wasn't notified of it

5    personally, they sent it to his last known address and he

6    wasn't served with it.  So he didn't find out until October of

7    1998 that his driver's license had been taken from him and

8    naturally he wanted to do something about it.  He struggled to

9    deal with the bureaucracy -- this is dating back to a child

10   support debt from 1983, okay?  And swimming upstream into the

11   bureaucracies is not easy, as he found, and ultimately on Au-

12   gust 30th of 1999, he filed his lawsuit.

13           He's a poor man.  He works as a jeweler part-time.

14   He had done some construction when he was younger, but his

15   back and his knees were bad, and so he's not a guy that has

16   the kind of money that he can go hire -- put out the kind of

17   money that can get him a good result from a lawyer.  So he

18   filed this lawsuit on his own, in effect taking on the State

19   of Alaska, Department of Motor Vehicles, and the County of Los

20   Angeles, which was the outfit that initially took away his

21   license.

22           The essence of his claim, of course, is it's not my

23   kid, why should I owe?  He asked for his driver's license back

24   and money damages for the harm caused him for being deprived

25   his license.  Now this was filed August 30 of 1999.

1       During the course of this lawsuit, he began I think

2   -- well, he began more and more upset that things weren't hap-

3   pening his way.  And finally, on January 22 of the year 2002

4   -- that's two and a half years -- now this is a guy who lives

5   in Seward -- two and a half years not having a driver's li-

6   cense, he got a favorable order from Judge Singleton.

7       It's document one oh eight.  Can you go ahead and

8   balloon that up?

9                           (Pause)

10      Finally, June 22nd -- January 22nd -- two and a half

11  years:

12              "Long has shown a probability of success on the

13          merits, or at least arguable issues and irreparable

14          injury with the balancing of the hardships tipping

15          in his favor.  Specifically, Long will probably pre-

16          vail in the Alaska Supreme Court.  The State's stat-

17          utory construction argument is strained and will

18          probably be rejected, but even if the Alaska Supreme

19          court shows the State to suspend driver's licenses

20          for failing to pay child support, it will mandate a

21          due process hearing to determine the ability to pay.

22          Long will suffer irreparable injury if his license

23          remains suspended until the court rules.  The hard-

24          ships balance in his favor:

25              "One.  No one contends that Long is a dangerous

1            driver; his privileges have been suspended solely to

2            force him to pay child support which he contends he

3            does not owe and cannot afford to pay.

4               "Two.  The child is grown and Los Angeles is

5            the assignee on the claim.  Alaska has no real in-

6            terest in whether Long pays child support beyond

7            hoping for reciprocity from California.

8               "In summary, a balancing of the hardships help

9            in Long's favor."

10 So that's January 22 of 2002.  So for two and a half years --

11 from August 30, 1999, 'til this date, he lost the privilege to

12 drive in the State of Alaska.  That was Long versus County.

13 Now it's not over -- the lawsuit's not over.  The Government's

14 attorney, Mr. Terrell, will undoubtedly testify that Judge

15 Singleton's order was temporary, certain issues were being

16 sent from the federal court over to the state court for the

17 state supreme court to look at to determine whether the taking

18 of Mr. Long's license was authorized by statute.

19         Well, what happened during the two years and four

20 months that caused Mr. Long to be angry?  Well, he had to

21 fight pro se -- that's a fancy lawyer term for "for yourself"

22 -- against learned counsel from the State of Alaska and it

23 just dragged on forever and ever.

24         What was Mr. Long's life during this time period?

25 Well, he lived in Seward, and in Seward he had a lot of

1-23

1    friends and the scene of the crime, so to speak, is the Marina

2    Café -- the Marina Café -- where he would sit there with his

3    friends, talk about the case and write his pleadings.

4            Well, what is the -- what is the -- let's just step

5    back for a second and find out what it is that Mr. Long stated

6    that is the basis of these charges.

7            Why don't we go ahead and show two oh six.

8                              (Pause)

9    Can it make it longer -- larger than that?

10                             (Pause)

11           "Do it Singleton, or the Ninth Circuit will not have

12           time to remove you and Roberts from this court be-

13           cause I will have your hearts in my hand.  Fuck you

14           and your federal law enforcement punks."

15   That's the question about profanity.

16           "I very well informed you over a year that you have

17           only as long to live as I do, you have committed

18           just about your last criminal act against me, denied

19           the last legal and civil right, denied me appointed

20           counsel, payment and relief of denied counsel.  My

21           time and yours are just about up."

22           Now what you're going to be deciding today -- or

23   today -- next day or two or three is how to read that is re-

24   ally the issue that's before you.  Is that a threat of physi-

25   cal violence in the total context?  Is that a threat of physi-

1-24

1  cal violence against the judge, or is it just blowing off

2  steam and -- and being the little guy trying to get the

3  judge's attention?  And the Government has to prove this be-

4  yond a reasonable doubt.

5          The "hearts in hand" is a bright metaphor and one

6  could look at hearts -- could we go back to two oh six,

7  please?

8                        (Pause)

9  "Your hearts in my hand" is going to be one I suppose the Gov-

10  ernment will rely on as -- and you'll have to decide whether

11  this is poetry expressing his anger or if it means that he's

12  physically going to do something to the judge's heart.

13          To twe -- to -- the key to these charges -- go ahead

14  and show us two twelve, please.

15                        (Pause)

16  The key to these charges is, is the -- is the defendant's as-

17  sertions specific and unambiguous enough that you can only

18  look at it as a threat to cause physical harm?  Keep in mind

19  he's not charged with contempt.  Clearly, this is contemptuous

20  talk.  It's an assault charge.  So the other one -- count

21  three, I believe --

22          "The past is not the past.  Only as plaintiff re-

23          quests these action does plaintiff stay his hand at

24          this time.  In the event plaintiff cannot find the

25          resources, no warning will be given to the federal

1-25

1           and state governments or the court of plaintiff's

2           imminent actions."

3   Again, the question is can it be said specifically, unambigu-

4   ously, that this is a threat of physical violence on the

5   judge?  That'll be the question.

6           When you look at what you -- at those -- those alle-

7   gations, you have to take into account the context in which

8   they were produced.  These were not notes stuffed under a door

9   of the courthouse.  These notes were on pleading paper, mean-

10  ing they were filed in a civil lawsuit.  They were signed by

11  Mr. Long, not inci -- they weren't cut up little magazine

12  things, you know, with no signature -- signed by Mr. Long,

13  filed on pleading paper, served on the other side, State At-

14  torney General got a copy of these pleadings, Mr. Long's ad-

15  dress appears on the bottom of the form.  Mr. Long is practic-

16  ing law in the way he presents these things

17          Where did he produce them?  I mentioned to you the

18  scene of the crime, the Marina Café, a family restaurant.  We

19  have a videotape we'll show you of the Marina Café.  Got ta-

20  bles all around the edge of it, little horseshoe in the mid-

21  dle.  Mr. Long, twice a day, sits at that little horseshoe

22  with his laptop computer, and there's a set of friends he has

23  that are there, and you'll hear testimony and see a picture of

24  what this place is like.  It's not some dark cave or some lit-

25  tle trailer off in the woods where the Unabomber might be

1-26

1   plotching a -- plotting a hatch.  It's Mr. Long's hangout.

2         The police knew where to find him.  He made his lo-

3   cation no secret.  The state -- the Deputy Marshals went down

4   to see him on October 5, found him where they knew they would.

5   When the arrested him on March 1, two -- 2002, went down

6   there, knew where he was, he didn't hide, no secret about

7   where he -- where he lived and where he did his work.

8         Okay.  Like I said, the question is how to interpret

9   those statements on the 12th and the 19th of 2002.  I want to

10  show you the worst of what's in those writings during the time

11  Mr. Long got angrier and angrier, and he does talk about doing

12  bad things to the government.  Why don't we go ahead and show

13  document seventy-two.

14                        (Pause)

15              "Defense counsel for the State of Alaska also should

16              know well that if an end to the ability to attempt

17              to use the courts for protection or relief comes to

18              the plaintiff, created by the labor of defense coun-

19              sel and others, plaintiff will be reduced to defense

20              by deadly force against the governments in his just

21              defense against the criminal and defective assaults

22              against his person and rights by the governments."

23  This was a document dating back -- it's document seventy-two

24  -- and it is dated September 29 of 2000.

25              Well, you can imagine the judge didn't like that.

1-27

1    And so the judge responded to Mr. Long when he started talking

2    about his deadly force against the governments.   In document

3    seventy-three, the judge issued an order.

4                              (Pause)

5    This is what the judge said on October 4:

6              "Plaintiff" -- "Finally, plaintiff is cautioned that

7              threats or retaliation against a person or party

8              because of this or related pending litigation may

9              constitute obstruction of justice, a crime under

10             federal law.   The Court recognizes Mr. Long's desire

11             to have this litigation concluded as soon as possi-

12             ble.   All parties are entitled to due process and an

13             opportunity to be heard.   The parties are expected

14             to abide by the pretrial deadlines set by the

15             Court."

16   Mr. Long then responded a few days later to the Court's state-

17   ment.   Document seventy-six:

18             "Your Honor, in your minute order of October 4,

19             2000, you have cautioned that threats or retaliation

20             against a person or party may constitute obstruction

21             of justice.   I wish you to understand that no threat

22             of any act or action of criminality is or has been

23             made against any person."

24   So putting these three documents together, pleading one talks

25   about deadly force against the governments, and then immedi-

1-28

1   ately upon being called by the judge on it, retracts and says,

2   no, "no act of criminality is or has been made against any

3   person."

4        Now this is -- of course, we're talking September of

5   2000 -- September, October of 2000.  That's about a year after

6   he filed his lawsuit.  Obviously, we're just getting rolling

7   'cause he's still a year -- a year and months and months away

8   from getting his license back.  So he does make -- he pulls

9   out of his -- of his is bag a bunch of poetry, ugly stuff, and

10  I want to show you a couple of the items.  The Government made

11  mention of the little black dress.  Document one oh five.

12        "If made necessary by the court" -- "federal court,

13        I will use the time I have left to strip that little

14        black dress off your ass in some manner of judicial

15        system review or by my own hands if necessary."

16  "Hearts in hand."  Are we talking about little black dress

17  ripped off literally or figuratively?  That'll be a question

18  for you.

19        And then in a -- in its (indiscernible) at document

20  one twelve, he refers to:

21        "May I ask a copy of the court recorder's transcript

22        of the scheduling conference of August 4 filed Au-

23        gust 9.  If it's hidden up the ass of this court, I

24        will be happy to kick it out.  And if it's been al-

25        tered, fuck you, too."

1-29

1    So kicking the transcript out of the ass of the Court, should

2    that reasonably be received as a literal statement of what he

3    intends to do by the party receiving it, or is it figurative.

4    Is it?  That'll be the question you'll have to deal with.

5              Well, naturally this produced yet another warning

6    from the Court.  Document one twenty-six.  At this point we're

7    in April 25, oh one:

8              "The tenor of disparaging remarks by plaintiff is

9              not lost on the Court.  Should the plaintiff con-

10             tinue to use profanity and threats against this

11             Court, he runs the risk of being found in contempt

12             of court and having his pleadings stricken from the

13             record."

14   This is plaintiff's second warning.

15             Well, our position at the end of this trial will be

16   he should have been found in contempt of court, but that's not

17   what we're here to talk about.  We're here to talk about as-

18   sault and whether he assaulted the judge, not whether he was

19   contemptuous of the Court.  We concede that.

20             Well, in response to document one twenty-six, this

21   would have been about six weeks later, Mr. Long makes it clear

22   at document one forty-four that he is not a risk of harm to

23   anyone.  "Motion is made to this court" --  is that document

24   one forty-four?

25             "Motion is made to this court that this case, jus-

1          tice" -- "just bring the parties before the court to

2          issue rulings to this point in the matters stated to

3          be resolved, and rulings on these and other out-

4          standing motions.  It is understood there is no

5          right to this request.  Plaintiff will restrain his

6          person before the court even in the event the court

7          cannot bring itself to act in a lawful honest man-

8          ner.  This justice is going" -- "going on two years

9          of my life.  At least have the guts, if you're going

10          to F me, to do it in my face, I can handle that."

11  So plaintiff will restrain his person before the court.

12          These ugly writings were mailed from a hundred and

13  thirty miles away.  The assault, if it were to be reasonably

14  feared by the recipient, would not occur from a hundred and

15  thirty miles away, it would have occurred --

16          MR. COOPER:  Object to the argument, Your Honor.

17          MR. DIENI:  The evidence will show that the Govern-

18  ment -- that the pleadings were sent from a hundred and thirty

19  miles away.  The allegation is that the threat was one of

20  physical violence to the person of the judge.  In this plead-

21  ing, one forty-four, Mr. Long states he will restrain himself

22  in the person of -- in -- in -- in the face of the judge when

23  that occurs, when he gets into court.

24          Well, we're moving into the fall of the year 2001,

25  the lawsuit is now, what, sixteen, eighteen months old, and we

1-31

1    have more colorful language from Mr. Long.   Document one
2    sixty-six.
3                              (Pause)
4    The last line:
5              "If repetitive and redundant are not enough, maybe a
6              foot up your ass, Justice Roberts, may help.   I
7              strive to be helpful when I can."
8    It gets worse.   Document one ninety-five.
9                              (Pause)
10             "Under this, if plaintiff nails Terrell, Roberts and
11             this justice to a wall and skins all of you alive,
12             as long as that action has nothing to do with the
13             issues of this suit, the actions of plaintiff will
14             not be punishable under law.  As wonderful as this
15             would be to plaintiff, plaintiff does not believe
16             the law works that way.  This justice had better be
17             damn glad of that.  The criminal actions of Roberts
18             are a stand-alone federal criminal action" --
19   -- et cetera, et cetera.  Press on.  Later in the same plead-
20   ing:
21             "You, Justice, able to have my word, I will, if the
22             system fails to punish Roberts by your actions as
23             if" -- "as is your responsibility, not only cut Rob-
24             erts' balls off, cut yours off and feed them to
25             you."

1-32

1    Now we're reaching the height of Mr. Long's poetry, but how

2    does he follow up that phrase?

3              "I make no threats and attempt in no manner to in-

4              terfere with justice, but simply just to gain jus-

5              tice from a corrupt system and the clear open crimi-

6              nals within it."

7                        (Pause)

8    More nice poetry:

9              "Let the state appeal themselves into shit stains on

10             busted concrete" --

11   -- et cetera.  Finally, in that same pleadings, that's docu-

12   ment one ninety-five, Mr. Long comments in a self-effacing

13   manner:

14             "Plaintiff may well be paranoid and to a large part

15             insane, but that doesn't mean no one is out to get

16             me."

17   Document one ninety-five.

18             Now that's probably the last -- I call them nasty-

19   grams -- written from a family style restaurant, the Marina

20   Café, about two blocks from the SeaLife Center in Seward,

21   Alaska, before we get to document two oh six and two twelve,

22   where what we'll assert into this case more poetry is written.

23             All of you probably drove here today, those of you

24   who live in the valley or Soldotna, regularly enjoy the com-

25   fort of an automobile.  Mr. Long isn't going to make any apol-

1-33

1  ogies for his anger for what's happened here. He feels he --
2  as you will see from all the pleadings -- was wrongfully dis
3  -- denied one of really our fundamental rights as citizens in
4  this state would be a right to travel, right to work, to have
5  a -- access to a vehicle. These pleadings are dripping with
6  these kinds of concerns and complaints. Yeah, he was angry
7  and he makes no apology for that.

8        The way he chose to express himself as an un -- un-
9  learned counsel for himself is the -- well, yes, it's clearly
10  deplorable. No excuses there, it's contemptuous. The ques-
11  tion is -- which you'll have to decide at the end of the case
12  is whether this is just contempt in the form of the colorful
13  poetry or whether it really is a specific and unambiguous
14  threat to harm a federal judge, and I'll show document two oh
15  six and two twelve.

16                    (Pause)

17        "Hearts in hand," "F you," there's -- the phrase --
18  the phraseology is cryptic, probably intentionally. Again,
19  written in distant language, unspecific and unclear. "Past is
20  not the past," "stay his hand" -- jeez, staying the hand is
21  nothing compared to cutting off balls or skinning or nailing
22  to the wall. Things he said he didn't intend as threats.

23        Folks, I do apologize for having to present what is
24  a lot of harsh language. At the end of this case, it will be
25  our plea to you that you see these for what they are, blowing

1-34

1  off steam, angry words, not a serious threat to cause actual

2  physical harm to a federal judge.  That concludes my opening.

3  Thank you, Your Honor.

4          THE COURT:  Thank you, Mr. Dieni.  Mr. Cooper, I'll

5  ask you to call your first witness.

6          MR. COOPER:  Thank you, Your Honor.  The Government

7  calls Timothy Terrell.

8                      (Pause)

9          UNIDENTIFIED SPEAKER:  Do we get those notebooks

10  now?

11          THE COURT:  Yes, she should be giving them to you.

12                      (Pause)

13  If you'll come forward here, Mr. Terrell, and stand in front

14  of the Clerk's station, she'll give you an oath in just a mo-

15  ment.

16                      (Pause)

17  Actually, why don't you just put your things down and give her

18  a minute.

19                      (Pause)

20          THE WITNESS:  Your Honor, where (indiscernible -

21  away from microphone).

22          THE COURT:  Just wait there if you would.  She's

23  passing out notebooks to the jurors, so as soon as she's ac-

24  complished that task, she'll give you an oath.

25                      (Pause)

Terrell - Direct                                        1-35

1   All right, sir.  If you'd stand in front of the Clerk, she'll

2   give you an oath.

3            THE CLERK:  Please stand here, sir.  Thank you.

4   Please raise your right hand.

5            **TIMOTHY TERRELL, PLAINTIFF'S WITNESS, SWORN**

6            THE CLERK:  Thank you, sir.  Please have a seat at

7   the witness box.  For the record, sir, please state your full

8   name, spelling your last name, with your current address.

9            THE WITNESS:  Timothy Wynn Terrell.  Business or

10  residence?

11           THE COURT:  Give your business address, but spell

12  your last name for the record, please.

13           THE WITNESS:  T-e-r-r-e-l-l.  And my business ad-

14  dress is 310 K Street, Suite 407, Anchorage, Alaska, 99501.

15           THE COURT:  Mr. Cooper?

16           MR. COOPER:  Thank you, Your Honor.

17                        **DIRECT EXAMINATION**

18  BY MR. COOPER:

19  Q    Mr. Terrell, by whom are you employed, sir?

20  A    I'm employed by the State of Alaska, Department of Law.

21  Q    In what capacity?

22  A    I'm an Assistant Attorney General.

23  Q    Could you tell the jury, please, as an Assistant Attorney

24  General, what's your normal job responsibilities are?

25  A    I represent three different agencies.  I represent the

Terrell - Direct                                    1-36

1   Department of Corrections, I represent the Parole Board, and I

2   represent the Division of Motor Vehicles.  In corrections and

3   the parole board, I mostly defend civil litigation brought by

4   inmates against the DOC and its employees.  In DMV litigation,

5   I represent the State in administrative appeals of license

6   revocation actions.

7   Q    How long have you been working there in the Office of

8   Special Prosecutions and Appeals?

9   A    A little over ten years.

10  Q    And how long have you been a lawyer?

11  A    Since 1990, twelve years.

12  Q    In -- in the course of performance of your responsibili-

13  ties as lawyer for the State, about how much of your time is

14  spent on Department of Motor Vehicle or DMV type actions?

15  A    Well, now it's getting to be may -- maybe about half.

16  Q    Now in the course of your performance of your duties,

17  both representing the Department of Corrections or DOC and the

18  Parole Board and -- and -- and Department of Motor Vehicles,

19  do you have on occasion the responsibility to litigating in --

20  here in the federal district court here in the District of

21  Alaska?

22  A    Yes, I do, fairly frequently.

23  Q    Are you then familiar with the way that a district court

24  judge may sometimes assign pretrial motions to a magistrate

25  judge?

1    A    Yes.

2    Q    Could -- could you explain just briefly that system here

3    in -- in the District of Alaska?

4    A    It's mostly done in -- in prisoner cases, but it can also

5    be done in other civil cases.  To sort of relieve the workload

6    on judges like Judge Sedwick, there's a system set up where

7    magistrate judges can be assigned to make reports and recom-

8    mendations on motions that are filed by the attorneys so that

9    an attorney in a case -- Mr. Cooper or -- or Mr. Dieni could

10   file a motion and then the magistrate judge will analyze it

11   and issue what's called a report and recommendation, and then

12   at that point, the district court judge decides to accept or

13   modify or reject the magistrate judge's recommendation.

14   Q    Under the local rules, they perform what's called a de

15   novo review, is that correct?

16   A    Well, that -- that depends on the type of case, but gen-

17   erally speaking, yes, that's --

18   Q    And -- and what does de novo mean?  One of those legal

19   terms that we use so often.

20   A    De novo essentially means they give it a full searching

21   review on their own and -- and don't accord deference to the

22   other judge's findings.

23   Q    Now in the course of your performance of your -- and the

24   discharge of your responsibilities as an Assistant Attorney

25   General with the Department of Law here in Alaska, did -- have

Terrell - Direct                                    1-38

1   you ever been involved representing your clients with an indi-
2   vidual identifying himself as Robert A. Long?

3   A    Yes, in several lawsuits.

4   Q    Okay.  I want to con -- confine our inquiry here to a
5   case captioned Robert A. Long, Junior versus County of Los
6   Angeles, Jay Delaney (ph), Carrie Hennings (ph), et. al., Case
7   Number A99-0520 Civil, here in the District of Alaska, okay?
8   Are you familiar with that case?

9   A    Yes, I am.  I -- I was counsel for the DMV administrators
10  who were the defendants in the case.

11  Q    And -- and have you met Mr. Long personally before?

12  A    I've attended a couple of court hearings where I met him
13  personally, yes.

14  Q    And -- and is he present here in the courtroom today?

15  A    Yes, he's over at the table there next -- seated next to
16  Mr. Dieni.

17  Q    Okay.  The gentleman in the middle?

18  A    Yes.

19  Q    All right.  Thank you.  Now how did this -- how did this
20  litigation first come to your attention?

21  A    Oh, in early 2000 -- I think in March of 2000 -- Diane
22  Wendlandt, who is an Assistant Attorney General in the Civil
23  Division of the State, called me up and said she'd gotten a
24  copy of a -- of a motion for an order entering a default judg-
25  ment in a civil case and thought it might be something that I

1    was supposed to deal with, and so we talked about it and it

2    turned out it was my case, so I took over the case.

3    Q    What's a -- what's a default judgment -- an order for a

4    default judgment?

5    A    A default judgment -- when a civil action begins -- the

6    plaintiff files what's called the complaint, then the defen-

7    dant files an answer -- or they're supposed to file an answer,

8    but sometimes if the defendant hasn't answered under the time

9    line set out by the court rules, the plaintiff then will move

10   for a default judgment in which they ask the court to simply

11   grant them the relief that they requested in their complaint

12   without any further court proceedings simply by virtue of the

13   fact that the defendant has failed to answer.

14   Q    Okay.  So if the time has run out for the defendant to

15   answer --

16   A    Right.

17   Q    Okay.  And -- and had such an order been entered in this

18   -- this A99-0520 Civil case?

19   A    Yes, there -- well, there's two steps.  First you enter a

20   default and then -- and then you enter the default judgment,

21   and Judge Singleton had issued an order of default but not a

22   default judgment yet.

23   Q    Once you obtained or received that pleading, what did you

24   do?

25   A    I contacted the DMV employees who were the defendants in

Terrell - Direct                                    1-40

1  the case and got the information from them and then moved to

2  set aside the default.

3  Q    And was that ultimately successful?

4  A    Yes, it was.

5  Q    And just -- I'm -- I'm asking now in general terms, after

6  the default was set aside, was there then a course of litiga-

7  tion that -- that then ensued over the years?

8  A    Yes, there -- the -- the case is still ongoing, but it's

9  -- yeah, for the last couple of years.

10         MR. COOPER:  Your Honor, the Government has previ-

11  ously marked and shown to defense counsel Exhibits 1 through

12  29, which are certified copies of the pleadings filed in A99-

13  0520 Civil.  We'd ask that we -- ask that they be identified

14  and admitted under Rule 1005.

15         THE COURT:  Mr. Dieni, will there be any objection

16  to Exhibits 1 through 29?

17         MR. DIENI:  No, sir.

18         THE COURT:  All right.  Exhibits 1 through 29 are

19  admitted.

20      (Plaintiff's Exhibits 1-29 admitted)

21                   (Pause)

22  BY MR. COOPER:

23  Q    Sir, I've handed you what's been marked and -- and admit-

24  ted into evidence as one through twenty-nine.  Would you take

25  a moment just to --

Terrell - Direct                                              1-41

1    A    Sure.

2    Q    -- take a look at those documents, please?

3                          (Pause)

4    A    Okay.

5    Q    Do you recognize those, sir?

6    A    Yes, I do.

7    Q    Generally, could you tell us what they are, please?

8    A    They simply represent a series of -- of pleadings and

9    motions filed in the Long case.

10   Q    And also some minute orders from Judge Singleton and

11   also --

12   A    Right.

13   Q    -- from Judge Roberts' chambers.

14   A    Right.

15   Q    Sir, in fairness, does that represent the totality of all

16   the pleadings that have been filed in A99-520 Civil?

17   A    No.  My -- my personal litigation file is four volumes.

18   It takes up that entire suitcase there.  That's --

19   Q    Okay.  When you say suitcase, it's like a large brief bag

20   that you're pointing at?

21   A    The brief -- the briefcase right there.  That's -- yeah.

22   Q    Now were you the sole lawyer that was representing the

23   State of Alaska and Department of Motor Vehicles in the liti-

24   gation with Mr. Long in this case?

25   A    Yes, I was.

Terrell - Direct                                    1-42

1    Q    Would you describe for the jury your level of familiarity
2    then -- then with the pleadings and the -- the matters that
3    were brought before the Court and litigated?
4    A    Well, fairly extensive.  I mean, it's -- it's hard to
5    remember every single -- because they are so voluminous, it's
6    hard to remember every single thing, but I mean it's --
7    Q    Okay.  Turning your attention to Exhibit Number 1, sir,
8    can you tell us what that is, please?
9    A    Yes.  This is actually the amended complaint in the Long
10   case.
11   Q    And -- and explain to the jury, please, what it is that
12   an amended complaint is -- is meant to do.
13   A    Well, in this case, Mr. Long had originally filed an
14   opening complaint pro se, which means he was acting without a
15   lawyer, so the -- the judge in performing their initial duties
16   of screening the case had identified several problems or defi-
17   ciencies that needed to be corrected and gave Mr. Long time to
18   file an amended complaint, and in response to the judge's or-
19   der, Mr. Long filed this document which is the amended com-
20   plaint.
21   Q    Okay.  What's the date of this document, sir?
22   A    The date of execution?
23                        (Pause)
24   Mr. Cooper?
25   Q    Yes, the date of execution, if you can.

1    A    It looks like October 20th of 1999.

2    Q    Okay.  And filed that same day?

3    A    Yes.

4    Q    Okay.  Without reading the document out loud to the jury,

5    what is the gravamen or the -- the -- the essence of -- of Mr.

6    Long's complaint as set out in Exhibit 1?

7    A    Well, it involves several things.  There -- there are

8    several different defendants.  There's the Los Angeles County

9    defendant and the DMV administrator defendants and -- and the

10   gravamen of his complaint is that he had some underlying child

11   support action that was enforced by Los Angeles County, and so

12   he complains with -- with respect to that; that the -- that

13   the child support order that was issued by Los Angeles County

14   was fraudulently obtained for whatever reasons, and then with

15   respect to the DMV defendants, he alleges that it was sort of

16   a conspiracy between the DMV defendants and -- and the Los

17   Angeles County defendants to suspend his license for -- so

18   they could enforce the child support order and things like

19   that.

20   Q    Let's -- let's talk a little bit about child support and

21   reciprocity.  Is it your understanding, sir, from reading this

22   pleading that his driver's license -- operator's license in

23   California had been suspended for failure to abide by a child

24   support order?

25   A    I believe so.  I -- from talking to DMV administrators or

Terrell - Direct                                    1-44

1    -- or -- or -- you -- you'll --

2              MR. DIENI:  Well, I'm going to object.  We're get-

3    ting into hearsay here.

4    A    Well, let me -- let me re --

5              THE COURT:  Sustained.

6    A    Let me rephrase my answer then.  I guess what I mean is in

7    -- in running the interstate computer checks on Mr. Long's

8    license, which were attached as exhibits to some of my motion

9    work in this case, there's little computer codes that indicate

10   the underlying basis for the suspension in another state, and

11   I think it's according to a uniform national system, so it --

12   any state doing an interstate computer check can know what the

13   basis for the action is in the other state, and they assign

14   uniform codes and I believe that the code was understood to be

15   child support.

16   BY MR. COOPER:

17   Q    So if a person has their license suspended in California,

18   can -- can they have a -- still have an operator's license in

19   Alaska?

20   A    Well, that's -- that's actually the -- the subject of,

21   you know, litigation in -- in -- in this case -- in the Long

22   case, but basically DMV's interpretation of the existing

23   Alaska Statutes is if you come to Alaska and if you apply for

24   a driver's license and they discover you're suspended or re-

25   voked in another state, whether it's a court suspension or

Terrell - Direct                                    1-45

1    whether it's an administrative suspension from a DMV, then

2    you're not entitled to be licensed.

3    Q    Did there come a time, based upon your review of Mr.

4    Long's DMV records, that the State of Alaska had issued a -- a

5    notice of revocation or suspension to Mr. Long concerning his

6    OL license?

7    A    Yeah, I think it was in June of ninety-seven, somewhere

8    around that time.

9    Q    And tell me -- or tell the jury, excuse me -- what is --

10   if there is a reciprocity agreement between Alaska and Cali-

11   fornia with respect to a driver's license, what it is and how

12   it operates.

13   A    Well, there -- there is an interstate driver's license

14   compact and it's not something I have a great deal of famil-

15   iarity with 'cause it's not something that would get -- hon-

16   estly gets litigated a lot in -- in my run of cases, but --

17   and it's all -- also the subject of some dispute in this case

18   as to whether his license was suspended under the interstate

19   compact or other -- other statutes.  But basically, the inter-

20   state compact that requires states to report to each other

21   into an interstate data base criminal convictions and things

22   like that that involve licensing so that you can reciprocally

23   enforce suspensions and revocations and things.

24   Q    And so what is the purpose then, with respect to revoca-

25   tions, of the interstate compact as you understand it?

Terrell - Direct                                1-46

1   A    Well, simply to enforce a degree of uniformity and -- and

2   state laws and to ensure that people can't skip from one state

3   to another to avoid actions against their license in one

4   state.

5   Q    'Kay.  Turning your attention, if we could, please, to

6   Exhibit Number 2.  Do you have that before you?

7   A    Yes, I do.

8           MR. COOPER:  Could you give me two on this film,

9   please?

10  BY MR. COOPER:

11  Q    Sir, what is Exhibit Number 2?

12  A    It's what I would term sort of a miscellaneous motion.

13  It's just an action where he asked the court to take action by

14  a certain date and asked the court to answer several questions

15  that he's posed in his various legal documents.

16  Q    'Kay.  What's the date that it was filed, please?

17  A    Filing date is March 16th, 2001.

18          MR. COOPER:  If the Court can bear with me for just

19  a moment.

20          THE COURT:  I will.

21                       (Pause)

22  As the Court is aware, sometimes gremlins attack the computers

23  both on the defense and the plaintiff's side.

24                       (Pause)

25  Well, let me use the document camera if I may while we're

1    working on this over here.

2                        (Pause)

3              THE COURT:  I think she's got it.

4                        (Pause)

5    BY MR. COOPER:

6    Q    Okay.  So I think you've testified it was filed about

7    March 16th or so.  And what was your understanding about what

8    this document was -- the purpose of this document?

9    A    Well, like I say, it's -- it's what I would call sort of

10   a miscellaneous motion.  He asks the court for a jury trial

11   date, he asks the court to answer several other legal ques-

12   tions that he's posed in his pleadings -- or in his motion

13   work rather.

14                        (Pause)

15   Q    And now that we're really ready to go here, here's the

16   caption -- it's in the same case, is it not?

17   A    Yes, it is.

18             MR. COOPER:   'Kay.  May I have page four, please?

19   BY MR. COOPER:

20   Q    Now as Mr. Long -- as Mr. Long proceeded along in the

21   course of this litigation, could you describe to the jury what

22   your impression was of the sense of -- you know, the urgency

23   of his pleadings?

24   A    Well, I think it definitely shifted.  I mean, there were

25   no -- in the early stages of the litigation, you know, the

1  first volume or so of my file, everything is, you know, rela-

2  tively calm when the case was in its incipient stages, but I

3  would say as -- as time went by and there were more adverse

4  legal rulings, that the urgency of his pleadings, if you want

5  to phrase it that way, increased markedly over time.

6  Q    Now in -- in this exhibit -- and I'm -- we'll get to page

7  four here for the jury in a moment.  Why don't you take --

8  turn to page four in --

9            THE COURT:  You're speaking of Exhibit 2?

10           MR. COOPER:  Excuse me, Exhibit 2.  I apologize,

11  Your Honor.

12  BY MR. COOPER:

13  Q    Turning your attention, sir, to -- getting my mouse back

14  -- the third or fourth paragraph here which I'm highlighting

15  for you, which says:

16           "This filing will be as useless as all others.  The

17           court knows its bad actions as it" -- "and is at

18           risk from them.  It will act as the other parts of

19           the governments at risk for their bad actions" -- or

20           -- "from their bad actions, act only to destroy this

21           plaintiff instead of being responsible for its bad

22           acts in granting relief."

23  Can you tell the jury, based upon your experience with this

24  case, which bad actions Mr. Long was referring to in this

25  paragraph?

1    A    As far as the court's bad actions?

2    Q    Yes.

3    A    Just essentially adverse rulings against him.  I think

4    Mr. Long also had several other complaints.  He -- I think he

5    believed that a magistrate judge that was assigned to the

6    case, Magistrate Judge Roberts, had -- had falsified or al-

7    tered a tape of a -- of a pretrial status hearing that had

8    been held.  There were some other things like that, but I

9    think it was a combination of that and just the rulings

10   against him on various legal issues that he perceived to be as

11   -- as its illegal actions.

12              MR. COOPER:  Turning your attention, please, to Ex-

13   hibit Number 3.  May I have three, please?

14                              (Pause)

15   BY MR. COOPER:

16   Q    Could you tell us what Exhibit Number 3 is?

17   A    Well, it's -- it's phrased as request for discovery,

18   meaning documentation from the State and he felt he hadn't

19   gotten the discovery that he wanted from the State and that's

20   -- that's the underlying nature of it.

21   Q    Turning your attention to the first paragraph where it

22   says:

23              "To make this as simple as can be, grant me my dis-

24              covery now or risk facing a judicial review board

25              and senate impeachment hearing."

Terrell - Direct                                        1-50

1    Do you know to what he's referring there?

2    A    Well, I -- I -- I believe that Mr. Long felt that, you

3    know, he would bring this to the attention of the press or to

4    the attention of a judicial review board or the U.S. Senate

5    and start impeachment hearings or something again -- against

6    Judge Singleton.

7    Q    Now is it against Judge Singleton?  I'm going to draw

8    your attention to the -- the bottom paragraph.  It is against

9    Judge Singleton or Judge Roberts, do you know?

10   A    Honestly, off the top of my head, I don't know because at

11   the beginning of the case, these statements would have been

12   more directed against Magistrate Roberts, but later on as

13   Judge Singleton is -- issued final rulings on more of the mo-

14   tions, I -- I think it might have been more directed towards

15   him.

16   Q    Drawing your attention, sir, to the date.  What date was

17   this -- was this filed?

18   A    April 2001.

19   Q    And at that time, who was doing most of the work on the

20   -- on the case?

21   A    Probably still Magistrate Judge Roberts, but I think

22   Judge Singleton may have issued more rulings at this point.

23   He may have ruled on the summary judgment motion by that time.

24            MR. COOPER:  'Kay.  Exhibit 4, please.

25                        (Pause)

Terrell - Direct                    1-51

1   BY MR. COOPER:

2   Q    Drawing your attention to Exhibit Number 4, can you tell

3   us what this is?

4   A    Well, again, this is I guess what I would kind of term a

5   miscellaneous motion.  It's not really something a lawyer

6   would normally file in litigation, where he just poses a se-

7   ries of questions to the court essentially asking it to ex-

8   plain itself and -- and justify its prior rulings in the -- in

9   the case.

10  Q    In fact, what -- what is he asking for here?

11  A    In terms of -- oh, in the highlighted --

12  Q    Yes.

13                         (Pause)

14  A    Honestly, I'm not always entirely clear in some of Mr.

15  Long's pleadings.  What he's asking for in this maybe an exam-

16  ple.

17  Q    Well, is he complaining about --

18  A    I don't -- I don't --

19  Q    -- the default judgment?

20  A    I think so, but I mean, he says "In granting default

21  judgment to plaintiff," and no default judgment was granted to

22  -- to plaintiff.  Default was entered, but it was ultimately

23  set aside.

24          MR. COOPER:  Ms. Branson, were you able to get up in

25  that -- where the page number is?

<u>Terrell - Direct</u>                    1-52

1                      (Pause)

2    BY MR. COOPER:

3    Q    See if I can -- still continuing on page two of Exhibit

4    Number 4, does this assist you in determining what it was he

5    was complaining about right now?  What he was referring to as

6    the bad faith actions?

7    A    Well, I mean -- yeah.  I mean, I think the -- the bad

8    faith actions referred to were just -- again, refer to the

9    series of underlying rulings and summary judgment motions and

10   things like that.  I think the state defendants, as I recol-

11   lect, moved for summary judgment and -- in their favor and the

12   court had granted it on most of their claims and left a few

13   outstanding issues that were left to be litigated, but -- but

14   the bulk of his claims had been disposed of at that point and

15   he felt those rulings were erroneous.

16                     (Pause)

17            MR. COOPER:  I apologize, Your Honor.  I have to

18   find within here a specific exhibit number now that the system

19   has cratered on me.

20                     (Pause)

21   BY MR. COOPER:

22   Q    Well, turning your attention, sir, to page four of five.

23   The -- the penultimate paragraph on that page, it starts

24   "Plaintiff at this date."  Could you read that out loud for

25   us, please?

Terrell - Direct                                    1-53

1   A    Page four of five of document number four?

2   Q    Yes.

3   A    On the very bottom -- okay.  I don't think it's the same

4   one as is on screen here is why I'm asking.

5   Q    No, it's no longer on the screen for the jury.

6   A    Okay.  The bottom paragraph says:

7              "The court is asked to explain in a lawful manner

8              the dismissals of the county based of the facts of

9              this court's records that no review was ever asked

10             of the lower court, that no review was ever neces-

11             sary in this suit of the lower court's actions as

12             it's the duty under law of this court to have re-

13             solved the issues between plaintiff and the county

14             to resolve this federal civil rights suit."

15  And that's more or less --

16  Q    And could you read the paragraph above that, please?

17  A              "Plaintiff at this late date does not move this

18             court to reinstate the county as defendants.  This

19             only as the court would use this action to" -- and

20             I'm quoting here -- "to fuck over plaintiff by ex-

21             tending this suit to aid the government parties in

22             the murder of plaintiff."

23  Q    In the issues that Mr. Long was upset about over the

24  course of this litigation, was extension of time -- or the

25  length of time it was taking to prosecute this one of the mat-

Terrell - Direct                                          1-54

1   ters that he was concerned with?

2   A    Yeah, that was -- that was a very constant theme.  His

3   feeling was that -- that the court in -- in combination with

4   the -- with the State was intentionally dragging out the ac-

5   tion and that it was a deliberate attempt to -- he'd -- he had

6   lost his driver's license as a result of the underlying action

7   and so his claim was that by dragging out the action, the

8   State was preventing him from working and getting a job and

9   was intentionally trying to murder him, and he was convinced

10  that it was an intentional attempt to thwart his ability to

11  earn a livelihood and ultimately to kill him.

12  Q    And so as this litigation ensued, how did -- how did he

13  address that concern or that issue?

14  A    How did he address the concern or how did I --

15  Q    Yes.

16  A    It was just repeated throughout the pleadings and I --

17  Q    Now was there ever an issue about Mr. Long being allowed

18  to take his laptop into a courtroom?

19  A    I -- I believe there was.  I know we -- we only had one

20  or two pretrial status hearings in the case and at one of

21  those conferences, Mr. Long drove up from Seward, brought his

22  laptop with him, and I think the Marshal's Office -- whoever

23  runs the -- you know, the little screening station outside

24  that you go through when you come in, had not permitted him to

25  bring his laptop into the courtroom for whatever reason.

Terrell - Direct                                                1-55

1    Q    How did he -- how did he react to that?

2    A    I'm not sure how he acted -- reacted at the time.  I know

3    it became more of something in --

4                MR. DIENI:  I'm -- I'm going to object.  There's a

5    lack of personal knowledge.  I -- I -- I think that's where

6    he's heading here.

7                THE COURT:  Sustained.  He can only testify to what

8    he saw.

9    A    Yeah, and I --

10               MR. COOPER:  Yeah, that's --

11   A    -- and I -- I'm saying, I -- I -- you know, what I --

12   only -- the only way I know is that it resurfaced more in

13   pleadings later where he complained about the -- the actions.

14   I wasn't there personally to observe what happened when the --

15   BY MR. COOPER:

16   Q    Right.  And -- and that's what we were asking is did he

17   respond by filing pleadings?

18   A    Yes, he did.

19   Q    Okay.  And -- and then at that same hearing, did you

20   later learn or become aware that Mr. Long was concerned about

21   a third person being present in the courtroom?

22               MR. DIENI:  I'll object again.  This calls for --

23   for hearsay.  If you're referring to a pleading, fine, just do

24   so, but I --

25               MR. COOPER:  Wait, Mr. Dieni.  I'll try my case,



1   okay?

2            MR. DIENI:  Thank you.

3            MR. COOPER:  May I have a ruling from the Court?

4            THE COURT:  Could I have the question again?

5            MR. DIENI:  Lack of personal knowledge.

6            MR. COOPER:  I asked him if he later became aware of

7   a concern by Mr. Long that there was a third person in the

8   courtroom.

9            THE COURT:  All right.  Well --

10  A    I -- I think in the same pleadings --

11           THE COURT:  -- I'll permit you to answer that ques-

12  tion.  Go ahead.

13  A    Sorry, Your Honor.  I -- I think in the same pleadings

14  where he made complaints about having his laptop taken by the

15  Marshals, he also asked questions about who was the third per-

16  son present in the courtroom.

17  BY MR. COOPER:

18  Q    So pleadings were prepared.

19  A    Yes.

20  Q    Okay.  Turning your attention, please, to Exhibit Number

21  8.

22                        (Pause)

23  Do you have that before you?

24  A    Yes, I do.

25  Q    Is that one of the pleadings to which you were just re-

1  ferring?

2  A    Yes, it is.

3  Q    And what does Mr. Long have to say there?

4                        (Pause)

5  Well, first of all, let me go up here -- let's get the caption

6  of the pleading and the date.  On Exhibit Number 8, what's the

7  caption?

8  A    It's "Motion to the Court for a Protective Order From the

9  Actions of the Federal Marshals."  I'm skimming it.  I -- I

10 think the gist of the motion is that he wants in future court

11 proceedings to be allowed to bring his laptop into the court-

12 room, and he's also complaining about the past incident where

13 it was taken away.

14 Q    And drawing you attention to the first paragraph, this is

15 what he's complaining about, correct?

16 A    Yes.

17            MR. COOPER:   Okay.  Exhibit Number 9, please.

18                        (Pause)

19 BY MR. COOPER:

20 Q    Drawing your attention to number nine.  What is this?

21 A    It's titled "Motion for Report of Ex Parte Communications

22 Between Justice Roberts, Timothy W. Terrell, and an Unidenti-

23 fied Person at the Oral Arguments August 13, 2001."

24 Q    And here he -- he writes:

25            "At the end of the oral arguments on August 13,

1    2001, before Justice Roberts, as plaintiff was leav-

2    ing the courtroom, a beeline was made by the justice

3    and counsel Terrell" -- "Terrell for this third un-

4    known person present presumed to be a federal law

5    enforcement agent, placed behind plaintiff for the

6    forbidden purpose it seems of the intimidation of

7    this plaintiff, intended to have a chilling effect

8    on plaintiff and plaintiff's arguments before this

9    court, violating plaintiff's rights again by this

10   court as stated by plaintiff in court proceedings at

11   the time."

12   Mr. Terrell, does this writing accurately reflect what you

13   recall that occurred at the end of the proceedings on August

14   13, 2001?

15   A    No.  I mean there -- there was a federal Marshal or I

16   think may -- maybe have two of them, I can't recall, but there

17   were a couple of them that were assigned working normal court-

18   room security and were -- were seated, you know, kind of be-

19   hind the bar like as you see that wall there that -- behind

20   you.  But Justice Roberts -- the door that normally leads out

21   to his chambers goes to the side and he went -- went out that

22   way like he normally would in any court proceeding, and I'm

23   sure I -- I'm pretty sure that I stayed for a few minutes and

24   chatted with the Marshals, and then left for my office.

25   Q    Show you the second page, Mr. Terrell.

1                          (Pause)

2    Where it says:

3              "As the above being the case, plaintiff must assume

4              that ex parte communications took place with this

5              long history of bad acts by this court over the last

6              two years of this civil rights suit."

7    Were there any ex parte communications between you and Judge

8    Roberts on that day?

9    A    No, there were not.  All -- I -- I became concerned over

10   the course of the lawsuit a little bit about security issues,

11   and I -- I called Judge Roberts' secretary the morning before

12   the hearing and -- and inquired if the Marshals would be pres-

13   ent, and she said she thought they would, and that was the end

14   of the question.  I certainly didn't ever talk to Justice --

15   Judge Roberts.

16   Q    So your comment was in the nature of inquiry --

17   A    Yeah.  Just a --

18   Q    -- of the court's -- court staff on whether or not secu-

19   rity was going to be present.

20   A    Ver -- very simple one-minute conversation.

21   Q    Showing you Exhibit Number 10, please.

22                          (Pause)

23   What was this pleading, Mr. Terrell?

24                          (Pause)

25   A    Well, as you mentioned earlier, there's a system in fed-

1  eral court with some of these cases where they're assigned to

2  a -- a judge and a magistrate judge for reports and recommen-

3  dations.  In this case, there had been a summary judgment

4  filed I think by the State, and then Magistrate Judge Roberts

5  had issued his report and recommendations saying how -- how

6  he thought the motion should be ruled on.  And the way it

7  works is once the magistrate's issued the report and recommen-

8  dation, then both parties get to file their objections to his

9  suggested disposition of the motion and then the district

10  court judge like Judge Sedwick can consider both the magis-

11  trate's report and recommendations and anything that the par-

12  ties may have said in their objections.  And this document

13  here would be Mr. Long's objections to Magistrate Judge Rob-

14  erts' report and recommendation on the summary judgment mo-

15  tion.

16  Q    Now on the first page in the second paragraph, do you see

17  that?

18  A    Yes.

19  Q    Do -- do you see a reference in there to a protected spe-

20  cies of property with inherent property rights?

21  A    Yes.

22  Q    What is your understanding about what Mr. Long was seek-

23  ing to get the judge to do with respect to this ruling?

24  A    He wanted the judge to address a claim that he had made

25  throughout the course of the proceedings that a driver's li-

Terrell - Direct                              1-61

1   cense was in essence a species -- a form of property and that,

2   thus, you know the -- the federal due process clause that says

3   you can't be deprived of life, liberty or property without due

4   process, and he argued that the State had not given him the

5   proper due process when they had taken away his -- his

6   driver's license in 1997, so -- but as a foundational matter,

7   he wanted the judge to address this issue about it being a --

8   a property right.

9   Q    To your recollection, did -- did Judge Roberts or Judge

10  Singleton ever make a ruling on whether or not it was a pro-

11  tected species of property with inherent property rights?

12  A    Like I say, the file is so voluminous, I'm not sure.

13  They may have -- I mean, I -- I -- I think certainly at some

14  point the State would -- would have no issue conceding that,

15  you know, there's Alaska case law that says it's a -- it's a

16  property right, once you have it, anyway.

17  Q    Now in the litigation of Mr. Long's claims against the

18  County of Los Angeles and others, was there an issue about --

19  ever raised about what is the appropriate Alaska law -- the

20  law of the State of Alaska to be applied in this federal civil

21  rights case?

22  A    Yes.

23  Q    And could you explain that process to the jury?

24  A    Meaning --

25  Q    Well, why is it that the -- the law of the State of

1    Alaska would be drawn into a federal civil rights case as pre-

2    sented by Mr. Long?

3    A    Well, because once -- it's a federal civil rights law-

4    suit, which requires that you're -- you -- you'll be litigat-

5    ing issues involving constitutional issues.  But once you get

6    beyond that, you can still have subsidiary state law issues.

7    In this case, since it involved Alaska driver's licensing

8    laws, our interpretation of -- of -- DMV's interpretation of

9    those became relevant in the case and --

10   Q    Well, what if anything happens if a United States Dis-

11   trict Court judge believes that the -- the law of Alaska is

12   unclear on an issue?

13   A    Well, that's what happened to -- in this case.  There --

14   some foundational underlying questions about whether the

15   Alaska law permitted DMV to revoke Mr. Long's license led the

16   district court judge in this case to certify questions of

17   state law to the Alaska Supreme Court to have them answer the

18   questions.  Rather than taking it upon himself to rule on is-

19   sues of state law, the judge decided to -- to let the Alaska

20   Supreme Court have the first crack at that.

21   Q    Is there an Alaska appellate rule that cov -- covers is-

22   sues like that?

23   A    Yes.  That's Rule 407.

24   Q    The appel -- the Alaska Appellate Rules of --

25   A    Yes.



Terrell - Direct                                    1-63

1   Q    -- Rules of Appellate Procedure.  Okay.  And just so

2   we're -- we're clear on it, was a Rule 407 certification ever

3   attempted in this case to determine matters of Alaska law?

4   A    Yes, it -- in the last three or four months, the judge

5   assigned to the case has issued a Rule 407 certification and

6   the Alaska Supreme Court has not decided whether or not yet

7   they will accept the -- the certification.

8   Q    Roughly -- based upon your experience, how long does it

9   take to get a ruling back from the Alaska Supreme Court once a

10  legal issue is certified to it on Rule 407?

11  A    I'm not sure because a Rule 407 certification is rela-

12  tively unusual. The normal time for typical appeals in the

13  Alaska Supreme Court is incredibly slow.  It's -- from time to

14  filing notice of appeal to actual decision is about two years.

15  My sense is that probably with the certification from the fed-

16  eral court, they would perceive it as a little bit more impor-

17  tant and they might speed it up and actually rule in maybe a

18  year or something like that.

19          MR. COOPER:  Your Honor, it's now four twenty-eight.

20          THE COURT:  Is this a logical time to break your

21  questioning?

22          MR. COOPER:  Yes, Your Honor.

23          THE COURT:  All right.  Ladies and gentlemen, we're

24  going to start tomorrow at nine-thirty rather than nine a.m.,

25  so we'll resume again tomorrow at nine-thirty.  Mr. Terrell,

1-64

1  I'm sorry, sir, we'll have to ask you to come back tomorrow
2  morning at nine-thirty.

3          THE WITNESS:  Sure.

4          THE COURT:  You're free to go for the evening if you
5  like.

6          Ladies and gentlemen, before you leave, let me re-
7  mind you of my earlier admonitions not to discuss this case
8  with anyone nor permit anyone to do so in your presence.  If
9  anybody attempts to do that, please notify me by giving a
10  writing to the Clerk who's assisting me and we can address the
11  problem.  Do avoid contact with the new media where from time
12  to time there are reports of things that have happened here in
13  the courtroom.  Although I haven't seen any reporters in here
14  today, nevertheless it is important that you avoid that sort
15  of possible contact.

16          And so with that, the jury is excused with my thanks
17  for your attention today.  We'll see you back here in the
18  courtroom at nine-thirty, so be in the jury assembly room by
19  nine-fifteen.  The jury's excused.  You may step down, sir.
20  I'll ask the parties to remain briefly.

21                      (Pause)

22      (Jury out at 4:32 p.m.)

23          THE COURT:  All right.  The jury has left the room.
24  One of the reasons that I asked them to come back at nine-
25  thirty tomorrow relates to my calendar, though to be candid, I

1-65

1   can't recall if tomorrow or the next day is the problem.  But

2   I had another consideration.  It seems to me by starting at

3   nine-thirty, we have ample time for Mr. Long simply to go home

4   to Seward tonight and come back tomorrow morning.  Is there

5   any reason he can't do that?

6          THE DEFENDANT:  We just barely made it today.  The

7   electronic monitoring went bad last night and it was talking

8   to itself all night.  We haven't had any sleep.  I'm not re-

9   ally sure we'd be safe driving home tonight, Your Honor.

10         THE COURT:  Well, no, you weren't doing the driving.

11         THE DEFENDANT:  Say again?

12         THE COURT:  You weren't doing the driving.

13         THE DEFENDANT:  Well, she hasn't had any sleep ei-

14   ther.

15         THE COURT:  Well, the alternative may be to have you

16   stay here in the Marshal's facilities.  Is there any way we

17   can set up electronic monitoring here in Anchorage?

18                 (Pause)

19         PROBATION OFFICER:  See, Your Honor, the electronic

20   monitoring could be set up in Anchorage only at a private res-

21   idence.  It couldn't be set up like at a hotel.  There are --

22   they're generally not open to that kind of thing.

23         THE COURT:  Mr. Dieni, do you have any private resi-

24   dence where your client can spend the night?

25         MR. DIENI:  Not to my knowledge.

1-66

1          THE DEFENDANT:  We'll dri -- we'll drive home, Your

2    Honor.  Is the monitoring repaired now?

3          THE COURT:  All right.  Well, it's four-thirty now.

4    I mean you have until nine-thirty tomorrow, so is -- is there

5    any reason why we -- is there some problem with the monitoring

6    in Seward?

7          PROBATION OFFICER:  There is a problem that occurred

8    last night, like I said, at one o'clock in the morning with

9    the phone line.  We're not sure exactly if the problem with

10   the phone line or with the electronic monitoring unit itself.

11         THE COURT:  All right.  Is there another unit

12   that --

13         PROBATION OFFICER:  What we could probably do is

14   we've got spare units.  We could hook him up -- disconnect the

15   current unit he's on, hook him up on a new unit, and just as-

16   sume it's not a phone line problem.

17         THE COURT:  Well, that would take -- I mean that

18   would solve it if it's in the monitor itself, correct?

19         PROBATION OFFICER:  Correct.

20         THE COURT:  All right.  And the phone line presum-

21   ably -- has the phone otherwise been operating to make phone

22   calls?

23         THE DEFENDANT:  I checked the phone last night to

24   make sure.  It had a good dial tone.

25         THE COURT:  All right.  Well, let's do that.  And I



1-67

1   would appreciate it if you did it as promptly as possible so

2   these folks can hit the road for Seward.  It's a bit of a

3   drive.

4           PROBATION OFFICER:  We could do it directly after

5   the court hearing, Your Honor.

6           THE COURT:  Okay.  Well, we're -- unless there's

7   something one of the parties wished to bring up, then I'd like

8   you to do that promptly so Mr. Long can get home and get some

9   sleep.  Anything further that either of you has to bring up?

10          MR. DIENI:  I -- I did have one concern, Your Honor,

11  and that was one of the documents that was supplied to me to-

12  day -- Mr. Terrell -- is a statement by my client to a Penny

13  Agianos (ph) --

14          MR. COOPER:  The Government does not intend to in-

15  troduce that anyway, Your Honor.

16          MR. DIENI:  All right.  Okay.

17          THE COURT:  All right.  That -- that resolves that.

18  All right.  Then I'll see you back here at nine-thirty tomor-

19  row morning.

20          THE CLERK:  All rise.  This matter stands in recess

21  until nine-thirty a.m.

22      (Proceedings concluded at 4:34 p.m.)

23

24

25

1-ii

1                                  **INDEX**

2                                                              Further
                     Direct    Cross    Redirect    Recross   Redirect
3
WITNESSES FOR THE
4  PLAINTIFF:

5  Timothy Terrell    1-35

6

7  EXHIBITS:                                         Marked     Received

8  PLAINTIFF:

9   1   Amended Complaint - 10/20/99                              1-40
    2   Petition for Immediate Court Date -
10       3/14/01                                                  1-40
    3   Petition for Unlimited discovery - 4/3/01                 1-40
11  4   Petition to Have the Court Answer
        Questions Relating to Bad Faith
12       Findings - 4/3/01                                        1-40
    5   Petition for Court Order of Protection
13       From Actions of Creditors in Collection
         Actions - 4/3/01                                         1-40
14  6   Petition to Order a Date of Trial Before
         a Jury - 4/3/01                                          1-40
15  7   Reply to Defense Filing of April 5, '01 -
         4/10/01                                                  1-40
16  8   Motion for Protective Order From the
         Actions of the Federal Marshals - 8/15/01                1-40
17  9   Motion for Report of Ex Parte Communications
         - 8/15/01                                                1-40
18  10  Answer to the Revised Bad Faith Recommenda-
         tions - 8/23/01                                          1-40
19  11  Minute Order - 8/28/01                                    1-40
    12  Motion for Inquest - 9/25/01                              1-40
20  13  Motion for Reconsideration - 9/31/01                      1-40
    14  Motion to Inform the Court - 9/31/01                      1-40
21  15  Motion for Rule 407 Action - 10/1/01                      1-40
    16  Order from Chambers - 10/5/01                             1-40
22  17  Motions Regarding Falsified Court Records                 1-40
    18  Order From Chambers - 10/24/01                            1-40
23  19  Order From Chambers - 1/22/02                             1-40
    20  Motion to the Court Regarding 1/22/02
24       Minute Orders of the Court in Rule 407
         Certification - 2/12/02                                  1-40
25  21  Declaration to this Court to Extension of
         Time This Court Has to Act - 2/19/02                     1-40

1-ii

1                              **INDEX**

2    EXHIBITS:                              Marked    Received

3    PLAINTIFF:

4    22   Declaration of Plaintiff's Status -
          8/25/00                                       1-40
5    23   Answer to the Revised Bad Faith Recom-
          mendation - 8/9/01                            1-40
6    24   Rebuttal to the Defense Objections -
          6/5/01                                        1-40
7    25   Motions Regarding the Court's Orders of
          October 17, 2001 - 11/9/01                    1-40
8    26   Opposition to Defense Extension of Time
          - 9/11/01                                     1-40
9    27   Statement to this Court - 8/27/01             1-40
     28   Motion for Immediate Action - 1/9/00          1-40
10   29   Order From Chambers - 2/15/02                 1-40

11                                                      Page

12   PLAINTIFF'S OPENING STATEMENT:  Mr. Cooper         1-11

13   DEFENDANT'S OPENING STATEMENT:  Mr. Dieni          1-19

14

15

16

17

18

19

20

21

22

23

24

25

1

## CERTIFICATE

2

3

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

4

5

*Donna K. Chertkow*                    *July 11, 2002*
Signature of Approved Transcriber                Date

6

7

DONNA K. CHERTKOW
Typed or Printed Name

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25